**THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

|  |  |  |
|---|---|---|
| U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, | ) ) ) | |
| Petitioner, | ) ) | |
| v. | ) ) | Civil Action No. _____ |
| THE TRUSTEES OF THE UNIVERSITY OF PENNSYLVANIA, | ) ) ) | |
| Respondent. | ) ) | |
| _____ | ) | |

**APPLICATION FOR AN ORDER TO SHOW CAUSE WHY**
**U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION'S**
**ADMINISTRATIVE SUBPOENA SHOULD NOT BE ENFORCED**

Petitioner U.S. Equal Employment Opportunity Commission ("EEOC") hereby states as follows:

1.      This is an action for enforcement of the EEOC's administrative subpoena, Subpoena No. PA-25-07, pursuant to Sections 709 and 710 of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §§ 2000e-8 & 2000e-9.

2.      Jurisdiction is conferred upon this Court by Section 706(f)(3) of Title VII, 42 U.S.C. § 2000e-5(f)(3), and by Section 11 of the National Labor Relations Act, 29 U.S.C. § 161, as amended, which is incorporated by Section 710 of Title VII, 42 U.S.C. § 2000e-9.

3.      The EEOC is the federal government agency charged with the administration, interpretation, and enforcement of Title VII, including the investigation of charges alleging unlawful employment practices. *See* 42 U.S.C. § 2000e-5.

4.      Respondent, The Trustees of the University of Pennsylvania ("Respondent") is an employer under Title VII doing business in the Commonwealth of Pennsylvania.

5.     The attached Declaration of Karen McDonough, the Deputy Director of the EEOC's Philadelphia District Office, provides the factual basis for this Application. *See* Exhibit 1 (Declaration of EEOC Deputy Director Karen McDonough). The Deputy Director's Declaration and all supporting Attachments are incorporated by reference in this Application.

6.     The EEOC is presently conducting an investigation concerning potential unlawful employment practices by Respondent in violation of Title VII.

7.     Specifically, on December 8, 2023, EEOC Chair Andrea Lucas issued Charge No. 530-2024-01963, which alleges that Respondent is "subjecting Jewish faculty (including tenured, non-tenured, and adjunct professors), staff, and other employees (including, but not limited to, students employed by the university) to an unlawful hostile work environment based on national origin, religion, and/or race." *Id.* at Attachment A.

8.     On July 23, 2025, pursuant to its statutory investigative authority under Title VII, the EEOC issued the administrative subpoena that is the subject of this Application: Subpoena No. PA-25-07 ("the subpoena"). It requires Respondent to produce information relevant to the EEOC's investigation of potential unlawful employment practices, namely religious, national origin, and race-based harassment, under Title VII. *Id.* at Attachment Q**.**

9.     On July 30, 2025, Respondent submitted to the EEOC its Petition to Revoke or Modify Subpoena pursuant to 29 C.F.R. § 1601.16(b)(1). It sought to have the subpoena revoked in its entirety.

10.     On September 2, 2025, after consideration by the Commission, EEOC served Respondent with a detailed Determination addressing Respondent's objections to the subpoena, partially modifying the subpoena, but otherwise denying its Petition to Revoke and/or Modify,

and directing compliance within 21 days. *Id.* at Attachment S. Respondent's time period within which to comply with the subpoena expired on September 23, 2025.

11.     As of the date of the filing of this Application, Respondent has refused to comply with the EEOC's subpoena.

12.     Respondent's failure to comply with the subpoena has delayed and hampered the EEOC's investigation.

WHEREFORE, the EEOC requests the following relief:

(a)     That an Order to Show Cause be issued directing Respondent to show cause why an Order should not be issued requiring it to comply with EEOC Subpoena No. PA-25-07 in its entirety.

(b)     That upon return of said Order to Show Cause, an Order be issued enforcing the subpoena in its entirety and directing Respondent to produce all information sought in the subpoena; and

(c)     That the EEOC be granted its costs incurred by instituting this action and such further relief as may be necessary and appropriate.

Respectfully submitted,
U.S. EQUAL EMPLOYMENT
OPPORTUNITY COMMISSION

/s/
DEBRA M. LAWRENCE
Regional Attorney
Philadelphia District Office
31 Hopkins Pl., Suite 1432
Baltimore, MD 21201
410 801-6691
Debra.lawrence@eeoc.gov

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, | ) ) ) | |
| Petitioner, | ) ) | |
| v. | ) ) | Civil Action No. _____ |
| THE TRUSTEES OF THE UNIVERSITY OF PENNSYLVANIA, | ) ) ) | |
| Respondent. | ) ) ) | |

**MEMORANDUM OF LAW IN SUPPORT OF
APPLICATION FOR AN ORDER TO SHOW CAUSE WHY THE EEOC'S
ADMINISTRATIVE SUBPOENA SHOULD NOT BE ENFORCED**

**INTRODUCTION**

This case is before the Court on the Application of the U.S. Equal Employment Opportunity Commission ("the EEOC" or "the Commission") for an Order to Show Cause why EEOC's administrative subpoena should not be enforced.

On December 8, 2023, EEOC Commissioner (now Chair) Andrea Lucas issued a Charge against the University of Pennsylvania ("Respondent") with the EEOC's Philadelphia District Office ("PDO"), stating she had reason to believe that since at least November 2022, Respondent

> has engaged in a pattern or practice of harassment based on national origin, religion, and or race against Jewish employees, in violation of Title VII by subjecting Jewish faculty (including tenured, non-tenured, and adjunct professors), staff, and other employees (including, but not limited to, students employed by the university) to an unlawful hostile work environment based on national origin, religion, and/or race. Specifically, the unlawful practices include, but are not necessarily limited to subjecting Jewish faculty (including tenured, non-tenured, and adjunct professors), staff, and other employees (including, but not limited to, students employed by the university) to an unlawful hostile work environment based on national origin, religion, and/or race.

1

The above allegations are based on publicly available information regarding the employer, including, but not limited to, news reporting; public statements by the employer and its leadership; publicly available letters from university board members, donors, alumni, and others; university materials; Title VI complaints filed against the employer in federal court and with the U.S. Department of Education; sworn testimony before the U.S. House Committee on Education and the Workforce.

The aggrieved individuals include a class of all current and former Jewish faculty, staff, and other employees who have been, continue to be, or may be in the future adversely affected by the unlawful employment practices complained of herein.

Exhibit 1, Declaration of Deputy Director Karen McDonough, at Attachment A. In the course of the investigation, the EEOC sought from Respondent the identification of employees exposed to the alleged harassing conduct. Respondent has refused to furnish the requested information. The EEOC thereafter issued an administrative subpoena pursuant to its authority under Title VII. Therein it again sought identification of employees exposed to the alleged harassing conduct so that it could determine whether and to what extent employees may have been subjected to a hostile work environment based on race, religion, and national origin. To date, Respondent refuses to produce the subpoenaed information. Therefore, pursuant to Title VII, the EEOC applies to this Court for entry of an order requiring Respondent to show cause why the EEOC's administrative subpoena should not be enforced and an order directing Respondent to comply with the subpoena in full.

## **FACTUAL BACKGROUND**

A.    The Charge

The charge alleges a pattern of antisemitic behavior that has been publicly displayed throughout Respondent's campus, the entirety of which is Respondent's workplace. Its then President, M. Elizabeth Magill (Magill), conveyed disapproval of these incidents through letters to the university community, to no avail. Chair Lucas understood that a Commissioner charge

was necessary, in light of the probable reluctance of Jewish faculty and staff to complain of a

harassing environment due to fear of hostility and potential violence directed against them.

    B.      Antisemitic Harassment at Respondent

    The EEOC's investigation has revealed that Chair Lucas's charge is consistent with

Magill's own characterization of antisemitic events occurring on Respondent's campus, of the

effect of such events on Jewish staff, and with Magill's admissions that the University was not

doing enough to address antisemitism. Below are just a few examples of Magill's statements:[1]

> Across the country and the world, we are witnessing pernicious acts of antisemitism, including on college and university campuses. I am appalled by incidents on our own campus, and I've heard too many heartbreaking stories from those who are fearful for their safety right here at Penn. This is completely unacceptable.
>
>         ***
>
> We can and will do better to combat antisemitism.

*Id.* at Attachment F, 11/1/23.

> Penn must do more.  Antisemitism can take many forms. Incidents on Penn's campus this fall—an individual shouting antisemitic obscenities and destroying property in Hillel, a swastika painted in an academic building, and hateful graffiti outside of a fraternity—are recent examples. Regardless of form, they are all appalling and unacceptable….. Penn has work to do.

*Id.* at Attachment G, (undated).

> There have been swastikas and hateful graffiti on our campus—here in our home. There have been chants at rallies, captured on video and widely circulated, that glorify the terrorist atrocities of Hamas, that celebrate and praise the slaughter and kidnapping of innocent people, and that question Israel's very right to exist.
>
>         ***
>
> I've heard from some that I have not been as effective as I could or should have been. This left room for doubt—doubt about my convictions, what our University believes, and how Penn moves forward from this. I regret that, and I am listening.

---

[1] The EEOC is mindful that at the subpoena enforcement stage, it need not prove merits of the underlying charge. These excerpts are offered to show the extreme likelihood that numerous employees, all of whom Respondent refuses to identify, were exposed to the incidents described.

***

Our Jewish community is afraid.

*Id.* at Attachment H, 11/3/23.

> Today I learned that a small number of Penn staff members received vile, disturbing antisemitic emails that threatened violence against members of our Jewish community, specifically naming Penn Hillel and Lauder College House. These messages also included hateful language, targeting the personal identities of the recipients.

*Id.* at Attachment I, 11/6/23.

> Last night, vile, antisemitic messages were projected onto several campus buildings, including on Penn Commons, Huntsman Hall, and Irvine Auditorium.

***

> For generations, too many have masked antisemitism in hostile rhetoric. These reprehensible messages are an assault on our values and cause pain and fear for our Jewish community.

*Id.* at Attachment J, 11/9/23.

> Over the past few weeks, Penn has experienced appalling acts of antisemitism and other forms of hate on our campus—swastikas drawn on our walls, hateful antisemitic messages projected on our buildings, disturbing emails threatening violence to individuals purely based on their Jewish and other identities, viral videos of people spewing hateful rhetoric or ripping down posters. Each incident is abhorrent and has brought tremendous pain to Jewish students, faculty, and staff and to our Penn community.

*Id.* at Attachment K, 11/10/23.

On November 16, 2023, Respondent convened a task force with the stated purpose of

**"*restor[ing] a sense of safety and belonging at Penn to our Jewish community ….*"** Exhibit 2,

at 3, excerpts, emphasis in original.[2] The task force conducted seven "listening sessions" to

discuss antisemitism. Per Respondent,

> A total number of 88 individuals participated in the listening sessions: 34 students (13 undergraduates, 12 non-PhD graduate and professional students, 6 PhD

---

[2] The complete Task Force Report can be found at University-Task-Force-on-Antisemitism-Report-with-Appendix_ada.pdf, last accessed November 18, 2025.

> students, and *3 postdocs); 29 staff members; and 25 faculty members (15 standing faculty and 10 non-standing)*. Participants were both Jewish and non-Jewish.

*Id.* at 29 (emphasis supplied). Respondent noted that,

> Most participants mentioned that the latest events on campus – namely, the protests, the chants, the posters and graffiti have caused a lot of fear, anxiety, distress, discomfort, isolation, and a negative sentiment amongst the Jewish community. This has led them to currently feel less safe and less comfortable in identifying themselves as Jews on campus.
>
> &ast;&ast;&ast;
>
> Some participants mentioned experiencing serious antisemitic incidents, such as assault and threats. Others shared experiences of microaggressions when offensive comments, stereotypes, and assumptions were made by supervisors, co-workers, faculty, and other students. Many students referred being excluded from clubs, social networks, or friend groups because of their religion or political views. Faculty described situations where students dropped their classes when they learned they were Jewish.
>
> &ast;&ast;&ast;
>
> Some participants felt supported by their supervisor(s) and co-workers during the protests. However, many also mentioned that there was, and still is, a lack of action and support from the university administration, faculty, and supervisors. Participants indicated that they (leaders/faculty/supervisors) have allowed antisemitism to persist with no sanctions. This impacts the ability of Jewish people to feel safe and welcomed on campus. Participants also mentioned that there were special events being scheduled without consideration for Jewish holidays.

*Id.* at 30. In addition to listening sessions, Respondent issued surveys to those unable to participate in the listening sessions. According to Respondent,

> Four hundred fifteen … people responded to at least one question on the survey… Faculty and staff were most represented in the survey data, with 141 and 154 respondents respectively. Seventy-eight graduate students, 14 postdocs, 17 undergraduates, and 11 "others" submitted responses to the survey. Some respondents only answered one or two of the three questions, but all data from answered questions were analyzed. The responses are summarized below.

*Id.* For those who experienced antisemitism, Respondent noted,

> [they] shared fears about their physical safety on campus due to protests, seeing physical signs of antisemitism such as taking down posters of Israeli hostages, antisemitic graffiti, and other overt forms of antisemitism. Some respondents were afraid to publicly show indications of their Judaism and feared being on campus.

> Many respondents felt that perpetrators of antisemitism faced minimal, if any, consequences.
>
> ***
>
> While some respondents experienced overt experiences of antisemitism and were concerned for their physical safety. Others shared experiences of microaggressions in which antisemitic comments were made or the needs of Jews on campus were ignored.
>
> ***
>
> Faculty, students, and staff shared experiences of antisemitism from supervisors or others in positions of power, including administrators and faculty.
>
> ***
>
> Respondents felt that the university administration has acted in ways that either ignore antisemitism or allow it to persist. Some faculty shared experiences in which their supervisors overlooked comments that were anti-Semitic, including disparaging comments made about fasting for Yom Kippur, or wearing a Star of David. Respondents shared that some administrators showed a lack of empathy for emotions that Jews may have been feeling after recent global events.

*Id.* After Magill's successor, Interim President Larry Jameson, took the helm, he too was forced to acknowledge persistent and ongoing antisemitism on Respondent's campus:

> I will not, and should not, respond to every event on our campus, but I want it understood that these political cartoons, posted on a personal website, were not taught in the classroom and do not reflect the views of the University of Pennsylvania or me, personally. I find them reprehensible, with antisemitic symbols, and incongruent with our efforts to fight hate. They disrespect the feelings and experiences of many people in our community and around the world, particularly those only a generation removed from the Holocaust.

Exhibit 1, Attachment L, 2/4/24. As these events persisted under Jameson, Respondent's Provost added:

> I have heard in these conversations a troubling and increasing concern about doxing and other forms of online harassment. These types of harassment can feel relentless, terrifying, and personally damaging to those who experience them. Any effort to target or intimidate members of the Penn community is unacceptable.

*Id.* at Attachment M, 2/28/24. Interim President Jameson thereafter noted,

6

> Members of our community will have different reactions to what is happening, including feeling heightened anxiety and other strong emotions. That this unrest is happening at the start of Passover undoubtedly creates further stress.

*Id.* at Attachment N, 4/22/24.

By April 2024, protesters had set up an encampment and not long thereafter, Interim President Jameson observed,

> Unfortunately, blatant violations of University policies and credible reports of harassing and intimidating conduct compel us to protect the safety and security of our campus community.
>
> The encampment itself violates the University's facilities policies. The harassing and intimidating comments and actions by some of the protesters, which were reported and documented by many in our community, violate Penn's open expression guidelines and state and federal law, including Title VI of the Civil Rights Act.[3] The vandalism of the statue in front of College Hall with antisemitic graffiti was especially reprehensible and will be investigated as a hate crime.

*Id.* at Attachment O, 4/26/24. The Provost's and Presidents' letters of disapproval to Respondent's community were ineffective at halting the antisemitism, which only increased.[4]

Throughout its investigation, the EEOC has endeavored to locate employees exposed to this harassment and to identify other harassing events not noted by Respondent in its communications, but Respondent has refused to furnish this information, thereby hampering the EEOC's investigation.

C.    Respondent's Refusal to Produce Relevant Information Sought by the EEOC

During its investigation, the EEOC issued a Request for Information ("RFI") to Respondent. Respondent refused to provide the information sought in Request Nos. 1, 5, and 7, as set forth below:

---

[3] Under both Title VI and Title VII, a showing of severe or pervasive harassment constitutes a hostile work environment. *See, e,g., Canaan v. Carnegie Mellon Univ.,* 760 F. Supp. 3d 306, 325 (W.D. Pa. 2024), citing *Doe v. Boyertown Area Sch. Dist.*, 897 F.3d 518, 534 n. 99 (3d Cir. 2018). Here, Respondent's Acting President opined that the behavior on campus violated Title VI.

[4] Respondent's submissions include harassing incidents as late as January 2025. *See id.* at Attachment P.

Request No. 1. Produce complaints by employees; including but not limited to:
faculty (including, but not limited to, tenured, non-tenured, and adjunct professors), staff,
and other employees (including, but not limited to, students employed by the University),
of discrimination based on Jewish religion, faith, ancestry/National Origin and/or
complaints of anti-Semitism from November 1, 2022, to the present. For each complaint,
produce the following information:
    a. First and Last name of complaining employee;
    b. Position title of complaining employee;
    c. Dates of employment of complaining employee;
    d. The complaint;
    e. The method of complaint (ie hotline, email, in-person, etc.);
    f. Identify Respondent Official(s) by name (first and last) and position title who
had a role in the investigation, disposition or outcome of the complaint;
    g. What the Respondent did in response to the complaint; and,
    h. Complete investigation to include witness interviews, disposition reports,
corrective action issued, etc.

*Id.* at Attachment B. For Request No. 1, taking what it called "an expansive view" of this

Request, Respondent identified just three complaints as all it had received from its workforce of

20,000 employees. It supplied a few pages of purported complaints, all lacking identification of

the complainants, and made clear that it intended to maintain the complainants' confidentiality

absent consent from the complainants to disclose their identity. *Id.* at Attachment C. Moreover,

its representation to the EEOC that it received just three complaints of antisemitism out of

20,000 employees is inaccurate, as the request specifically included "in-person" complaints,

which were received through listening sessions and survey responses conducted by the task

force.

Request No. 5. Produce a list of all clubs, groups, organizations and recreation
groups (hereinafter referred to as "organizations") related to the Jewish religion, faith,
ancestry/National Origin. For each organization listed, produce the following
information:
    a. Name of organization;
    b. Indicate if the organization is run by employees and/or volunteers;
    c. Identify the organization Point of Contact by first and last name;
    d. Produce the organizations Point of Contact's contact information to include
phone number, email address and mailing address;
    e. Produce a roster of organization members. For each member listed, indicate if
they are a University employee or volunteer;

f. For employees identified on the roster, produce their last known contact information to include personal phone number, email address and mailing address; and,
g. Produce the organization's website, if applicable.

*Id.* at Attachment B. In its response to Request No. 5, Respondent offered a list of such

organizations but refused to identify its members, again claiming confidentiality or a lack

of access to their membership rosters. It also argued that the request was overly broad and

that the information sought lacked relevance as those members of the organizations were

not any of the three complainants (which suggests that Respondent possesses information

about membership). Finally, Respondent referred the EEOC back to its Response to

Request No. 1, in which it described three anonymous complaints. *Id.* at Attachment D.

Request No. 7. Produce a list of employees in the Jewish Studies Program at the University of Pennsylvania department during the period of November 1, 2022, to the present. For each employee listed, produce the following information:
a. First and last name;
b. Position title;
c. Dates of employment;
d. Location/campus; and,
e. Last known contact information to include personal email address, phone number and mailing address.

*Id.* at Attachment B. In its response to Request No. 7, Respondent referred back to its

Responses to Request Nos. 1 and 5, and also argued that the information sought was irrelevant in

that the charge did not allege that employees from the Jewish Studies Program were subjected to

a hostile work environment. *Id.* at Attachment E.

D.    The EEOC is Compelled to Issue the Subpoena

Unable to obtain the identities of actual or potential complainants, or those who

witnessed harassment, on July 23, 2025, the EEOC served upon Respondent Subpoena No. PA

9

25-07 (the "subpoena"), the subject of the present application. *Id.* at Attachment Q. Items 1[5], 2[6], and 3[7] are identical to items 1, 5, and 7 of the previously issued RFI. The subpoena also contains additional requests seeking the identities of employees exposed to the antisemitism but not previously addressed by Respondent in its communications with the EEOC.

---

[5] <u>Subpoena Item 1:</u> Produce complaints by employees; including but not limited to: faculty (including, but not limited to, tenured, non-tenured, and adjunct professors), staff, and other employees (including, but not limited to, students employed by the University), of discrimination based on Jewish religion, faith, ancestry/National Origin and/or complaints of anti-Semitism from November 1, 2022, to the present. For each complaint, produce the following information:
a. First and Last name of complaining employee;
b. Position title of complaining employee;
c. Dates of employment of complaining employee;
d. The complaint;
e. The method of complaint (ie hotline, email, in-person, etc.);
f. Identify Respondent Official(s) by name (first and last) and position title who had a role in the investigation, disposition or outcome of the complaint;
g. What the Respondent did in response to the complaint; and,
h. Complete investigation to include witness interviews, disposition reports, corrective action issued, etc.

[6] <u>Subpoena Item 2</u>: Produce a list of all clubs, groups, organizations and recreation groups (hereinafter referred to as "organizations") related to the Jewish religion, faith, ancestry/National Origin. For each organization listed, produce the following information:
a. Name of organization;
b. Indicate if the organization is run by employees and/or volunteers;
c. Identify the organization Point of Contact by first and last name;
d. Produce the organizations Point of Contact's contact information to include phone number, email address and mailing address;
e. Produce a roster of organization members. For each member listed, indicate if they are a University employee or volunteer;
f. For employees identified on the roster, produce their last known contact information to include personal phone number, email address and mailing address; and,
g. Produce the organization's website, if applicable.

[7] <u>Subpoena Item 3</u>: Produce a list of employees in the Jewish Studies Program at the University of Pennsylvania department during the period of November 1, 2022, to the present. For each employee listed, produce the following information:
a. First and last name;
b. Position title;
c. Dates of employment;
d. Location/campus; and,
e. Last known contact information to include personal email address, phone number and mailing address.

In light of Respondent's inaccurate claim of receiving just three complaints from a workforce of over 20,000 employees, the EEOC referenced Respondent's task force's articulated process for collecting data related to antisemitism throughout campus and included in its subpoena, the following items:

> 4. Produce a list of staff and faculty members who participated in the Listening Sessions held in March 2024 as part of the University of Pennsylvania Task Force on Antisemitism (TFAS). For each staff or faculty member listed, produce the following information:
>> a. First and last name;
>> b. Position Title;
>> c. Date of employment; and
>> d. Last known contact information to include personal email address,
> phone number, and mailing address.

> 5. Produce all notes taken as part of the seven (7) listening sessions conducted in March 2024 as part of the University of Pennsylvania Task Force on Antisemitism (TFAS).

> 6. Produce a list of all faculty and staff members who received the University of Pennsylvania Task Force on Antisemitism's online Qualtrics survey. For each individual provide the following:
>> a. First and Last name;
>> b. Staff Member (Y/N);
>> c. Faculty Member (Y/N);
>> d. Position Title;
>> e. Date of Employment;
>> f. Copy all survey responses; and
>> g. Last known contact information to include personal email address,
> phone number, and mailing address.

*Id.* Respondent refuses to respond, thereby stalling the EEOC's investigation.

The final group of subpoena items stem from a complaint from a Jewish faculty member who, along with five other Jewish faculty members, had travelled to Israel, discovered that a Respondent organization called "penn.against.the.occupation" had posted on social media their group picture, their individual pictures, and their names and positions, along with a caption "Supports Scholasticide." Respondent had the post taken down, but claimed that the

organization's members were anonymous and it therefore could not identify whether they violated any policies.[8] About two months later, Respondent deregistered the organization. *Id.* at Attachment R. In an effort to identify these faculty members, the EEOC sought the following:

>7. Produce a list of staff and faculty members who were identified in the February 26, 2024 social media post from the handle "penn.against.the.occupation" captioned "We Condemn…Any Penn faculty supporting the ongoing scholasticide in Palestine." For each staff or faculty member identified, provide the following information:
>>a. First and last name;
>>b. Position Title;
>>c. Dates of employment;
>>d. Last known contact information to include personal email address, phone number, and mailing address.
>
>8. Identify the individuals who reported the "penn.against.the.occupation" February 26, 2024 social media post to the University of Pennsylvania's Division of Public Safety. For each individual identified, provide the following information:
>>a. First and last name;
>>b. Position Title;
>>c. Dates of employment;
>>d. Copy of complaint; and
>>e. Last known contact information to include personal email address, phone number, and mailing address.
>
>9. Provide the complete investigation for the "Penn Students Against the Occupation" investigative report, including witness interviews, notes, disposition reports, corrective action issued, etc.

*Id.* at Attachment Q.

On July 30, 2025, Respondent submitted a Petition to Revoke and/or Modify Subpoena pursuant to 29 C.F.R. § 1601.16(b)(1), seeking to have the subpoena revoked in its entirety. *Id.* at ¶ 15. On September 2, 2025, after consideration by the Commission, EEOC served Respondent with a detailed Determination addressing Respondent's objections to the subpoena, and limited

---

[8] Respondent explained that its investigation could not go further due to the anonymity of the group's members. This irony is not lost on EEOC, as its own investigation cannot go further due to Respondent's refusal to furnish contact information of potential victims and witnesses. But this begs the question of how Respondent was able to remove the post without knowing the members of the organization.

item 2 of the subpoena to Respondent's identification of employees, and not students,[9] but

otherwise upheld the remaining subpoena items and directed compliance within 21 days. *Id.* at

Attachment S. To date, Respondent has refused to comply with the Subpoena.

## ARGUMENT

1. The Court's Role is Limited in Assessing the Enforceability of an EEOC Subpoena.

"A district court's role in a proceeding to enforce an administrative subpoena is extremely

limited." *EEOC v. C & P Tel. Co.*, 813 F. Supp. 874, 875 (D.D.C. 1993) (citing *FTC v. Texaco,

Inc.,* 555 F.2d 862, 871–72 (D.C. Cir.), *cert. denied sub nom. Standard Oil Co. v. FTC,* 431 U.S.

974 (1977)). As the Supreme Court has stated, "A district court is not to use an enforcement

proceeding as an opportunity to test the strength of the underlying complaint." *McLane Co. Inc.

v. EEOC*, 581 U.S. 72, 76 (2017); *EEOC v. Randstad*, 685 F.3d 433, 449-50 (4th Cir. 2012)

(lower court erred in requiring the EEOC to make some showing on the merits, which is

"essentially to 'require[ ] the EEOC to make a reasonable cause showing as a prerequisite to

enforcement of the [subpoena].'") (internal citations omitted). "Rather, a district court should

'satisfy itself that the charge is valid and that the material requested is 'relevant' to the

charge.'" *McLane Co. Inc.*, 581 U.S. at 76 (quoting *EEOC v. Shell Oil Co.*, 466 U.S. 54, 72 n.26

(1984)). "It should do so cognizant of the 'generou[s]' construction that courts have given the

---

[9] Request No. 2: Produce a list of all clubs, groups, organizations and recreation groups (hereinafter referred to as "organizations") related to the Jewish religion, faith, ancestry/National Origin. For each organization listed, produce the following information:
a. Name of organization;
b. Indicate if the organization is run by employees and/or volunteers;
c. Identify the organization Point of Contact by first and last name if such Point of Contact is an employee of Respondent;
d. Produce the organizations Point of Contact's contact information to include phone number, email address and mailing address if such Point of Contact is an employee of Respondent;
e. Produce a roster of organization members who are employees of Respondent.
f. For employees identified on the roster, produce their last known contact information to include personal phone number, email address and mailing address; and,
g. Produce the organization's website, if applicable.

term 'relevant'" in the context of EEOC subpoena enforcement actions. *Id.* (quoting *Shell Oil*, 466 U. S. at 68-69 ("virtually any material that might cast light on the allegations against the employer")). "If the charge is proper and the material requested is relevant, the district court should enforce the subpoena unless the employer establishes that the subpoena is 'too indefinite,' has been issued for an 'illegitimate purpose,' or is unduly burdensome." *Id.* at 77 (quoting *Shell Oil*, 466 U.S. at 72, n.26); *C & P Tel. Co.*, 813 F. Supp. at 875 ("An administrative subpoena for an agency investigation should be enforced if the inquiry is within the authority of the agency, the demand is not too indefinite and the information sought is reasonably relevant.").

      a.      The EEOC's Subpoena is Within the Commission's Authority.

Congress has authorized, and indeed mandated, that the EEOC investigate charges of discrimination alleging a violation of Title VII. 42 U.S.C. § 2000e-5(b). Title VII "confers a broad right of access to relevant evidence: '[T]he Commission or its designated representative shall at all reasonable times have access to, for the purposes of examination, and the right to copy any evidence of any person being investigated . . . that relates to unlawful employment practices covered by [the Act] and is relevant to the charge under investigation.'" *Univ. of Pa. v. EEOC*, 493 U.S. 182, 191 (1990) (quoting 42 U.S.C. § 2000e-8(a)). "If an employer refuses to provide this information voluntarily, the Act authorizes the Commission to issue a subpoena and to seek an order enforcing it." *Id.* (citing 42 U.S.C. § 2000e-9 (incorporating 29 U.S.C. § 161)).

Here, the EEOC is investigating a Charge alleging anti-Jewish harassment in violation of Title VII. Such an investigation is within the EEOC's statutory authority under Title VII. Additionally, the subpoena was issued by an appropriate agency official and contains all the information required in the EEOC's regulations. Specifically, it states the name and address of the issuing official; identifies the information subpoenaed; identifies the person to whom, and the

place, date, and the time, at which it is returnable; and it is returnable to a duly authorized

investigator or other representative of the Commission. *Id.*; 29 C.F.R. § 1601.16(a)(3) (setting

forth subpoena requirements). Therefore, the first prong of the test has been satisfied.

      b.   The EEOC's Subpoena Seeks Relevant Information.

The information sought by the subpoena is relevant to the Charge under investigation. As

noted above, Title VII broadly grants the EEOC access to "any evidence of any person being

investigated or proceeded against that relates to unlawful employment practices covered by this

subchapter and is relevant to the charge under investigation." 42 U.S.C. § 2000e-8(a). "Since the

enactment of Title VII, courts have generously construed the term 'relevant' and have afforded

the Commission access to virtually any material that might cast light on the allegations against

the employer." *Shell Oil Co.*, 466 U.S. at 68-69; *EEOC v. Franklin & Marshall Coll.*, 775 F.2d

110, 116 (3d Cir.1985) ("The concept of relevancy is construed broadly when a charge is in the

investigatory stage."); *EEOC v. Kronos,* 620 F.3d 287, 297 (3d Cir. 2010) ("Courts have given

broad construction to the term 'relevant' and have traditionally allowed the EEOC access to

any material that 'might cast light on the allegations against the employer.'") (citing *Shell Oil

Co.*); *Randstad*, 685 F.3d at 448 ("This definition of relevance necessarily is broader than

'evidentiary relevance' because in this context '[w]e determine relevancy in terms of the

investigation,' not in terms of litigation of the merits of the underlying charge.") (internal

citations omitted). The EEOC need not demonstrate that evidence sought in the subpoena is

"necessary," only that it is relevant to the discrimination under investigation. *EEOC v. McLane

Co., Inc.*, 857 F.3d 813, 816 (9th Cir. 2017); *McLane Co. Inc.*, 581 U.S. at 86 (Ginsburg, J.,

concurring in part) ("As the Ninth Circuit correctly conveyed, however: The EEOC does not

have to show a particularized necessity of access, beyond a showing of mere relevance, to obtain

evidence.") (internal quotations omitted). The EEOC's determination of relevance is entitled to deference. *Shell Oil Co.*, 46 U.S. at 68-69 ("In this and other areas, where an agency is tasked with investigation, we 'defer to an agency's own appraisal of what is relevant so long as it is not obviously wrong.'") (internal citations omitted).

In the present case, Respondent's employees exposed to antisemitic incidents[10] are at the heart of the Commissioner's charge. Respondent, however, has refused to provide the contact information for the employees with information about the subject of the Commissioner's charge. Gathering information from Respondent's workforce regarding experiences with antisemitism in the workplace is relevant to the investigation of the Commissioner's charge and will aid the EEOC in determining both whether there is a hostile work environment and how Respondent has responded to such incidents of harassment. *See McLane Co., Inc.*, 857 F.3d at 815–16 ("But the EEOC also wants to contact other McLane employees and applicants for employment who have taken the test to learn more about their experiences. Speaking with those individuals 'might cast light' on the allegations against McLane—whether positively or negatively. . . . To pursue that path, however, the EEOC must first learn the test takers' identities and contact information, which is enough to render the pedigree information relevant to the EEOC's investigation.").

Here, on its face, the charge alleges that Respondent's workplace is replete with antisemitism, and its Presidents' and Provost's letters describing the antisemitic environment are consistent with the allegations in the charge. Identification of those who have witnessed and/or been subjected to the environment is essential for determining whether the work environment was both objectively and subjectively hostile. *Brooks v. CBS Radio, Inc.*, 342 F. App'x 771, 776

---

[10] Respondent has vigorously argued that it has not subjected its workforce to a hostile work environment. But such an argument is premature as EEOC cannot yet make this determination without communicating with the individuals Respondent refuses to identify. Moreover, that assertion is also inconsistent with admissions made by Respondent's own leadership as discussed above.

n.5 (3d Cir. Aug. 14, 2009) ("Given that the second prong, the 'severe or pervasive' element, includes both an objective and subjective inquiry, this requirement substantially overlaps with the third and fourth elements of this Circuit's hostile work environment claim, which respectively require a plaintiff to establish (i) that the discrimination detrimentally affected him and (ii) that the discrimination would have detrimentally affected a reasonable person of the same protected class in his position."). The EEOC is authorized, and indeed compelled, to investigate whether Respondent's employees have been unlawfully harassed on the basis of their race, religion, and national origin due to an organization-wide tolerance of escalating antisemitism as alleged in the charge. In order to do so, the EEOC must have access to Respondent's employees and is therefore entitled to the requested information.  For these reasons, the EEOC's subpoena items are relevant to the Commissioner charge and the EEOC has met the second prong of the subpoena enforcement test.

      c.      The EEOC's Subpoena Request is Not too Indefinite.

An administrative subpoena "can be too indefinite if its demands are overly vague or amorphous." *Walsh v. Alight Sols. LLC*, 44 F.4th 716, 724 (7th Cir. 2022). "In other words, the information or materials requested by the agency must be sufficiently specific." *EEOC v. Sinclair*, 2024 WL 3970874, at *4 (S.D. Fl. Aug. 9. 2024). There is no question that the EEOC's simple subpoena requests, seeking the most recent contact information of specific segments of Respondent's workforce during the relevant time period from November 1, 2022 to the present, are sufficiently specific and are not vague or amorphous. Therefore, this prong of the test has also been met.

      d.      Respondent Cannot Establish Undue Burden.

To preclude enforcement of the EEOC's subpoena, it is Respondent's burden to demonstrate an undue burden. *C & P Tel. Co.*, 813 F. Supp. at 875 ("a court will not enforce a subpoena if the party being investigated demonstrates that the subpoena is unduly burdensome") (citing *EEOC v. Maryland Cup Corp.*, 785 F.2d 471, 477 (4th Cir. 1986)). Respondent cannot do so. The undue burden standard in the administrative subpoena context is particularly exacting, requiring a showing that, "in light of the company's normal operating costs" compliance with the subpoena "would threaten its normal business operations. In the absence of such a threat, the subpoena is enforceable." *Maryland Cup Corp.*, 785 F. 2d at 479.

Here, the EEOC's subpoena seeking the name and contact information for certain segments of its workforce does not jeopardize Respondent's ability to continue operating. *See EEOC v. McLane Co. Inc.*, No. CV-12-02469-PHX-GMS, 2018 WL 1961162, at *2 (D. Ariz. Apr. 26, 2018) (finding that compliance with the subpoena to provide the name, social security number, date of application, date of hire, last known address, and phone number for the thousands of individuals who took the Physical Capabilities Exam from 2006 to 2018 would not be unduly burdensome to the respondent). Moreover, the subpoena dates back to November 2022, which mirrors the allegations in the charge, and accordingly is limited in temporal scope.

2. Respondent's Attempt to Shield Witness and Victim Contact Information on the Grounds of Privacy is Unwarranted.

It is well-settled that an employer's claim of privacy or confidentiality is not a valid basis on which to withhold information requested in an EEOC investigation. Indeed, Respondent has previously argued that its status as an academic institution should shield relevant information from an EEOC investigation and that a heightened showing was warranted before it was required to divulge what it deemed to be confidential information. The Supreme Court rejected this argument and reaffirmed the subpoena standards articulated above as all that is needed to warrant

enforcement of an EEOC subpoena. *Univ. of Pa. v. EEOC,* 493 U.S. at 191. In response to

Respondent's concerns about disclosing what it deemed confidential information, the Court

noted that safeguards existed to address its concerns:

> Congress did address situations in which an employer may have an interest in the confidentiality of its records. The same [42 U.S.C.]§ 2000e–8 which gives the Commission access to any evidence relevant to its investigation also makes it "unlawful for any officer or employee of the Commission to make public in any manner whatever any information obtained by the Commission pursuant to its authority under this section prior to the institution of any proceeding" under the Act. A violation of this provision subjects the employee to criminal penalties.

*Id.* at 192. Whether addressing peer review documents underlying a tenure decision -- at issue in

the above case, or personnel contact information underlying harassment allegations -- at issue

here, the same result applies. Respondent cannot be the gatekeeper between the EEOC and

potential witnesses to and victims of harassment. *See, e.g., EEOC v. AAM Holding Corp,* 736 F.

Supp. 3d 186, 192 (S.D.N.Y 2024) (rejecting employer's argument in a class harassment case

that employee privacy considerations should allow it to withhold their contact information);

*EEOC v. MTV Food, Inc.,* 2024 WL 4164507, *5 (S.D.N.Y. Sept. 12, 2024) (same, and noting

that the employer failed to address the Supreme Court's decision in *Univ. of Pa. v. EEOC*);

*EEOC v. Alliance Residential Co.*, 866 F. Supp.2d 636, 645 (W.D. Tex. 2011) (rejecting

employer's privacy argument in an ADA class case in which the EEOC requested employees

medical and contact information and noting the statutory safeguards highlighted by the Supreme

Court in *Univ. of Pa. v. EEOC).*

## CONCLUSION AND REQUEST FOR RELIEF

For the foregoing reasons, the EEOC respectfully requests that this Court grant its

Application for an Order Requiring Respondent to Show Cause why the Subpoena Should not be

Enforced, and upon giving Respondent an opportunity to be heard, enforce the subpoena in full,

order Respondent to produce all information requested in the subpoena, and order Respondent to

pay the EEOC the costs of instituting this action.

Respectfully submitted,

U.S. EQUAL EMPLOYMENT
OPPORTUNITY COMMISSION


/s/_____
DEBRA M. LAWRENCE
Regional Attorney
Philadelphia District Office
31 Hopkins Pl., Suite 1432
Baltimore, MD 21201
410 801-6691
Debra.lawrence@eeoc.gov