## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

U.S. EQUAL EMPLOYMENT
OPPORTUNITY COMMISSION,

                              Petitioner,

        v.

THE TRUSTEES OF THE UNIVERSITY OF
PENNSYLVANIA,

                              Respondent.

No. 2:25-cv-06502 (GJP)

## RESPONDENT'S ANSWER IN OPPOSITION TO
## <u>APPLICATION FOR AN ORDER TO SHOW CAUSE</u>

## TABLE OF CONTENTS

INTRODUCTION .................................................................................................................1

BACKGROUND ..................................................................................................................2

    A.    The Investigation ...............................................................................2

    B.    Penn's Responses To The Subpoena Requests .......................................4

ARGUMENT .......................................................................................................................8

I.    THE SUBPOENA DOES NOT SATISFY THE CRITERIA FOR JUDICIAL
ENFORCEMENT ......................................................................................................8

    A.    The Charge Fails To Identify Any Alleged Unlawful Employment Practice..........9

    B.    The EEOC Has Not Shown That The Lists Are Relevant To Investigating
Unlawful Employment Practices ........................................................11

    C.    The Requested Lists Are Unreasonably Burdensome ............................13

II.    PRIVACY INTERESTS OUTWEIGH THE EEOC'S NEED FOR ACCESS ................14

    A.    The Information Requested Is Private (Factors 1 And 2) ......................15

    B.    The Potential Harm From Disclosure Is Serious (Factors 3 And 4) ......................16

    C.    The Remaining Factors Do Not Tip The Scale In The EEOC's Favor
(Factors 5, 6, and 7) .......................................................................18

III.    THE DEMAND FOR MEMBERSHIP LISTS SHOULD NOT BE ENFORCED
BECAUSE IT INFRINGES UPON THE ASSOCIATIONAL RIGHTS OF PENN'S
EMPLOYEES ........................................................................................................19

IV.    MEMBERSHIP INFORMATION FOR THIRD PARTY-RUN ORGANIZATIONS
IS NOT IN PENN'S POSSESSION, CUSTODY, OR CONTROL...............................21

CONCLUSION..................................................................................................................22

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Allegheny Reproductive Health Center v. Pennsylvania Dep't of Human Services*,
    309 A.3d 808 (Pa. Jan. 29, 2024) ............................................................16

*Americans for Prosperity Foundation v. Bonta*,
    594 U.S. 595 (2021) ...............................................................................20, 21

*Arista Records, LLC v. Doe 3*,
    604 F.3d 110 (2d Cir. 2010) ....................................................................16

*Behar v. Pennsylvania Dep't of Transportation*,
    791 F. Supp. 2d 383 (M.D. Pa. 2011) ....................................................16

*Fraternal Order of Police, Lodge No. 5 v. City of Philadelphia*,
    812 F.2d 105 (3d Cir. 1987) ....................................................................15

*Fraternal Order of Police Pennsylvania Lodge v. Township of Springfield*,
    668 F. Supp. 3d 375 (E.D. Pa. 2023) .....................................................20

*EEOC v. Grinnell Fire Protection Systems Co.*,
    764 F. Supp. 623 (D. Kan. 1991) ...........................................................11

*EEOC v. Kronos, Inc.*,
    620 F.3d 287 (3d Cir. 2010) ..........................................................8, 9, 12, 13

*EEOC v. Shell Oil Co.*,
    466 U.S. 54 (1984) ................................................................10, 11, 12, 13

*EEOC v. Superior Temporary Services, Inc.*,
    56 F.3d 441 (2d Cir. 1995) .....................................................................11

*In re Subpoena No. 25-1431-014*,
    2025 WL 3252648 (E.D. Pa. Nov. 21, 2025) .......................................15

*John Doe No. 1 v. Reed*,
    561 U.S. 186 (2010) ................................................................................21

*Local 1814, Int'l Longshoremen's Ass'n, AFL-CIO v. Waterfront Commission of New York Harbor*,
    667 F.2d 267 (2d Cir. 1981) ...................................................................20

*McLane Co. v. EEOC*,
    581 U.S. 72 (2017) ...................................................................................9

*NAACP v. Alabama ex rel. Patterson*,
  357 U.S. 449 (1958) ..................................................................................................16, 20

*Pennsylvania State Education Ass'n v. Commonwealth Dep't of Community & Economic Development*,
  148 A.3d 142 (Pa. 2016) .................................................................................................15

*Rodriguez v. Maricopa County Community College District*,
  605 F.3d 703 (9th Cir. 2010) ..........................................................................................10

*Salvation Army v. Department of Community Affairs of New Jersey*,
  919 F.2d 183 (3d Cir. 1990) ............................................................................................20

*United States v. Westinghouse Electric Corp.*,
  638 F.2d 570 (3d Cir. 1980) ..........................................................................14, 15, 18, 19

*University of Pennsylvania v. EEOC*,
  493 U.S. 182 (1990) ........................................................................................................12

*U.S. Dep't of Defense v. Federal Labor Relations Authority*,
  510 U.S. 487 (1994) ........................................................................................................15

*Yakoby v. Trustees of University of Pennsylvania*,
  2025 WL 1558522 (E.D. Pa. June 2, 2025) ................................................................9, 10

**Statutes & Regulations**

29 U.S.C. § 161(2) ...................................................................................................................8

42 U.S.C.
  § 2000e-5(b) .........................................................................................................9, 10, 12
  § 2000e-8(a) .....................................................................................................................12
  § 2000e-8(e) .....................................................................................................................18
  § 2000e-9 ...........................................................................................................................8

29 C.F.R.
  § 1601.12(a)(3) ..................................................................................................................9
  § 1601.16(a) .....................................................................................................................21
  § 1601.22 ..........................................................................................................................18

**Other Authorities**

Anti-Defamation League, *New FBI Data Reflects Record-High Number of Anti-Jewish Hate Crimes* (Sept. 23, 2024), https://www.adl.org/resources/press-release/new-fbi-data-reflects-record-high-number-anti-jewish-hate-crimes ..........................17

Associated Press, *Antisemitic incidents on rise across the U.S., report finds*, PBS
(Apr. 17, 2023), https://www.pbs.org/newshour/politics/antisemitic-incidents-
on-rise-across-the-u-s-report-finds ...........................................................................17

Callum Sutherland, *The Rise of Antisemitism and Political Violence in the U.S.*, TIME
(June 2, 2025), https://time.com/7287941/rise-of-antisemitism-political-violence-in-
united-states/ .............................................................................................................17

David DiMolfetta, *EEOC experienced security incident involving contractor's
'unauthorized' access, email says*, NEXTGOV/FCW (Jan. 8, 2026),
https://www.nextgov.com/cybersecurity/2026/01/eeoc-experienced-security-incident-
involving-contractors-unauthorized-access-email-says/410543/ .............................19

Jonny Diaz, *Antisemitic Incidents Reach New High in the U.S., Report Finds*, NYTIMES
(Oct. 6, 2024), https://www.nytimes.com/2024/10/06/us/antisemitic-incidents-us-adl-
report.html ...............................................................................................................17

Masood Farivar, *Antisemitic Incidents Set All-Time High in US in 2021*, VOICE OF
AMERICA NEWS (Apr. 26, 2022), https://www.voanews.com/a/antisemitic-
incidents-set-all-time-high-in-us-in-2021-/6545852.html .....................................17

Nicole Sganga, *Cybersecurity order warns of "imminent risk" to federal agencies following
possible breach*, CBS NEWS (Oct. 15, 2025), https://www.cbsnews.com/news/f5-source-
code-cybersecurity-infrastructure-security-agency-emergency-order/ ...................19

Oliver Holmes, *Antisemitic Incidents in US Soar to Highest Level in Two Decades*, THE
GUARDIAN (Feb. 27, 2018),
https://www.theguardian.com/society/2018/feb/27/antisemitism-us-rises-anti-
defamation-league ...................................................................................................17

Sean Lyngaas & Gabe Cohen, *Hacker stole sensitive FEMA and border patrol data in
months-long breach*, CNN (Sept. 30, 2025),
https://www.cnn.com/2025/09/30/politics/hacker-stole-fema-border-patrol-data .................19

## INTRODUCTION

The issue presented in the EEOC's application is narrow but exceptionally consequential. Penn has cooperated for more than two years with the EEOC's investigation, producing nearly 900 pages of materials. The sole dispute is over the EEOC's extraordinary and unconstitutional demand that Penn assemble and produce lists of employees that reveal their Jewish faith or ancestry, associations with Jewish organizations, affiliation with Jewish studies, participation in programming for the Jewish community and/or de-anonymized responses to surveys on antisemitism, alongside their personal home addresses, phone numbers, and emails. The EEOC insists that Penn produce this information without the consent—and indeed, over the objections—of the employees impacted while entirely disregarding the frightening and well-documented history of governmental entities that undertook efforts to identify and assemble information regarding persons of Jewish ancestry. The government's demand implicates Penn's substantial interest in protecting its employees' privacy, safety, and First Amendment rights.

The EEOC's demand is not only disconcerting but also entirely unnecessary. Penn has offered to send notices to *all of its employees* informing them of the agency's desire to hear about any experiences of antisemitism, together with instructions about how to contact the EEOC directly. That comprehensive offer eliminates any possible justification for mandating compilation of the requested lists. Indeed, it reflects the obvious fact that even employees who are not Jewish may nonetheless have information about acts of antisemitism.

The EEOC's request is a particularly unjustified use of enforcement authority given the weakness of the underlying charge, which fails to identify a single allegedly unlawful employment practice or incident involving employees. Rather, premised on the unspecified suspicions of a single Commissioner, it asserts a hostile work environment for Jewish *employees* based only on unidentified news reports and claims of *students* about their experiences *as*

*students* (claims which have since failed in court). On that gossamer basis, the EEOC seeks to invade employees' private affairs and compel the disclosure of their associations without articulating any compelling interest justifying that serious burden on First Amendment rights, and even though Penn has proposed an eminently reasonable means for the agency to pursue its asserted objective in a far less intrusive and problematic manner.

Although purportedly in service of Penn's Jewish employees, the EEOC's demands have engendered fear and opposition across Penn's Jewish community. Ex. 13 at 1; Ex. 15 at 1; Ex. 18 at 1; Dkt. 14-1 at 1-2; *see also* Ex. 17 at 1; Ex. 14 at 1; Ex. 16 at 1.[1] The EEOC's application fails the standards for judicial enforcement several times over and should be denied.

## BACKGROUND

### A.    The Investigation

On December 8, 2023, Commissioner Andrea Lucas filed a charge alleging "reason to believe that since at least November 2022, [Penn] has engaged in a pattern or practice of harassment based on national origin, religion, and/or race against Jewish employees, in violation of Title VII." Ex. 1 at 1. The charge alleged Penn has "subject[ed] Jewish faculty (including tenured, not-tenured, and adjunct professors), staff, and other employees (including, but not limited to, students employed by the university) to an unlawful hostile work environment based on national origin, religion, and/or race." *Id.*

Far from "delay[ing] and hamper[ing] the EEOC's investigation," Appl., ¶11, Penn cooperated from the very start. Because the charge does not refer to *any* employee complaint the agency received, *any* allegation made by or concerning employees, or *any* specific alleged

---

[1]    All "Ex." references refer to the exhibits attached to the Declaration of Debo P. Adegbile filed concurrently herewith.

workplace incident(s) or practice(s), Penn immediately sought particulars as to the charge of a hostile workplace for Jewish employees, so that it could provide a response to the EEOC's specific concerns. Ex. 2 at 1; Ex. 5 at 1-2. The EEOC refused to provide further information, demanding that Penn provide a position statement on the charge as filed. *Id.* Penn did so on April 16, 2024, Ex. 2, after which the EEOC did not engage with Penn in any way for nearly a year. If any party "delayed" this investigation, it was the agency.

On March 5, 2025, now-EEOC Chair Lucas announced plans to target "elite universities" for allegedly allowing antisemitism on campus following the October 7, 2023 Hamas terrorist attacks, *see* Ex. 3 at 1, and on March 27, 2025, the EEOC issued a request for information ("RFI") to Penn in its long-dormant investigation. Ex. 4. Then, after dragging its feet for almost a year, the EEOC charged toward this enforcement proceeding.

Penn produced over 800 pages of materials in response to the RFI. Declaration of Debo P. Adegbile ("Adegbile Decl."), ¶7. Penn invited the EEOC to confer about Penn's responses, *see, e.g.*, Ex. 5 at 9, but the EEOC never accepted the offer. Instead, just days after Penn's second production, the EEOC issued a subpoena dated May 16, 2025; due to the agency's failure to execute service, Penn did not receive it until June 11, 2025. Adegbile Decl., ¶17; Ex. 7. On June 18, 2025, Penn filed a petition to revoke the subpoena, Adegbile Decl., ¶17, to which the EEOC did not respond, but on July 23, 2025, the EEOC reissued and served the same subpoena, Ex. 8. On July 30, 2025, Penn filed a petition to revoke or modify the subpoena for the reasons discussed herein, *see infra* 8-21; Ex. 9. The EEOC then modified slightly the demand for membership lists of Jewish organizations, clarifying that it sought only employee (not student) information. Ex. 10 at 14. The EEOC set a return date of September 23, 2025. *Id.* at 16.

On September 16, 2025, Penn notified the investigator that it intended to produce

documents in response to several requests but sought to confer about proposals for responding to other requests before providing formal responses. Ex. 11 at 2. The investigator agreed to schedule a call to discuss Penn's response proposals on September 25, 2025. *Id.*

On September 23, 2025, Penn made its initial response to the subpoena, producing an additional 53 pages of materials. Adegbile Decl., ¶21. While it did not produce the lists of employees' names and personal information at issue here, Penn advised the EEOC that it had a proposal it believed would substantially address those requests. Ex. 11 at 2.

On September 25, 2025, Penn met with the investigator and proposed satisfying the requests by sending *all* employees a notice informing them of the agency's desire to hear about any experiences of antisemitism, together with instructions about how to contact the EEOC directly. Ex. 12 at 1-2. Hours after that meeting, the investigator informed Penn that the EEOC would immediately move to enforce the subpoena. Adegbile Decl., ¶22.

### B.    Penn's Responses To The Subpoena Requests

In total, across Penn's responses to the RFIs and later subpoena, Penn has produced nearly 900 pages of material. Adegbile Decl., ¶21. What remains in dispute are the agency's demands for lists of names and personal information of employees who have objected to Penn sharing their identities with the EEOC, who associate with Jewish-related organizations, who pursue Jewish studies, and/or who submitted anonymous and confidential comments to Penn's Task Force on Antisemitism.

**Request No. 1** seeks complaints by employees of discrimination based on Jewish religion, faith, ancestry/national origin and/or complaints of antisemitism. Ex. 8 at 5. Penn identified for the EEOC all available employee complaint reporting procedures, and produced all responsive complaints received through those procedures. Adegbile Decl., ¶¶8, 10. For each complaint, Penn produced materials showing how it was made, the responding official(s), what

Penn did in response, how the complaint was resolved, and, where the complaint led to a formal investigation, the final investigative report.  Adegbile Decl., ¶10.  Penn did not produce the names of those complaining employees who objected to that disclosure.  Adegbile Decl., ¶12; *see also* Declaration of Sarah Estey ("Estey Decl."), ¶¶8-9.  Penn did produce, however, the names and contact information of two employee complainants who submitted police reports responsive to a separate request for information.  Adegbile Decl., ¶14.

**Request No. 2** seeks a list of all "clubs, groups, organizations and recreation groups … related to the Jewish religion, faith, ancestry/National Origin," including full membership rosters and personal phone numbers, email addresses, and home addresses.  Ex. 8 at 5.  Penn does not maintain such a list but undertook a search of its websites and those of its partner organizations and compiled and provided a list of organizations that appeared responsive.  Declaration of Hikaru Kozuma ("Kozuma Decl."), ¶¶8-9; Adegbile Decl., ¶15.  Penn objected, however, to assembling membership lists for those organizations and disclosing the personal information of members.  Doing so would invade their privacy and First Amendment associational rights.  Ex. 9 at 8-9.  Further, some of those organizations are *independent* parties for which Penn has neither possession or custody of, nor control over membership information.  *See* Declaration of Rabbi Rick Fox of MEOR Penn ("Fox Decl."), ¶¶4, 7; Declaration of Rabbi Gabriel Greenberg of Penn Hillel ("Greenberg Decl."), ¶¶4, 6; Declaration of Rabbi Menachem Schmidt of Penn Lubavitch House ("Schmidt Decl.), ¶¶5-6, 8-9.

**Request No. 3** seeks a list of employees in the Jewish Studies Program, including their personal phone numbers, email addresses, and home addresses.  Ex. 8 at 5-6.  A list of these employees was already publicly available on the Jewish Studies Program directory, which contains work contact information for those employees who elected to make it public.  Penn

5

produced that list, Ex. 11 at 4, but objected to producing those employees' private information. The agency can use the public directory information to contact employees with whom it wishes to speak.

**Request Nos. 4 and 6** seek a list of all staff and faculty who participated in Penn's Task Force on Antisemitism's listening sessions and survey in March 2024, including their personal phone numbers, email addresses, and home addresses.  Ex. 8 at 6.  The Task Force was charged with, among other things, engaging broadly with Penn's diverse Jewish community to understand how individuals experience antisemitism and recommending programmatic strategies to prevent and counter antisemitism on Penn's campus.  Ex. 2 at 6-7.  The Task Force held listening sessions and launched a survey, through which individuals could contribute anonymous and confidential comments.  Ex. 11 at 3.  Penn objected to providing the names of individuals who participated in the listening sessions and survey because the Task Force had expressly assured that anything said in the listening sessions or in survey responses would be confidential, all comments would be anonymized, and the anonymized, confidential feedback would be shared only with the Task Force.  Ex. 11 at 3.

**Request Nos. 5 and 6** seek all notes taken as part of the Task Force's listening sessions and all responses to the Task Force's survey.  Ex. 8 at 6.  Penn produced the Task Force's anonymized analysis of feedback at the listening sessions and in survey responses, which gives direct insight into what was said without violating the confidentiality the Task Force promised in order to obtain these observations.  Ex. 11 at 3.

**Request No. 7** seeks a list of all staff and faculty, including their personal contact information, identified in a February 2024 social media post from an account called "penn.against.the.occupation" that condemned a trip taken to Israel by Penn faculty members.

Ex. 8 at 6.  Penn produced the social media post in question.  Ex. 11 at 3.  Penn objected to the nonconsensual disclosure of the personal information of the individuals identified therein.

**Request No. 8** seeks the names and personal contact information of individuals who reported the social media post by the account "penn.against.the.occupation," as well as copies of their complaints.  Ex. 8 at 6-7.  Penn produced a report made to Penn's Division of Public Safety about the social media post, but not the identity of the reporter because they did not consent to Penn sharing it.  Adegbile Decl., ¶13.

**Request No. 9** seeks "the complete investigation" of the social media post from the account "penn.against.the.occupation."  Ex. 8 at 7.  Penn produced the full investigation report and the underlying witness interviews, redacted for personally identifying information of witnesses and students.  Ex. 11 at 3 & n.3.

\*        \*        \*

In summary, Penn has produced a large volume of documents and information responsive to the agency's requests, including information about every responsive employee complaint.  Penn is not hiding any complaints, and the EEOC has no basis to claim otherwise (*see* Appl. at 8).[2]  All Penn has objected to is constructing lists of employees that involuntarily reveal their Jewish faith or ancestry, associations with Jewish organizations and programs, and/or participation in activities related to the Jewish community, alongside their personal home addresses, phone numbers, and emails.  Penn has never had any objection to the EEOC speaking

---

[2]    The EEOC now suggests that comments made in surveys and listening sessions run by Penn's Task Force on Antisemitism were "complaints," but at no time prior to the EEOC's current application did the agency claim that its requests for "complaints" encompassed anything beyond those made through the employee reporting procedures Penn had identified.  And the fact that the agency sought those comments under different requests, referring to them as "notes" and "survey responses," *see* Ex. 8 at 6, belies any argument that they are withheld "complaints."

with its employees, and it has proposed a cooperative, transparent, pragmatic, and more comprehensive means for the EEOC to do so while avoiding significant harms.

## ARGUMENT

The EEOC's demands for the nonconsensual disclosure of highly sensitive personally identifiable employee information should not be enforced.  First, the subpoena does not satisfy the criteria for judicial enforcement.  Second, the privacy interests of Penn's employees in the information sought outweigh the agency's need to access it; Penn has offered a solution that would allow the EEOC to speak to employees without infringing on their privacy and rights. Third, the request for membership lists should not be enforced for the additional reason that it interferes with employees' freedom of assembly and association; while the Constitution thus requires "exacting scrutiny" of that request, the agency has articulated no justification for burdening those rights.  Fourth, the request for membership lists demands information that is not in Penn's possession, custody, or control.

## I.    THE SUBPOENA DOES NOT SATISFY THE CRITERIA FOR JUDICIAL ENFORCEMENT

While the EEOC has the power to issue administrative subpoenas in furtherance of its investigations of alleged discrimination, 42 U.S.C. § 2000e-9, "the EEOC's statutory investigative authority is not plenary."  *EEOC v. Kronos, Inc.*, 620 F.3d 287, 296 (3d Cir. 2010). The applicable statutes confer federal courts jurisdiction to order compliance only where *appropriate*.  *See* 29 U.S.C. § 161(2); 42 U.S.C. § 2000e-9 (cross-referencing National Labor Relations Board statutes).

To warrant enforcement, the government bears the burden of proving that: (1) the investigation has a legitimate purpose; (2) the inquiry is relevant to that purpose; (3) the information sought is not already within the government's possession; (4) procedures required by

the agency issuing the subpoena have been followed; and (5) the demand is not "unreasonably broad or burdensome." *Kronos*, 620 F.3d at 296 n.4; *accord McLane Co. v. EEOC*, 581 U.S. 72, 77 (2017). The EEOC's demand falls short on several grounds.

### A. The Charge Fails To Identify Any Alleged Unlawful Employment Practice

The EEOC has not complied with the threshold procedural requirement that it "serve a notice of … the alleged unlawful employment practice." 42 U.S.C. § 2000e-5(b); *see also* 29 C.F.R. § 1601.12(a)(3) (the charge should set forth "[a] clear and concise statement of the facts, including pertinent dates, constituting the alleged unlawful employment practices"). The EEOC's charge fails that basic requirement, as it merely states a legal conclusion: that Penn is subjecting Jewish employees to "an unlawful hostile work environment based on national origin, religion, and/or race." Ex. 1 at 1. By the EEOC's own account, the charge is only "based on" unspecified "publicly available" information, presumably about student protests in the wake of October 7 (though the charge does not say); a Title VI lawsuit brought by students, which has since been dismissed (*see Yakoby v. Trustees of University of Pennsylvania*, 2025 WL 1558522 (E.D. Pa. June 2, 2025)); and a congressional investigation that has since resulted in a report identifying no evidence that would support the charge of a hostile work environment (*see* Ex. 5 at 7-9). Ex. 1 at 1. The charge does not refer to *any* employee complaint the agency has received, *any* allegation made by or concerning employees, or *any* specific workplace incident(s) contemplated by the EEOC, nor does it even identify any *employment practice(s)* the EEOC alleges to be unlawful or potentially harmful to Jewish employees.

Penn does not deny that there have been episodic antisemitic incidents on and around its large, urban campus (as there have been at countless universities) or that there have been protests concerning events in Israel and Gaza that involve charged and, at times, vitriolic and insensitive language. If that is the basis for the EEOC's allegation of a hostile work environment (*see* Appl.

9

3-7), it was not noticed in the charge, and a court in this district has already found that "Penn has responded to the antisemitic incidents and expressions of antisemitism on its campus and has made efforts to redress these problems." *Yakoby*, 2025 WL 1558522, at *7.[3]  Nor does the fact that Penn responded to incidents surrounding student protests on matters of public concern mean that Penn has had any notice of what allegedly unlawful *employment* practices the EEOC purports to investigate; protests and other expressions in the public square do not equate to the workplace harassment of employees.  *See Rodriguez v. Maricopa Cnty. Cmty. Coll. Dist.*, 605 F.3d 703, 710 (9th Cir. 2010) ("Harassment law generally targets conduct, and it sweeps in speech as harassment only when consistent with the First Amendment.  For instance, racial insults or sexual advances directed at particular individuals in the workplace may be prohibited on the basis of their non-expressive qualities," but speech that is the "equivalent of standing on a soap box in a campus quadrangle and speaking to all within earshot" may not.).

Because the charge does not meet the minimum statutory requirements, the EEOC has not established the prerequisites to enforce the subpoena.  *See EEOC v. Shell Oil Co.*, 466 U.S. 54, 65 (1984) ("[T]he existence of a charge that meets the requirements set forth in § 706(b), 42 U.S.C. § 2000e–5(b), is a jurisdictional prerequisite to judicial enforcement of a subpoena issued by the EEOC."); 42 U.S.C. § 2000e-5(b) ("[T]he Commission *shall* serve a notice of the charge (including the date, place and *circumstances of the alleged unlawful employment practice*) on such employer[.]" (emphasis added)).

---

[3]    Penn has responded to the rise in antisemitism on college campuses and nationwide, by taking meaningful, comprehensive and concerted measures directed at eradicating antisemitism of any kind from its campus.  *See* Ex. 2 at 6-8; Ex. 5 at 2-7.  As just one example, in December 2024, Penn opened a new Office of Religious and Ethnic Interests, a stand-alone university-wide office dedicated to administering and overseeing compliance with Title VI related to religion, shared national ancestry, and ethnicity for students, faculty, and staff.  Ex. 5 at 4-5.

While courts have sometimes permitted the EEOC to enforce a subpoena issued in connection with a charge that was scarce on details, the charges in such cases still identified the alleged unlawful employment practices of which the employer was accused. *See Shell*, 466 U.S. at 73 ("The charge identified Negroes and women as the victims of respondent's putative discriminatory practices. … It alleged that respondent had engaged in discrimination in 'recruitment, hiring, selection, job assignment, training, testing, promotion, and terms and conditions of employment.'"); *EEOC v. Superior Temp. Servs., Inc.*, 56 F.3d 441, 443, 446-47, 449 (2d Cir. 1995) (charge was valid where it stated the respondent "[c]lassif[ied] and/or referr[ed] employees or applicants for employment in a way that deprives or tends to deprive them of employment opportunities" and "[f]ail[ed] and/or refus[ed] to refer [employees] for employment" based on sex); *EEOC v. Grinnell Fire Prot. Sys. Co.*, 764 F. Supp. 623, 626 (D. Kan. 1991) (hostile work environment charges were sufficient where they "allege[d] sexual harassment by [a] [s]upervisor" that "took the form of foul and sexually vulgar language, and physical contact of a sexual nature," and that an employee was "discharged in retaliation for rejecting [the supervisor's] advances"). By contrast, here there is an absence of any specific information about the circumstances or employment practices the EEOC cursorily alleges to be a "hostile work environment," Ex. 1 at 1, and a "workplace [] replete with antisemitism," Appl. at 16. The EEOC is not "permitted merely to allege that an employer has violated Title VII," *Shell*, 466 U.S. at 72-73, but that is all the charge does here.

## B.    The EEOC Has Not Shown That The Lists Are Relevant To Investigating Unlawful Employment Practices

Without having identified any alleged unlawful employment practices or other specific information related to Penn's employees, the EEOC attempts to meet its relevance burden essentially by asserting that its investigation of alleged antisemitism gives it an unbounded right

to the names and personal information of employees who participate in activities and organizations related to Judaism.

Title VII confers on the EEOC a right of access to evidence "of any person being investigated … that *relates to unlawful employment practices* covered by [the Act]." *University of Pennsylvania v. EEOC*, 493 U.S. 182, 191 (1990) (quoting 42 U.S.C. § 2000e-8(a)) (emphasis added). While the relevance requirement is not "especially constraining," *Shell*, 466 U.S. at 68, the statutes and regulations require the agency to notice the alleged unlawful employment practices, 42 U.S.C. § 2000e-5(b), and cabin the agency's investigatory authority to evidence relevant to the conduct noticed in the charge, 42 U.S.C. §2000e-8(a). *See also Shell*, 466 U.S. at 64 (observing the EEOC is "unlike other federal agencies that possess plenary authority to demand to see records relevant to matters within their jurisdiction"). That legal framework does not authorize the EEOC to demand information about any person who is part of or associated with a protected class, absent some relation between that information and alleged unlawful employment practices noticed in a valid charge. This relevance requirement "is designed to cabin the EEOC's authority and prevent fishing expeditions." *Kronos*, 620 F.3d at 297.

The agency's application does not make a cogent argument as to why the disputed employee lists are relevant to investigating (unidentified) employment practices or workplace antisemitism at Penn. For example, Request No. 2 seeks membership lists of Jewish-affiliated extracurricular organizations. Ex. 8 at 5. These organizations are connected to the educational environment at Penn, not the workplace, *see* Kozuma Decl., ¶13, and the EEOC has never explained why knowing who belongs to each organization has any plausible relevance to workplace discrimination. Likewise, Request No. 3 seeks the personal information of employees in the Jewish Studies Program, Ex. 8 at 6, but there is nothing in the charge to suggest that the

EEOC is investigating a hostile work environment for Jewish employees in this particular program or workplace practices related to the program.

Instead of explaining how the requests relate to an allegedly unlawful workplace practice, the EEOC simply asserts that it "must have access to [Penn's] employees and is therefore entitled to the requested information" because it is investigating antisemitism. Appl. at 17. Its argument posits (incorrectly) that the EEOC is entitled to the personal information of any of Penn's 20,000-plus employees whom the EEOC believes are affiliated with Judaism, regardless of at which of Penn's twelve schools or the employees' positions, locations, or jobsites. Accepting the agency's charge and its arguments on relevance would entirely upend the law, permitting a Commissioner to issue with no articulated evidentiary basis charges asserting employee discrimination and then deploy the agency's investigatory powers to find evidence justifying such charges *after* the fact. The EEOC does not have such "plenary authority to demand to see records relevant to matters within [its] jurisdiction," *Shell*, 466 U.S. at 64, and should not be permitted to engage in the fishing expedition evident here, *see Kronos*, 620 F.3d at 297.

### C.    The Requested Lists Are Unreasonably Burdensome

Penn's proposal to distribute to all its employees a notice informing them of the EEOC's request to hear from anyone about experiences with antisemitism in the workplace, and providing information about how to contact the agency directly, would allow the EEOC to pursue its stated goal in a way that does not invade employees' privacy, sense of safety, and constitutional rights or echo terrifying periods of history for Jewish communities. Penn's proposal is also more likely than the EEOC's requests to generate information for the investigation, as it would reach employees of all faith and ancestral backgrounds, regardless of

their affiliation with particular organizations or areas of study.  Indeed, it is incontrovertible that discrimination is not only observed by people in the protected class.

The EEOC's attempt to coerce the nonconsensual disclosure of personal information, associations with Jewish organizations, and/or participation in activities related to the Jewish community has alarmed Penn's Jewish community.  *See* Dkt. 14-1 at 1-2 ("In effect, these requests would require Penn to create and turn over a centralized registry of Jewish students, faculty, and staff … [and] will be experienced as a visceral threat to the safety of those who would find themselves so identified because compiling and turning over to the government 'lists of Jews' conjures a terrifying history."); Ex. 18 at 1 (Faculty Senate Executive Committee: the subpoena "compromises and puts at risk the safety and privacy of members of Penn's Jewish community and [] will play no meaningful role in combating antisemitism."); Ex. 15 at 1 (Penn Hillel and MEOR Penn: "[a]cross history, the compelled cataloging of Jews has been the source of profound danger, and collection of Jews' private information carries echoes of the very patterns that made Jewish communities vulnerable for centuries."); Dkt. 14-4, ¶12; *see also* Ex. 17 at 1; Ex. 14 at 1; Ex. 16 at 1.

Penn's proposal would give Jewish (and other) employees a way to participate in the investigation without undermining anyone's sense of safety and security or anyone's privacy and constitutional rights.  The EEOC's requests for the employee lists are thus unreasonably burdensome, to say the least.

## II.    PRIVACY INTERESTS OUTWEIGH THE EEOC'S NEED FOR ACCESS

Even where a subpoena "satisfies the criteria for judicial enforcement," a court must consider seven factors set forth in *United States v. Westinghouse Electric Corp.* in determining whether "an intrusion into an individual's privacy is justified."  638 F.2d 570, 578 (3d Cir.

1980); *see also In re Subpoena No. 25-1431-014*, 2025 WL 3252648, at *19 (E.D. Pa. Nov. 21, 2025). Those factors are:

> [1] The type of record requested, [2] the information it does or might contain, [3] the potential for harm in any subsequent nonconsensual disclosure, [4] the injury from disclosure to the relationship in which the record was generated, [5] the adequacy of safeguards to prevent unauthorized disclosure, [6] the degree of need for access, and [7] whether there is an express statutory mandate, articulated public policy, or other recognizable public interest militating toward access.

*Westinghouse*, 638 F.2d at 578. Applying the factors, the privacy interests of Penn's employees outweigh the EEOC's need for the requested lists. Penn has standing to assert its employees' privacy interests in connection with a subpoena directed to Penn, requiring assembly and production of private employee information without notice to or consent from the employees whose privacy is as stake. *See id.* at 574 (employer had standing to invoke employees' privacy interests in response to agency subpoena).

## A.    The Information Requested Is Private (Factors 1 And 2)

Under both the federal and Pennsylvania constitutions, employees have a privacy interest in avoiding the disclosure of personal matters that they reasonably expect to remain confidential. *See Fraternal Order of Police, Lodge No. 5 v. City of Philadelphia*, 812 F.2d 105, 109-10, 112-13 (3d Cir. 1987); *Pennsylvania State Educ. Ass'n v. Commonwealth Dep't of Cmty. & Econ. Dev.*, 148 A.3d 142, 150-52 (Pa. 2016). The requested lists reveal employees' faith and ancestral backgrounds; that is highly sensitive information with respect to which employees' expectation of confidentiality is strong. *See Fraternal Order*, 812 F.2d at 112-13 ("The more intimate or personal the information, the more justified is the expectation that it will not be subject to public scrutiny."). Employees likewise reasonably expect their employer will maintain the privacy of their personal home addresses and phone numbers. *See U.S. Dep't of Defense v. Federal Labor Relations Auth.*, 510 U.S. 487, 501 (1994) (holding federal employees had a privacy interest in

avoiding the disclosure of their home addresses to collective bargaining representatives, and observing "[m]any people simply do not want to be disturbed at home by work-related matters"); *Allegheny Reproductive Health Ctr. v. Pennsylvania Dep't of Hum. Servs.*, 309 A.3d 808, 902-03 (Pa. Jan. 29, 2024) (Pennsylvania constitution protects privacy interests in "names, addresses, … and telephone numbers"). Further, courts have long recognized the "vital relationship between freedom to associate and privacy in one's associations," including religious and political associations, such as those sought here. *NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449, 462 (1958); *see also Behar v. Pennsylvania Dep't of Transp.*, 791 F. Supp. 2d 383, 396 (M.D. Pa. 2011). And employees who gave anonymous comments to Penn's Task Force on Antisemitism, reasonably expect (as they were promised) that their identities and personal information will not be revealed. *See Arista Recs., LLC v. Doe 3*, 604 F.3d 110, 118 (2d Cir. 2010) ("[T]he First Amendment provides protection for anonymous speech. … To the extent that anonymity is protected by the First Amendment, a court should quash or modify a subpoena designed to breach anonymity." (collecting cases)).

**B.    The Potential Harm From Disclosure Is Serious (Factors 3 And 4)**

The lists requested necessarily identify an affiliation with Judaism alongside employees' personal home addresses, emails, and phone numbers. If the information demanded were somehow made public, *see infra* 18-19, the individuals identified on the lists could face real risk of antisemitic harm. Anti-Jewish hate and violence are serious threats to Jews (and others) in America today: anti-Jewish hate crimes constitute a substantial majority of religion-based hate

crimes,[4] and acts of violence against Jews have recently risen year after year to all-time highs,[5] with grave attacks—including the massacre at the Tree of Life synagogue and the firebombing of Governor Josh Shapiro's home—occurring in this State.  Indeed, the intervenors in this action, who assert their information would be disclosed if the subpoena is enforced, fear that disclosure would endanger their safety.  *See* Dkt. 14-3, ¶7; Dkt. 14-4, ¶11; Dkt. 14-6, ¶14.

Some of the requested lists would identify even more granular information about individuals' beliefs, views, and expressions.  For example, Request No. 2 demands membership lists, which would identify an individual's association with explicitly Zionist or anti-Zionist Jewish groups or groups aligned with certain doctrines or political views.  And Requests No. 4-5 demand the identities and personal information of individuals who understood themselves to be anonymous participants in confidential surveys and listening sessions by Penn's Task Force on Antisemitism, along with their de-anonymized contributions.  Any disclosure of this information risks chilling speech and freedom of association, among other constitutional rights.  *See* Dkt. 14-3, ¶10; Dkt. 14-4, ¶16; Dkt. 14-5, ¶10; Dkt. 14-6, ¶10; Dkt. 14-7, ¶9.

---

[4]    Anti-Defamation League, *New FBI Data Reflects Record-High Number of Anti-Jewish Hate Crimes* (Sept. 23, 2024), https://www.adl.org/resources/press-release/new-fbi-data-reflects-record-high-number-anti-jewish-hate-crimes.

[5]    *See, e.g.*, Oliver Holmes, *Antisemitic Incidents in US Soar to Highest Level in Two Decades*, THE GUARDIAN (Feb. 27, 2018), https://www.theguardian.com/society/2018/feb/27/antisemitism-us-rises-anti-defamation-league; Masood Farivar, *Antisemitic Incidents Set All-Time High in US in 2021*, VOICE OF AMERICA NEWS (Apr. 26, 2022), https://www.voanews.com/a/antisemitic-incidents-set-all-time-high-in-us-in-2021-/6545852.html; Associated Press, *Antisemitic incidents on rise across the U.S., report finds*, PBS (Apr. 17, 2023), https://www.pbs.org/newshour/politics/antisemitic-incidents-on-rise-across-the-u-s-report-finds; Jonny Diaz, *Antisemitic Incidents Reach New High in the U.S., Report Finds*, NYTIMES (Oct. 6, 2024), https://www.nytimes.com/2024/10/06/us/antisemitic-incidents-us-adl-report.html; Callum Sutherland, *The Rise of Antisemitism and Political Violence in the U.S.*, TIME (June 2, 2025), https://time.com/7287941/rise-of-antisemitism-political-violence-in-united-states/.

Moreover, disclosure to the EEOC itself would harm the relationship between Penn and its employees.  Many employees fear that their private information and associations could be shared with the federal government and vehemently oppose Penn doing so.  *See* Estey Decl., ¶9; Dkt. 14-1 at 13; Dkt. 14-3, ¶15; Dkt. 14-4, ¶17; Dkt. 14-5, ¶14.  Thus, producing the demanded lists to the EEOC would erode trust between Penn and its employees and the broader Jewish community at Penn.  Further, the lists would disclose information that was provided to Penn in confidence, such as the identities of respondents to the Task Force's surveys who were promised anonymity and individuals who submitted confidential complaints and object to the disclosure, Estey Decl., ¶9.[6]  Given employees' strong opposition to nonconsensual disclosure, disclosure would undermine Penn's efforts to solicit information about the experience of Jewish employees and deter individuals from reporting antisemitism out of fear that their personal information will be given to the government.

### C.    The Remaining Factors Do Not Tip The Scale In The EEOC's Favor (Factors 5, 6, and 7)

The "safeguards to prevent unauthorized disclosure" are inadequate.  *Westinghouse*, 638 F.2d at 578.  While the statute and regulations protect records from public disclosure "prior to the institution of any proceeding under [T]itle VII … involving such … information," 29 C.F.R. § 1601.22; *see also* 42 U.S.C. § 2000e-8(e), there is no statutory or regulatory guarantee that information obtained during an investigation will never be publicly disclosed by the agency.

---

[6]    As discussed, *supra* 4-6, Penn produced the Task Force's anonymized analysis of the anonymous feedback, and it produced the employee complaints.  The EEOC has the substance of what was said.  What is at issue is whether this information should be de-anonymized, despite the employees' expectations of privacy and express objections.

And federal agencies are not immune to data breaches.[7]  In fact, the EEOC has recently had at least one data security incident.[8]

Finally, the "degree" of the EEOC's "need for access" to the demanded lists is minimal, *Westinghouse*, 638 F.2d at 578, given Penn's proposed means for the agency to hear from employees without intruding on their privacy or infringing their rights.  This is particularly so where the EEOC has not articulated what employment practices it is investigating, how the lists are related to specific employment practices under investigation, *supra* 9-13, or why employee privacy interests should be subordinate to an agency's fishing expedition to justify an inadequate charge.

## III.   THE DEMAND FOR MEMBERSHIP LISTS SHOULD NOT BE ENFORCED BECAUSE IT INFRINGES UPON THE ASSOCIATIONAL RIGHTS OF PENN'S EMPLOYEES

Request No. 2 demands that Penn disclose the membership lists for Jewish-related organizations and the personal information of each employee member.  Ex. 8 at 5.  The forced disclosure of membership in Jewish organizations will have a substantial chilling effect on association with Penn Jewish organizations and participation in Jewish life on campus.  Dkt. 14-1 at 3 ("The prospect that the Subpoena or a similar future subpoena could be enforced will chill

---

[7]      Sean Lyngaas & Gabe Cohen, *Hacker stole sensitive FEMA and border patrol data in months-long breach*, CNN (Sept. 30, 2025), https://www.cnn.com/2025/09/30/politics/hacker-stole-fema-border-patrol-data; Nicole Sganga, *Cybersecurity order warns of "imminent risk" to federal agencies following possible breach*, CBS NEWS (Oct. 15, 2025), https://www.cbsnews.com/news/f5-source-code-cybersecurity-infrastructure-security-agency-emergency-order/.

[8]      *See* David DiMolfetta, *EEOC experienced security incident involving contractor's 'unauthorized' access, email says*, NEXTGOV/FCW (Jan. 8, 2026), https://www.nextgov.com/cybersecurity/2026/01/eeoc-experienced-security-incident-involving-contractors-unauthorized-access-email-says/410543/ (reporting that a contractor's handling of information "may have exposed personally identifiable information in records submitted to the agency by the public").

the Jewish community members' willingness to join and participate in these organizations for years to come."); Dkt. 14-3, ¶9; Dkt. 14-4, ¶16.  As the Supreme Court admonished nearly 70 years ago, "[i]t is hardly a novel perception that compelled disclosure of affiliation with groups engaged in advocacy may constitute … a restraint on freedom of association." *NAACP*, 357 U.S. at 462; *accord*, *e.g.*, *Salvation Army v. Department of Cmty. Affs. of New Jersey*, 919 F.2d 183, 201 (3d Cir. 1990) ("[F]orced disclosure may chill individuals from associating with a group engaged in expression protected by the First Amendment.").

Because of the burden on First Amendment rights, the EEOC's demand for disclosure of associations must be "reviewed under exacting scrutiny." *Americans for Prosperity Found. v. Bonta*, 594 U.S. 595, 608 (2021).  That standard applies whenever the government demands information that may infringe on associational activities, including discovery requests through litigation, *Fraternal Order of Police Pennsylvania Lodge v. Township of Springfield*, 668 F. Supp. 3d 375, 385-86 (E.D. Pa. 2023), or requests by commissions formed to identify unlawful activities, *Local 1814, Int'l Longshoremen's Ass'n, AFL-CIO v. Waterfront Commission of New York Harbor*, 667 F.2d 267, 270 (2d Cir. 1981).  The EEOC must show that there is "a substantial relation between the disclosure requirement and a sufficiently important governmental interest" and that the disclosure is "narrowly tailored to the government's asserted interest." *Americans for Prosperity*, 549 U.S. at 607-08.  The EEOC has failed to meet its burden.

There is no substantial relationship between the disclosure of employees' extracurricular association with Jewish organizations, which the EEOC seeks to compel, and the EEOC's interest in investigating workplace discrimination against Jewish employees; indeed, "[t]here is a dramatic mismatch" between the EEOC's interest "and the disclosure" it seeks.  *Americans for*

*Prosperity*, 594 U.S at 612.  The organizations act in support of the University's educational

mission; to the extent employees voluntarily associate with them, their participation is

independent of their employment.  *See* Kozuma Decl., ¶13.  The EEOC has never explained how

uncovering the extracurricular associations of Penn's employees could play any role in

advancing an investigation into workplace discrimination.  And to the extent the EEOC seeks

membership lists as an efficient way to identify individuals to contact, its desire for

"convenience does not remotely 'reflect the seriousness of the actual burden'" that the demand

for membership lists "imposes on [employees'] association rights."  *Americans for Prosperity*,

594 U.S. at 615 (quoting *John Doe No. 1 v. Reed*, 561 U.S. 186, 196 (2010)).

Certainly, the EEOC's sweeping inquiry into all employee associations with Jewish-

related organizations is not "narrowly tailored to the" agency's asserted interest in hearing about

employee experiences with antisemitism.  *Americans for Prosperity*, 594 U.S. at 608.  The

EEOC has identified nothing that suggests the employees who might have information relevant

to the EEOC's inquiry are specifically those who associate with Jewish-related organizations.

## IV.    MEMBERSHIP INFORMATION FOR THIRD PARTY-RUN ORGANIZATIONS IS NOT IN PENN'S POSSESSION, CUSTODY, OR CONTROL

Some of the organizations implicated by Request No. 2 for membership lists serve Penn's

community but are entities legally and financially separate from the University of Pennsylvania.

*See* Fox Decl., ¶¶4, 7; Greenberg Decl., ¶¶4, 6; Schmidt Decl., ¶¶5-6, 8-9.  Penn does not have

any possession or control over information about these organizations' members, *id.*, and the

EEOC may only issue subpoenas requiring production of evidence "in the possession or under

the control of the person subpoenaed."  29 C.F.R. § 1601.16(a).  The Court should not enforce

any request for information that is outside of Penn's possession and control.

## CONCLUSION

For the foregoing reasons, the Application for enforcement of the subpoena should be denied, and any further response to the subpoena should be limited to Penn's proposed notice to employees.

Dated:  January 20, 2026

Respectfully submitted,

*/s/ Debo P. Adegbile*
Debo P. Adegbile (*pro hac vice*)
WILMER CUTLER PICKERING
   HALE AND DORR LLP
7 World Trade Center
250 Greenwich Street
New York, NY 10007
Telephone: (212) 230-8864
Facsimile: (212) 230-8888
debo.adegbile@wilmerhale.com

Seth P. Waxman (*pro hac vice*)
WILMER CUTLER PICKERING
   HALE AND DORR LLP
2100 Pennsylvania Avenue, NW
Washington, DC 20037
Telephone: (202) 663-6000
Facsimile: (202) 663-6363
seth.waxman@wilmerhale.com

Sean V. Burke
Office of General Counsel
University of Pennsylvania
FMC Tower at Cira Centre South
2929 Walnut Street, Suite 400
Philadelphia, PA 19104-5099
Telephone: (215) 746-5200
Facsimile: (215) 746-5222

*Attorneys for Respondent the Trustees of the*
*University of Pennsylvania*