# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |
|---|---|
| U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION,<br><br>                         Petitioner,<br><br>v.<br><br>THE TRUSTEES OF THE UNIVERSITY OF PENNSYLVANIA,<br><br>                         Respondent. | Case No. 2:25-cv-06502 (GJP) |

## PROPOSED INTERVENORS' OPPOSITION TO THE APPLICATION FOR AN ORDER TO SHOW CAUSE

Mark A. Aronchick
Matthew A Hamermesh
Eitan G. Kagedan
HANGLEY ARONCHICK SEGAL
PUDLIN & SCHILLER
One Logan Square, 27th Floor
Philadelphia, PA 19103-6933
(215) 568-6200
maronchick@hangley.com
mhamermesh@hangley.com
ekagedan@hangley.com

Harold Craig Becker
Norman L. Eisen
DEMOCRACY DEFENDERS FUND
600 Pennsylvania Ave., S.E., No. 15180
Washington, D.C. 20003
(202) 594-9958
norm@democracydefenders.org
craig@democracydefenders.org

Witold J. Walczak
Stephen Loney
Ariel Shapell
AMERICAN CIVIL LIBERTIES
UNION OF PENNSYLVANIA
P.O. Box 60173
Philadelphia, PA 19102
(215) 592-1513
vwalczak@aclupa.org
sloney@aclupa.org
ashapell@aclupa.org

Seth Kreimer
3501 Sansom St.
Philadelphia, PA 19104
Telephone: (215) 898-7447
skreimer@law.upenn.edu

Amanda Shanor
3730 Walnut Street
Philadelphia, PA 19104
203-247-2195
shanor@upenn.edu

**TABLE OF CONTENTS**

I.     INTRODUCTION..................................................................................... 1

II.    BACKGROUND ....................................................................................... 2

III.   ARGUMENT ............................................................................................ 8

    A.    THE SUBPOENA VIOLATES THE RIGHT TO FREEDOM
         OF ASSOCIATION ......................................................... 8

        1.    The First Amendment Protects Expressive
            Association and Provides a Right Against
            Compelled Disclosure of Associational Ties............................................ 8

        2.    The Subpoena Violates Proposed Intervenors'
            Right to Expressive Association ............................................................ 10

    B.    THE SUBPOENA VIOLATES THE FREEDOM OF SPEECH .................... 12

        1.    Religious and Political Speech Lie at the Heart
            of the First Amendment........................................................................ 12

        2.    The Subpoena Chills Protected Speech and
            Violates the First Amendment............................................................... 14

    C.    THE SUBPOENA VIOLATES THE RIGHT TO ACADEMIC
         FREEDOM ........................................................................ 15

    D.    THE SUBPOENA VIOLATES PROPOSED INTERVENORS'
         RELIGIOUS RIGHTS ...................................................... 16

        1.    Both RFRA and the Free Exercise Clause Require
            Strict Scrutiny Here............................................................................ 16

        2.    The Subpoena Chills Religious Exercise and
            Violates Both RFRA and the Free Exercise Clause ............................. 17

E.    BY DEMANDING A LIST OF JEWISH EMPLOYEES —
A CLASSIFICATION BASED ON RELIGION THAT IS
SUBJECT TO HEIGHTENED SCRUTINY — THE
SUBPOENA VIOLATES EQUAL PROTECTION ........................................ 18

    1.    The Subpoena Demands a List of Religiously
-Identified Individuals and Their Personal
Contact Information ................................................................ 18

    2.    Government Action Targeting a Religious
Group Is Subject to Heightened Scrutiny ............................... 18

    3.    The Subpoena's Demand for a List of Jewish
Employees Violates Equal Protection ..................................... 19

F.    THE SUBPOENA IS NOT JUDICIALLY ENFORCEABLE ........................ 20

G.    PROPOSED INTERVENORS' PRIVACY INTERESTS
OUTWEIGH THE EEOC'S NEED FOR THE INFORMATION
IT DEMANDS ....................................................................................... 21

IV.    CONCLUSION ............................................................................................. 23

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*American Association of University Professors v. Rubio*,
   No. CV 25-10685-WGY, 2025 WL 2777659 (D. Mass Sept. 30, 2025)...................................6

*American Association of University Professors v. Trump*,
   No. 25-cv-07864-RFL, 2025 WL 3187762 (N.D. Cal. Nov. 14, 2025) ...................................6

*Americans for Prosperity Found. v. Bonta*,
   594 U.S. 595 (2021)............................................................................................9, 10, 11, 12

*Bartnicki v. Vopper*,
   532 U.S. 514 (2001)................................................................................................................14

*Bates v. City of Little Rock*,
   361 U.S. 516 (1960)..........................................................................................................10, 14

*Buckley v. American Constitutional Law Foundation, Inc*.,
   525 U.S. 182 (1999)..........................................................................................................10, 14

*Buckley v. Valeo*,
   424 U.S. 1 (1976)......................................................................................................................9

*Burwell v. Hobby Lobby Stores, Inc.*,
   573 U.S. 682 (2014)................................................................................................................17

*Capitol Square Review & Advisory Board v. Pinette*,
   515 U.S. 753 (1995)................................................................................................................14

*Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*,
   508 U.S. 520 (1993)................................................................................................................18

*Equal Employment Opportunity Commission v. Konica Minolta Business
   Solutions USA, Inc.*,
   639 F.3d 366 (7th Cir. 2011) .................................................................................................22

*Equal Employment Opportunity Commission v. Kronos, Inc.*,
   620 F.3d 287 (3d Cir. 2010)...................................................................................................21

*Equal Employment Opportunity Commission v. TriCore Reference Laboratories*,
   849 F.3d 929 (10th Cir. 2017) ...............................................................................................22

*First National Bank of Boston v. Bellotti*,
   435 U.S. 765 (1978)................................................................................................................14

*Fraternal Order of Police, Lodge No. 5 v. City of Philadelphia*,
  812 F.2d 105 (3d Cir. 1987)..................................................................10

*Hassan v. City of New York*,
  804 F.3d 277 (3d Cir. 2015)..............................................................19, 20

*Herndon v. Lowry*,
  301 U.S. 242 (1937)..........................................................................14

*Kennedy v. Bremerton School District*,
  597 U.S. 507 (2022)..................................................................14, 17, 18

*Keyishian v. Board of Regents*,
  385 U.S. 589 (1967)..........................................................................16

*Mack v. Warden Loretto FCI*,
  839 F.3d 286 (3d Cir. 2016)..................................................................17

*McIntyre v. Ohio Elections Commission*,
  514 U.S. 334 (1995)......................................................................10, 14

*McLane Co. v. Equal Employment Opportunity Commission*,
  581 U.S. 72 (2017)...........................................................................21

*National Association for the Advancement of Colored People v. Alabama ex rel.
  Patterson*,
  357 U.S. 449 (1958)........................................................................9, 11

*National Association for the Advancement of Colored People v. Claiborne
  Hardware*,
  458 U.S. 886 (1982)...........................................................................9

*President & Fellows of Harvard College v. U.S. Department of Health & Human
  Services*,
  798 F. Supp. 3d 77 (D. Mass. 2025) .............................................................6

*R.A.V. v. City of St. Paul*,
  505 U.S. 377 (1992) (Stevens, J., concurring)................................................13

*Roberts v. U.S. Jaycees*,
  468 U.S. 609 (1984)...........................................................................9

*Shelton v. Tucker*,
  364 U.S. 479 (1960)..........................................................................16

*Simon & Schuster, Inc. v. New York Crime Victims Board*,
  502 U.S. 105 (1991)..........................................................................12

*Sweezy v. New Hampshire*,
　354 U.S. 234 (1957) (plurality opinion) ........................................................13, 16

*Talley v. California*,
　362 U.S. 60 (1960)................................................................................................10

*Trinity Lutheran Church of Columbia, Inc. v. Comer*,
　582 U.S. 449 (2017)..............................................................................................18

*United States. v. Westinghouse Electric Corp.*,
　638 F.2d 570 (3d Cir. 1980)..................................................................................22

*United States v. Westinghouse Electric Corp.*,
　788 F.2d 164 (3d Cir. 1986)...........................................................................21, 24

*Virginia v. Black*,
　538 U.S. 343 (2003)..............................................................................................13

*West Virginia State Board of Education v. Barnette*,
　319 U.S. 624 (1943)..............................................................................................13

## Statutes

42 U.S.C. § 2000bb-1 .................................................................................................17

42 U.S.C. § 2000e-5...................................................................................................21

42 U.S.C. § 2000e-8...................................................................................................21

42 U.S.C. § 2000e-9...................................................................................................21

## Other Authorities

Exec. Order 14243, 90 Fed. Reg. 13681 (March 20, 2025)..........................................8

*Government databases*, Epic.org, https://epic.org/issues/surveillance-
　oversight/government-databases/...............................................................................7

Hannah Natanson, *et. al.*, *DOGE aims to pool federal data, putting personal
　information at risk*, Wash. Post (May 7, 2025) data-immigration-social-
　security/.......................................................................................................................8

Inspector General, U.S. Department of Defense, *Evaluation of the Secretary of Defense's Reported Use of Commercially Available Messaging Application for Official Business*, Rpt. No. DODIG-2026-021 (Dec. 2, 2025), https://media.defense.gov/2025/Dec/04/2003834916/-1/-1/1/DODIG_2026_021.PDF ...............................................................................7

Katie Rogers, *In Trump's Washington,  Hate Is Not a Deal Breaker*, N.Y. Times (Oct 21, 2025), https://www.nytimes.com/2025/10/21/us/politics/trump-ingrassia-republicans.html ...........................................................................8

*Protected Whistleblower Disclosure of Charles Borges Regarding Violation of Laws, Rules & Regulations, Abuse of Authority, Gross Mismanagement, and Substantial and Specific Threat to Public Health and Safety at the Social Security Administration* (Aug. 26, 2025), https://whistleblower.org/wp-content/uploads/2025/08/08-26-2025-Borges-Disclosure-Sanitized.pdf; ................................7

Robert C. Post, *Democracy, Expertise, and Academic Freedom: A First Amendment Jurisprudence for the Modern State* (2012).......................................................16

Sybil Milton, *Registering Citizens and Aliens in the Second World War*, Jewish Hist., vol. 11, no. 2, 79-87 (Fall 1997), https://www.jstor.org/stable /20101302......................7

Tom Dreisbach, *Multiple Trump White House officials have ties to antisemitic extremists*, NPR (May 14, 2025), https://www.npr.org/2025/05/14/nx-s1-5387299/trump-white-house-antisemitim...................................................................8

## I.    INTRODUCTION

This case concerns the EEOC's disturbing and unconstitutional demand that the University of Pennsylvania ("Penn" or the "University") collect and disclose to the government lists of faculty, students, and staff associated with campus Jewish organizations and the Jewish Studies Program, as well as participants in confidential listening sessions and anonymous surveys about antisemitism. The EEOC seeks to compel Penn to share membership rosters and affiliated employees' names and personal contact information, including home addresses — without these employees' consent and against many of their express wishes. Singling out organizations and individuals for such an invasion of privacy based on their actual or presumed religious affiliation would be deeply troubling under any circumstances. It is particularly chilling in light of the persecution that often has followed the compilation of lists of Jews in particular.

Against a backdrop of rising antisemitism, the prospect of forcible, nonconsensual disclosure of personal information — including not only personal phone numbers and email addresses but also home addresses, which may provide individuals' physical locations — poses a visceral threat to Jewish employees' safety and security. Far from protecting Penn's Jewish employees, the EEOC's demands have the opposite effect: the subpoena sparks fear among faculty, staff, and students associated with Jewish-identified groups and activities, potentially deterring participation in Jewish cultural, religious, academic, and political pursuits. Rather than combating discrimination, the EEOC's demand infringes the freedoms of association, speech, academic freedom, religion, and privacy enshrined in the First Amendment; the Fifth Amendment's guarantee of equal protection under the law; and the protections codified in the Religious Freedom Restoration Act ("RFRA"). In addition to violating fundamental rights, the subpoena does not meet

the requirements for judicial enforcement. And the EEOC's interest in disclosure is outweighed by the Proposed Intervenors' substantial privacy interests.

## II.    BACKGROUND

On December 18, 2023, Commissioner Andrea Lucas filed a charge alleging that Penn had "engaged in a pattern or practice of harassment based on national origin, religion, and/or race against Jewish employees, in violation of Title VII," in the form of an "unlawful hostile work environment." *See* Attach. A to Ex. 1 of EEOC's Appl. for an Order to Show Cause (ECF 1). After Penn provided a position statement dated April 15, 2024, the EEOC "did not engage with Penn in any way for nearly a year." *See* Respondent's Answer in Opp. to Appl. for an Order to Show Cause (ECF 20) at 3-4. On March 27, 2025, the EEOC issued a Request For Information ("RFI"). In response, Penn turned over hundreds of pages of documents. *Id.* The University, however, rightly refused to disclose employees' names and personal contact information, organizations' membership rosters, or the names of individuals who filed complaints about antisemitism, without their consent. *Id.* Penn offered instead to contact *every* University employee to notify them of opportunities to share information about or complaints of discrimination and harassment directly with the EEOC. *Id.* at 4. The EEOC insisted on enforcing the challenged subpoena, ultimately filing an application for an order to show cause on November 18, 2025.

The EEOC's attempt to enforce the subpoena alarmed many Jewish (and non-Jewish) faculty, staff, and students at Penn and beyond. A diverse array of organizations issued statements in support of Penn's refusal to comply with the subpoena, including Penn chapters of Hillel, Meor, and the American Association of University Professors ("AAUP"); local chapters of the Anti-Defamation League ("ADL"), the American Jewish Committee ("AJC"), and the Jewish Federation; and national organizations such as the American Council on Education, the Association

for Jewish Studies, and PEN America. On January 13, 2026, five organizations — the American Academy for Jewish Research ("AAJR"), the Jewish Law Students Association of the University of Pennsylvania Carey Law School ("JLSA"), the Penn Association of Senior and Emeritus Faculty ("PASEF"), and the AAUP and its Pennsylvania chapter (AAUP-Penn) — moved to intervene in this litigation. *See* Proposed Intervenor Defs.' Mot. Intervene (ECF 14); Proposed Intervenor Defs.' Mem. Supp. Mot. Intervene (ECF 14-1).

Each of the Proposed Intervenor organizations includes Penn employees whose names and personal contact information would be disclosed if the subpoena were enforced: members associated with campus Jewish organizations and with Penn's Jewish Studies program; members who participated in — and led — listening sessions sponsored by Penn's Task Force on Antisemitism; and members who received an anonymous survey about antisemitism. These individuals and groups express "grave concerns" about Penn handing over to the government their names, personal phone numbers, email addresses, and — perhaps most disturbingly — home mailing addresses. AAJR Decl., Ex. A to Proposed Intervenor Defs.' Mot. Intervene (ECF 14-3) at ¶ 3. They worry that "Penn's compliance with the subpoena or with similar demands would endanger employees' privacy and safety" and compromise myriad constitutional rights. *Id.* at ¶ 10.

Proposed Intervenors strongly support efforts to combat antisemitism and other forms of discrimination on university campuses and in workplaces generally. But the EEOC's subpoena is antithetical to that worthy goal. Targeting employees who are Jewish, join Jewish groups, or study topics related to Judaism "endangers the privacy, safety and freedoms of Jews and those who pursue Jewish studies or participate in Jewish-affiliated organizations." *Id.* at ¶ 7. Breaching the confidentiality promised to participants in discussions and surveys about antisemitism hinders rather than aids the fight against discrimination, as does nonconsensual disclosure of the identities

and personal information of individuals who reported or were involved in investigations of antisemitism. AAUP-Penn Decl., Ex. D to Proposed Intervenor Defs.' Mot. Intervene (ECF 14-6) at ¶ 17. At a time when threats, harassment, doxxing, and violence against Jews and other vulnerable groups are on the rise, Proposed Intervenors reasonably fear that identifying and cataloguing individuals associated with Jewish organizations is more likely to facilitate than to redress antisemitism.

Proposed Intervenors reasonably fear serious personal and systemic consequences if the subpoena is enforced. Law students' concerns include the "potential exposure of members' identity and personal information" and "unfavorable repercussions — whether professional or otherwise" attendant to having this data "turned over to the government in the context of an adversarial court proceeding." JLSA Decl., Ex. B to Proposed Intervenor Defs.' Mot. Intervene (ECF 14-4) at ¶¶ 14, 17. Faculty who led listening sessions convened by Penn's antisemitism task force worry that "[d]isclosure of participants' identity and any notes describing the discussions would violate the assurances of confidentiality" they provided to participants, "significantly compromising the trust that is essential to the integrity of such important and delicate information-exchange sessions." AAUP-Penn Decl. ¶ 7(e). Some members so dread the disclosure of their private personal details to the government — and potentially to other entities — that they asked attorneys to file their sworn declarations under seal. AAJR Decl. ¶ 15; JLSA Decl. ¶ 17.

The EEOC's demands threaten the Proposed Intervenors' religious liberty, freedom of speech and association, and academic freedom by chilling participation in activities and organizations associated with Jewish religion, politics, culture, learning, and life. "If people believe that membership in Jewish organizations could get them on a list turned over to a government agency," they "would be less likely to participate in Jewish community activities on

campus." JLSA Decl. ¶ 16. Disclosing membership rosters of campus Jewish organizations also would mean revealing the specific religious and political beliefs and affiliations of individual employees without their consent. ECF 20 at 15.

The subpoena's harm extends beyond Penn's Jewish community to affect all employees, who reasonably would fear that association with particular organizations or discussions of certain sensitive topics might subject them to government surveillance and to public exposure of their private personal information, including their physical location. PASEF believes that a government prerogative to "demand personally identifying information about arbitrary subgroups of our members, including those who have participated in particular events or talks with certain content or who have received information about such events, would have a chilling effect on our membership's participation in such events." PASEF Decl. ¶ 7, Ex. E of Mot. Intervene as Defs. (ECF 14-7). Recently retired and emeritus faculty will be deterred from continuing to associate with PASEF and with Penn if they cannot "pursue their interests, ideas, research, and teaching activities free from unexpected monitoring, interference or forced participation in matters that do not contribute to their teaching or scholarly activities." *Id*.

The federal government's punitive actions against universities and their affiliates — often undertaken in the name of combating antisemitism — heighten concerns about the potential chilling effect of collecting names, affiliations, and personal information. Utilizing lists compiled by others, the government has detained and deported non-citizen students because of their nonviolent protest activity, an effort one court characterized as "terrorizing" vulnerable people "into silence." *Am. Ass'n of Univ. Profs. v. Rubio*, No. CV 25-10685-WGY, 2025 WL 2777659, at *39 (D. Mass Sept. 30, 2025). Another court enjoined funding suspensions at Harvard University, characterizing the government's stated justification as "at best ... arbitrary and, at worst,

pretextual," and finding that the government had "used antisemitism as a smokescreen for a targeted, ideologically-motivated assault on this country's premier universities." *President & Fellows of Harvard Coll. v. U.S. Dep't of Health & Hum. Servs.*, 798 F. Supp. 3d 77, 121, 136 (D. Mass. 2025); *see also Am. Ass'n of Univ. Profs. v. Trump*, No. 25-cv-07864-RFL, 2025 WL 3187762, at *1 (N.D. Cal. Nov. 14, 2025) (describing the government's "playbook of initiating civil rights investigations of preeminent universities to justify cutting off federal funding, with the goal of bringing universities to their knees and forcing them to change their ideological tune"). Proposed Intervenors therefore fear appearing on a government list that might later be used to target or retaliate against individuals or organizations based on their religious or political affiliations and beliefs. AAUP-Penn Decl. ¶ 12–14; JLSA Decl. ¶ 12, 17; PASEF Decl. ¶ 10; AAJR Decl. ¶ 7–10.

The subpoena's ramifications reach far beyond Penn: if the government can force universities to disclose personal information without employees' consent, then "students and scholars may be discouraged and intimidated from studying topics related to Jewish studies, affiliating with Jewish studies programs, or participating in Jewish-identified academic, cultural, and religious organizations." AAJR Decl. ¶ 9. Such a government prerogative would imperil the rights "of all American scholars and students, especially those affiliated with or potentially interested in Jewish studies or related fields and disciplines." AAJR Decl. ¶ 12. Enforcement of the EEOC's subpoena would set a dangerous precedent that could allow the government to pressure or compel all kinds of employers to disclose private personal information of employees based on their religious, racial, or other identities or associations.

The broader historical context in which the EEOC demands membership rosters of Jewish organizations and private personal information of employees against their wishes exacerbates the

fear this subpoena evokes. Proposed Intervenors observe that "the grave history of turning over lists of Jews to the government" renders the subpoena "deeply frightening and profoundly dangerous." JLSA Decl. ¶ 12.[1] The AAJR, which includes many of the most prominent scholars of antisemitism, emphasizes the troubling implications of "compiling and sharing without consent individual and personal information of faculty, staff, and students based on race, ethnicity, religion, or other characteristics that have been the basis for exclusion, discrimination, and persecution in the past and present." AAJR Decl. ¶ 8.

A government demand that an employer collect and turn over lists of Jews or of other groups would be alarming in any context. It is particularly chilling in light of recent data privacy and security breaches within the federal government[2] and an unprecedented push to share data across the federal government.[3] Against a backdrop of rising antisemitism, white supremacy, and other forms of hate, the danger that lists of Jews or other groups could fall into the wrong hands

---

[1] *See, e.g.*, Katharina Kniefacz, *et. al.*, *Expulsion of teachers and students in 1938*, University of Vienna: 650 Plus: History of the University of Vienna (Dec. 5, 2024), https://geschichte.univie.ac.at/en/articles/expulsion-teachers-and-students-1938;  Sybil Milton, *Registering Citizens and Aliens in the Second World War*, Jewish Hist., vol. 11, no. 2, 79-87 (Fall 1997), https://www.jstor.org/stable /20101302.

[2] *See, e.g.*, Inspector General, U.S. Department of Defense, *Evaluation of the Secretary of Defense's Reported Use of Commercially Available Messaging Application for Official Business*, Rpt. No. DODIG-2026-021 (Dec. 2, 2025), https://media. defense.gov/2025/Dec/04/2003834916/-1/-1/1/DODIG_2026_021.PDF; *Protected Whistleblower Disclosure of Charles Borges Regarding Violation of Laws, Rules & Regulations, Abuse of Authority, Gross Mismanagement, and Substantial and Specific Threat to Public Health and Safety at the Social Security Administration* (Aug. 26, 2025), https://whistleblower.org/wp-content/uploads/2025/08/08-26-2025-Borges-Disclosure-Sanitized.pdf; *Government databases*, Epic.org, https://epic.org/issues/ surveillance-oversight/government-databases/.

[3] Exec. Order 14243, 90 Fed. Reg. 13681 (March 20, 2025) (ordering the "intra- and inter-agency sharing and consolidation" of data); Hannah Natanson, *et. al.*, *DOGE aims to pool federal data, putting personal information at risk*, Wash. Post (May 7, 2025), https://www.washingtonpost.com/business/2025/05/07/doge-government-data-immigration-social-security/.

looms especially large.[4] Proposed Intervenors therefore strenuously object to the enforcement of the EEOC's subpoena.

## III.    ARGUMENT

The EEOC's demand that Penn disclose the names, Jewish affiliations, and personal information — including personal phone numbers, email addresses, and home addresses — violates Proposed Intervenors' First Amendment association, speech, academic freedom, religion and attendant privacy rights; the Fifth Amendment's guarantee of equal protection; and rights protected under the Religious Freedom Restoration Act (RFRA). The subpoena does not meet established requirements for judicial enforcement. And the EEOC's interest in obtaining names and personal contact information is outweighed by the Proposed Intervenors' substantial privacy interests. Rather than protecting the safety or security of Jewish members of the Penn community, the subpoena evokes profound fear among Jewish faculty, staff, and students and, if enforced, would place them at greater risk of harm.

### A.    THE SUBPOENA VIOLATES THE RIGHT TO FREEDOM OF ASSOCIATION

#### 1.    The First Amendment Protects Expressive Association and Provides a Right Against Compelled Disclosure of Associational Ties

The Constitution robustly protects the right of expressive association. "[I]mplicit in the right to engage in activities protected by the First Amendment [is] a corresponding right to associate with others in pursuit of a wide variety of political, social, economic, educational, religious, and cultural ends." *Roberts v. U.S. Jaycees*, 468 U.S. 609, 622 (1984); *see also NAACP*

---

[4] *See, e.g.*, Tom Dreisbach, *Multiple Trump White House officials have ties to antisemitic extremists*, NPR (May 14, 2025), https://www.npr.org/2025/05/14/nx-s1-5387299/trump-white-house-antisemitism; Katie Rogers, *In Trump's Washington,*
*Hate Is Not a Deal Breaker*, N.Y. Times (Oct 21, 2025), https://www.nytimes.com/2025/10/21/us/politics/trump-ingrassia-republicans.html.

*v. Claiborne Hardware*, 458 U.S. 886, 908 (1982) ("Effective advocacy of both public and private points of view, particularly controversial ones, is undeniably enhanced by group association, as this Court has more than once recognized by remarking upon the close nexus between the freedoms of speech and assembly." (quotation omitted)). "[I]t is immaterial whether the beliefs sought to be advanced by association pertain to political, economic, religious or cultural matters, and state action which may have the effect of curtailing the freedom to associate is subject to the closest scrutiny." *NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449, 460–61 (1958).

The Supreme Court has long recognized "the vital relationship between freedom to associate and privacy in one's associations," *id*. at 462, because "compelled disclosure of affiliation with groups engaged in advocacy may constitute as effective a restraint on freedom of association as [other] forms of governmental action," *Ams. for Prosperity Found. v. Bonta*, 594 U.S. 595, 606 (2021) (quoting *NAACP v. Alabama*, 357 U. S. at 462); *see also Bonta*, 594 U.S. at 606–607 (Thomas, J., concurring) (compelled disclosures "directly burden[ ] the right to associate anonymously"); *Buckley v. Valeo*, 424 U.S. 1, 64 (1976) (recognizing that the Court has "repeatedly found that compelled disclosure, in itself, can seriously infringe on privacy of association and belief guaranteed by the First Amendment."). Courts routinely have struck down requirements that organizations disclose membership lists to the government or take other actions that compromise the anonymity of association. *See, e.g*., *Bates v. City of Little Rock*, 361 U.S. 516, 527 (1960) (upholding NAACP's refusal to provide members' names to municipal tax officials); *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 357 (1995) (invalidating Ohio statute that prohibited the distribution of anonymous campaign literature); *Talley v. California*, 362 U.S. 60, 65 (1960) (invalidating Los Angeles ordinance that prohibited the distribution of handbills without names and addresses of persons who prepared, distributed, or sponsored them); *Buckley v. Am.*

*Const. L. Found., Inc.*, 525 U.S. 182 (1999) ("*Buckley v. ACLF*") (holding unconstitutional Colorado statute that required persons who circulated petitions to wear name badges and report their names, addresses, and compensation to the state); *Fraternal Order of Police, Lodge No. 5 v. City of Philadelphia*, 812 F.2d 105, 119–120 (3d Cir. 1987).

Government inquiries into religious, political, social, or cultural affiliations are constitutionally suspect because they "discourage citizens from exercising rights protected by the Constitution." *Bonta*, 594 U.S. at 610–611 (quoting *Baird v. State Bar of Ariz.*, 401 U.S. 1, 6 (1971)). Compelled disclosure of an individual's associations may expose them to threats, harassment, retaliation, or physical harm. Fear of such consequences — or even a simple desire to avoid inclusion on any government list — may dissuade individuals from associating, speaking, advocating, studying, or engaging in other forms of First Amendment-protected activity. The Supreme Court has recognized that the compelled disclosure of associational ties is as constitutionally infirm as "[a] requirement that adherents of particular religious faiths or political parties wear identifying armbands." *NAACP v. Alabama*, 357 U.S. at 462.

The Constitution therefore applies "exacting scrutiny" to governmental attempts to compel disclosure of associational ties. *Bonta*, 594 U.S. at 607. Under that standard, the government must demonstrate a "substantial relation between the disclosure requirement and a sufficiently important governmental interest." *Id.* The strength of the government's interest must reflect "the seriousness of the actual burden on First Amendment rights." *Id*. And any required disclosure must be narrowly tailored to achieve the government's objective. *Id*.

**2.      The Subpoena Violates Proposed Intervenors' Right to Expressive Association**

The subpoena directly penalizes association with "all clubs, groups, organizations and recreation groups (hereinafter referred to as 'organizations') related to the Jewish religion, faith,

ancestry/National Origin" (Request No. 2); association with Jewish Studies (Request No. 3); participation in Jewish life on campus, including assembling to discuss antisemitism (Request Nos. 4 & 5); and even association with Jewish groups that are organized independently from the University but involve Penn-affiliated individuals, such as the group that traveled to Israel (Request Nos. 6 & 7).

The subpoena's burden on and chilling of association with Jewish organizations, studies, or events is neither speculative nor abstract. Jewish people across the country have faced harassment, threats, and doxxing in connection with their real or perceived religious, faith, ancestry, or political or cultural identity or affiliations. Compelled disclosure of lists identifying Jewish community members is likely to deter individuals from affiliating with the Proposed Intervenor organizations, participating in Jewish-associated meetings or programs, and engaging in efforts to fight antisemitism or in other Jewish-associated collective advocacy — for fear of exposure, reprisal, or other harms. The deeply felt need of multiple representatives of Proposed Intervenor organizations to file declarations under seal reflects those fears.

The EEOC has not met — and cannot meet — its burden under exacting scrutiny. *Bonta*, 594 U.S. at 607. Neither the subpoena nor the EEOC's Application for an Order to Show Cause explains — much less demonstrates — how Proposed Intervenors' identities and personal contact information will advance its investigation of any potentially discriminatory or unlawful employment practices at Penn. And there would seem to be no conceivable justification to demand employees' mailing addresses in addition to their personal phone numbers and email addresses.

Nor has the EEOC shown that its requests are narrowly tailored. Less intrusive means are readily available — and in fact have been proposed by the University. Penn volunteered to send notices to *all* of its employees informing them of the EEOC's interest in receiving reports of

- 11 -

antisemitism along with instructions about how to contact the EEOC directly. The EEOC could take the University up on that offer. Or it could, for example, invite voluntary submissions from community members through a hotline or rely on the extensive information Penn already has produced in response to the unchallenged portions of the subpoena. Where the government can obtain information through less restrictive means, as it can here, the First Amendment requires it to do so. *See Bonta*, 594 U.S. at 607.

The EEOC's intent is immaterial to the Constitutional violation. *Simon & Schuster, Inc. v. N.Y. Crime Victims Bd.*, 502 U.S. 105, 117 (1991) ("[I]llicit legislative intent is not the *sine qua non* of a violation of the First Amendment.") (citation omitted). Even if the EEOC seeks only to collect information that will enable the agency to investigate concerns about antisemitism, its interest does not justify — let alone require — the compelled creation and disclosure of a list of the University's Jewish community members without their consent. Enforcement of the subpoena would undermine, rather than advance, the EEOC's stated objective. The subpoena therefore violates the right of association and should not be enforced.

**B.    THE SUBPOENA VIOLATES THE FREEDOM OF SPEECH**

**1.    Religious and Political Speech Lie at the Heart of the First Amendment**

The First Amendment prohibits the government from discriminating among viewpoints or using government power to favor or disfavor certain ideas. "If there is any fixed star in our constitutional constellation," the Supreme Court has emphasized, "it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion...." *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943). "Our form of government is built on the premise that every citizen shall have the right to engage in political

expression and association." *Sweezy v. New Hampshire*, 354 U.S. 234, 250 (1957) (plurality opinion).

Political and religious speech in public discourse — the forms of speech in which Proposed Intervenor organizations engage and that were the subject of the confidential listening sessions on antisemitism attended and led by Proposed Intervenors' members — sit at the highest rung of First Amendment values. "[L]awful political speech [is] at the core of what the First Amendment is designed to protect." *Virginia v. Black*, 538 U.S. 343, 365 (2003). "Core political speech occupies the highest, most protected position" constitutionally accorded to speech. *R.A.V. v. City of St. Paul*, 505 U.S. 377, 422 (1992) (Stevens, J., concurring); *First Nat'l Bank v. Bellotti*, 435 U.S. 765, 776 (1978) (political speech "is at the heart of the First Amendment's protection"). "[I]n Anglo–American history, ... government suppression of speech has so commonly been directed *precisely* at religious speech that a free-speech clause without religion would be Hamlet without the prince." *Capitol Square Rev. & Advisory Bd. v. Pinette*, 515 U.S. 753, 760 (1995). Religious speech is in fact "doubly protect[ed]" by the First Amendment. *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 523 (2022). This "double protect[ion of] religious speech is no accident." *Id*. "It is a natural outgrowth of the framers' distrust of government attempts to regulate religion and suppress dissent." *Id*. at 524.

"When a law burdens core" speech such as this, courts "apply 'exacting scrutiny," and "uphold the restriction only if it is narrowly tailored to serve an overriding state interest." *McIntyre*, 514 U.S. at 347 (quoting *Bellotti*, 435 U.S. at 786). Only a "'need ... of the highest order'" can justify "a regulation of pure speech." *Bartnicki v. Vopper*, 532 U.S. 514, 526, 528 (2001) (quoting *Smith v. Daily Mail Publishing Co*., 443 U.S. 97, 103 (1979)).

Government mandated disclosure requirements that chill core speech must meet this exacting standard. *Buckley v. ACLF*, 525 U.S. 182, 199-200, 214 (1999) (holding unconstitutional requirements that ballot-initiative or referendum circulators, *inter alia*, wear name badges and report their names, addresses, and compensation to the state). Such disclosures may also deter assembly for the purpose of engaging in core speech. "Like freedom of speech and a free press, the right of peaceable assembly was considered by the Framers of our Constitution to lie at the foundation of a government based upon the consent of an informed citizenry." *Bates*, 361 U.S. at 522; *cf. Herndon v. Lowry*, 301 U.S. 242, 258 (1937) (holding unconstitutional state law that "penalize[d] innocent participation in a meeting held with an innocent purpose.").

> ## 2. The Subpoena Chills Protected Speech and Violates the First Amendment

For the same reasons that the First Amendment protects against compelled disclosure of individuals' associations, it prohibits the government from forcing disclosure of the identities of speakers or attendees at assemblies and other gatherings. Enforcement of the subpoena would mean that association with Jewish-affiliated campus organizations will put individuals at risk of inclusion on a government list. The Proposed Intervenors reasonably fear, therefore, that faculty, staff, and students who would otherwise join such groups will be deterred from doing so. A similar dynamic attends the compelled disclosure of the names and personal contact information of participants in listening sessions convened by the antisemitism task force, as well as notes from those discussions. If attendance at and participation in such meetings threatens to draw unwanted attention from the government, employees' right to assemble and express their views free from the prospect of public exposure, government surveillance, or retaliation are compromised. Public disclosure of the subpoenaed information, even if inadvertent, could jeopardize the safety and security of Proposed Intervenor groups and their individual members.

The subpoena's chilling effect on religious and political speech violates the First Amendment if it does not meet "exacting" constitutional scrutiny. For the reasons described above, the subpoena does not meet that standard. Its demands are not justified by the government's asserted interest, it is not narrowly tailored to achieve the government's objective, and many alternative means exist to enable employees to report concerns about discrimination and harassment to the EEOC without infringing employees' constitutional rights.

### C.    THE SUBPOENA VIOLATES THE RIGHT TO ACADEMIC FREEDOM

The Supreme Court has long held that the Constitution protects academic freedom as "a special concern of the First Amendment." *Keyishian v. Bd. of Regents*, 385 U.S. 589, 603 (1967). When it first considered academic freedom during the Red Scare, the Court explained the reasons for this special concern in stark terms:

> The essentiality of freedom in the community of American universities is almost self-evident. No one should underestimate the vital role in a democracy that is played by those who guide and train our youth. To impose any strait jacket upon the intellectual leaders in our colleges and universities would imperil the future of our Nation. … Scholarship cannot flourish in an atmosphere of suspicion and distrust. Teachers and students must always remain free to inquire, to study and to evaluate, to gain new maturity and understanding; otherwise our civilization will stagnate and die.

*Sweezy*, 354 U.S. at 250 (plurality opinion); *see also* Robert C. Post, *Democracy, Expertise, and Academic Freedom: A First Amendment Jurisprudence for the Modern State* (2012). "It is not disputed that to compel a teacher to disclose his every associational tie is to impair that teacher's right of free association, a right closely allied to freedom of speech and a right which, like free speech, lies at the foundation of a free society." *Shelton v. Tucker*, 364 U.S. 479, 485-6 (1960).

The subpoena's demand for the private information of individuals affiliated with Penn's Jewish Studies Program (Request No. 3) violates the First Amendment's protection of academic freedom. Among other infirmities, by singling out employees in Jewish studies the subpoena

exposes faculty to risks and burdens based on the subjects they research, teach, and study. The Proposed Intervenors reasonably fear that Jewish studies faculty at Penn and beyond will "be discouraged and intimidated from studying topics related to Jewish studies, affiliating with Jewish studies programs, or participating in Jewish-identified academic, cultural, and religious organizations." AAJR Decl. ¶ 9. The subpoena also infringes the academic freedom of other faculty members whose personal information might be disclosed. For example, recently retired and emeritus faculty may be deterred from engaging in academic activities at Penn if doing so risks inclusion on a government list. PASEF Decl. ¶ 7. The agency's interest is plainly insufficient to support the constitutionality of its disclosure demand and available alternatives serve the government's interests without burdening academic freedom.

### D. THE SUBPOENA VIOLATES PROPOSED INTERVENORS' RELIGIOUS RIGHTS

#### 1. Both RFRA and the Free Exercise Clause Require Strict Scrutiny Here

Congress enacted the Religious Freedom Restoration Act ("RFRA"), 42 U.S.C. § 2000bb-1(a)–(b), "in order to provide very broad protection for religious liberty." *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 693 (2014). RFRA prohibits the federal government from substantially burdening a person's exercise of religion unless it demonstrates that the burden is the least restrictive means of furthering a compelling governmental interest. *See Mack v. Warden Loretto FCI*, 839 F.3d 286, 301 (3d Cir. 2016). Because enforcement of the subpoena would deter individuals from affiliating with, supporting, or participating in Jewish religious organizations or activities, the subpoena triggers RFRA's strict-scrutiny standard, a standard that is "exceptionally demanding." *Hobby Lobby*, 682 U.S. at 728.

The Free Exercise Clause, likewise, "protects not only the right to harbor religious beliefs inwardly and secretly," but also "the ability of those who hold religious beliefs of all kinds to live

out their faiths in daily life." *Bremerton*, 597 U.S. at 524. When the government targets the members of a particular religious group for burdens — such as compelled disclosure of their private information without their consent, as here — strict scrutiny applies. *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 582 U.S. 449 (2017); *Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520 (1993). A party "may carry the burden of proving a free exercise violation in various ways, including by showing that a government entity has burdened his sincere religious practice pursuant to a policy that is not 'neutral' or 'generally applicable.'" *Bremerton*, 597 U.S. at 525. If such a showing is made, "this Court will find a First Amendment violation unless the government can satisfy 'strict scrutiny' by demonstrating its course was justified by a compelling state interest and was narrowly tailored in pursuit of that interest." *Id*. "The principle that government, in pursuit of legitimate interests, cannot in a selective manner impose burdens only on conduct motivated by religious belief is essential to the protection of the rights guaranteed by the Free Exercise Clause." *Lukumi*, 508 U.S. at 543.

**2.    The Subpoena Chills Religious Exercise and Violates Both RFRA and the Free Exercise Clause**

Compelled disclosure of the identities of members of Jewish religious organizations violates both RFRA and the First Amendment. The subpoena expressly seeks disclosure of the names and personal contact information of members of groups based on their relationship "to the Jewish religion, faith, ancestry/National Origin." (Request No. 2). In so doing, the subpoena burdens the free exercise of participants in those groups and communities. When the government seeks to compel disclosure of the identities of members of Jewish religious organizations, it risks deterring individuals from joining, worshiping with, or supporting those groups, thereby infringing both their right to associate and their right to the free exercise of religion. For the reasons

enumerated above, the subpoena is neither justified nor narrowly tailored. It therefore violates both RFRA and the Free Exercise Clause.

E.    BY DEMANDING A LIST OF JEWISH EMPLOYEES — A CLASSIFICATION BASED ON RELIGION THAT IS SUBJECT TO HEIGHTENED SCRUTINY — THE SUBPOENA VIOLATES EQUAL PROTECTION

1.    The Subpoena Demands a List of Religiously-Identified Individuals and Their Personal Contact Information

By demanding the collection and disclosure of the identities and contact information of individuals who are members of Jewish-affiliated organizations and the Jewish Studies program, the subpoena uses proxies for Jewish identity to expose the individuals' religious affiliation without their consent. By requiring Penn to compile and share organizations' membership rosters only if they are Jewish-identified, the EEOC singles out employees who are Jewish or who are presumed to be Jewish because they participate in Jewish religious, cultural, political activities and associations.

2.    Government Action Targeting a Religious Group Is Subject to Heightened Scrutiny

As the Third Circuit has recognized, "it has long been implicit in the Supreme Court's decisions that religious classifications are treated like others traditionally subject to heightened scrutiny, such as those based on race." *Hassan v. City of New York*, 804 F.3d 277, 299 (3d Cir. 2015) (collecting cases). While the Third Circuit has declined to decide what form of heightened review applies to religion-based classification (*i.e.*, strict or intermediate), it noted with approval that the Second, Eighth, Ninth, and Tenth Circuits have held that that religious affiliation is a "suspect" classification subject to strict scrutiny. *Id.* at 300 (collecting cases).

Regardless, the subpoena's express religious classification renders it presumptively invalid. *Id.* at 299. To rebut that presumption, the EEOC must demonstrate that its end justifies the

means. *See id.* at 305. It is not enough for the EEOC to invoke a generally legitimate interest (e.g., fighting antisemitism) or to show that its requests might advance that interest in some marginal way. Rather, the EEOC must demonstrate that the requests are closely and carefully tailored to achieve that end. *See id.* "[T]he burden of justification under both intermediate and strict scrutiny 'is demanding and ... rests entirely on the State....'" *Id.* (quoting *United States v. Virginia*, 518 U.S. 515, 533 (1996)). Heightened scrutiny additionally "requires that the relationship between the asserted justification and discriminatory means employed 'be substantiated by objective evidence.'" *Id.* at 306 (citation omitted).

### 3. The Subpoena's Demand for a List of Jewish Employees Violates Equal Protection

The subpoena's stated objective is to assist the EEOC in investigating potential discrimination and harassment of Jewish employees at Penn. The subpoena expressly makes religious affiliation the basis for its demands. It imposes a burden on individuals based solely on their membership or perceived membership in a particular demographic group, namely Jews.

The government's classification is also underinclusive: Non-Jewish employees also may have information relevant to the EEOC's investigation of alleged antisemitic discrimination and harassment. And alternative means exist to accomplish the government's goal that do not involve singling out employees because they are Jewish or because they participate in Jewish religious, cultural, or political activities. Penn's offer to communicate to *all* employees opportunities to contact the EEOC directly would enable the EEOC to hear from any employees who could provide information pertinent to its investigation without creating lists of Jews, targeting Jewish employees and organizations, or invading the privacy of any of Penn's Jewish or non-Jewish employees. The EEOC therefore cannot demonstrate that the subpoena's classification of employees based on their

religious identity is sufficiently closely tailored to the government's asserted interest in combating antisemitism to rebut the presumption of unconstitutionality.

F.    THE SUBPOENA IS NOT JUDICIALLY ENFORCEABLE

In addition to violating fundamental rights, the subpoena fails the standard for judicial enforcement on several grounds. That standard requires the government to bear the burden of proving that: "1) its investigation has a legitimate purpose, 2) the inquiry is relevant to that purpose, 3) the agency does not already possess the information requested, 4) the agency has complied with relevant administrative requirements, and 5) the demand is not unreasonably broad or burdensome." *EEOC v. Kronos, Inc.*, 620 F.3d 287, 296 n.4 (3d Cir. 2010) (cleaned up); *see also United States v. Westinghouse Elec. Corp.*, 788 F.2d 164, 166–67 (3d Cir. 1986); *accord*, *McLane Co. v. EEOC*, 581 U.S. 72, 77 (2017).

Congress has empowered the EEOC to investigate charges of discrimination. *See* 42 U.S.C. § 2000e–5(b). The agency is authorized to issue subpoenas to collect evidence that "relates to unlawful employment practices ... and is relevant to the charge under investigation." *Id.* §§ 2000e–8(a)–(b), 2000e–9. Proposed Intervenors respect and value these powers.

Here, however, the EEOC has failed to fulfill even the minimal requirement that the information it seeks is "relevant to the charge under investigation." *Id.* "When determining whether the EEOC has met its burden, courts must be careful not to read relevancy so broadly as to render the statutory requirement a 'nullity.'" *EEOC v. TriCore Reference Lab'ys*, 849 F.3d 929, 937 (10th Cir. 2017) (quoting *EEOC v. Shell Oil Co.*, 466 U.S. 54, 69 (1984)). The EEOC's charge does not in fact allege *any* specific unlawful employment practice. The agency instead demands that the University provide employees' private information — without their consent and often over their express wishes — to further what appears to be a fishing expedition in search of an unlawful

- 20 -

employment practice. The statute does not afford the EEOC such power. *See EEOC v. Konica Minolta Bus. Sols. USA, Inc.*, 639 F.3d 366, 369 (7th Cir. 2011) (the EEOC must show it has a "realistic expectation rather than an idle hope that the information requested will advance its investigation...." (quotation omitted)).

### G.   PROPOSED INTERVENORS' PRIVACY INTERESTS OUTWEIGH THE EEOC'S NEED FOR THE INFORMATION IT DEMANDS

Even if a subpoena is judicially enforceable, a court must consider whether its "intrusion into an individual's privacy is justified" by weighing the seven factors set out in *United States. v. Westinghouse Elec. Corp.*, 638 F.2d 570, 578 (3d Cir. 1980):

> [1] The type of record requested, [2] the information it does or might contain, [3] the potential for harm in any subsequent nonconsensual disclosure, [4] the injury from disclosure to the relationship in which the record was generated, [5] the adequacy of safeguards to prevent unauthorized disclosure, [6] the degree of need for access, and [7] whether there is an express statutory mandate, articulated public policy, or other recognizable public interest militating toward access.

*Id*.

The subpoena seeks private personal information — not just Proposed Intervenor's names, phone numbers, email addresses, and home addresses but also their affiliations with specific Jewish organizations; relationships to academic pursuits related to Jewish history, religion, culture, and the like; and participation in particular aspects of Jewish life on campus. Were Penn to provide such information to the government, it would establish a central registry of the University's Jews, with all of the frightening implications and historical echoes of such a list.[5] What is more, that information would provide with granularity the particular valence of employees' religious and political affiliations: for example, whether or not they support or are critical of Israel or Zionism; their level of religious observance; and other information that might make them targets of

---

[5] *See supra* note 1 (collecting sources).

harassment and other adverse actions — all information unrelated to any legitimate governmental purpose.

Regardless of EEOC's intent, were this information to be shared with other agencies, hacked, or publicly disclosed, it would create a serious safety risk for individual Proposed Intervenors, their organizations, and their communities. This is especially so in a political environment increasingly saturated with unvarnished hate, including antisemitism.[6] The government's stated desire to facilitate information-sharing across agencies and departments and evidence of serious recent data privacy and security breaches render these dangers especially acute.[7]

These grave concerns far outweigh the government's need for the information sought by the subpoena, which is based on no charge of any specific unlawful employment practice. The EEOC could utilize myriad alternative, less intrusive methods to invite Penn employees voluntarily to report discrimination or harassment they have experienced or observed, thereby achieving the government's stated goal of redressing antisemitism without infringing upon employees' constitutional and statutory rights. No other *Westinghouse* factors alter that conclusion.

---

[6] *See supra* note 4 (collecting sources).
[7] *See supra* notes 2-3 (collecting sources).

## IV.    CONCLUSION

For the foregoing reasons, the Application for enforcement of the subpoena should be denied.

Respectfully submitted,

Dated: January 20, 2026

By: */s/ Matthew A Hamermesh*
    Mark A. Aronchick
    Matthew A Hamermesh
    Eitan G. Kagedan
HANGLEY ARONCHICK SEGAL
PUDLIN & SCHILLER
One Logan Square, 27th Floor
Philadelphia, PA 19103-6933
(215) 568-6200
maronchick@hangley.com
mhamermesh@hangley.com
ekagedan@hangley.com

Harold Craig Becker
Norman L. Eisen
Democracy Defenders Fund
600 Pennsylvania Ave., S.E., No. 15180
Washington, D.C. 20003
(202) 594-9958
norm@democracydefenders.org
craig@democracydefenders.org

Seth Kreimer
3501 Sansom St.
Philadelphia, PA 19104
(215) 898-7447
skreimer@law.upenn.edu

Amanda Shanor
3730 Walnut Street
Philadelphia, PA 19104
203-247-2195
shanor@upenn.edu

Witold J. Walczak
Stephen Loney
Ariel Shapell
AMERICAN CIVIL LIBERTIES
UNION OF PENNSYLVANIA
P.O. Box 60173
Philadelphia, PA 19102
(215) 592-1513
vwalczak@aclupa.org
sloney@aclupa.org
ashapell@acluepa.org

*Counsel for the Proposed Intervenors*

## **CERTIFICATE OF SERVICE**

I, Matthew A Hamermesh, hereby certify that on this 20th day of January, 2026, I caused to be filed a true and correct copy of the foregoing OPPOSITION TO THE APPLICATION FOR AN ORDER TO SHOW CAUSE via the Court's electronic filing system, which will serve a copy on all counsel of record.

Dated: January 20, 2026                    Respectfully submitted,

                                            */s/ Matthew A Hamermesh*