**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

U.S. EQUAL EMPLOYMENT
OPPORTUNITY COMMISSION,

     Petitioner,

     v.

THE TRUSTEES OF THE UNIVERSITY OF
PENNSYLVANIA,

     Respondent.

Civil Action No. 2:25-CV-06502-GJP

**BRIEF OF PENN FACULTY ALLIANCE TO COMBAT ANTISEMITISM AS *AMICUS CURIAE* IN SUPPORT OF THE TRUSTEES' RESPONSE TO THE EEOC'S APPLICATION FOR AN ORDER TO SHOW CAUSE**

Kevin Kelly (PA Id. # 311876)
Robert K. Kelner (*pro hac vice* pending)
Evan D. Parness (*pro hac vice* pending)
Noam Kutler (*pro hac vice* pending)
Samuel Ackerman (*pro hac vice* pending)
Benjamin Rolsma (*pro hac vice* pending)
COVINGTON & BURLING LLP
850 Tenth Street, NW
Washington, DC 20001-4956
202-662-6000
kkelly@cov.com

*Counsel for Penn Faculty Alliance to Combat Antisemitism*

January 20, 2026

## TABLE OF CONTENTS

Table of Authorities ............................................................................................................. ii

Statement of Interest ............................................................................................................ 1

Introduction .......................................................................................................................... 2

Background ........................................................................................................................... 3

      A.     The EEOC's subpoena demands what amounts to a list of Jews at Penn and their contact information. ................................................................................. 3

      B.     For centuries, identifying and listing Jews has presaged antisemitic violence and discrimination. .................................................................................. 5

      C.     The Jewish community continues to face all-too-real risks of violence and discrimination. ...................................................................................................... 7

Argument ............................................................................................................................ 10

I.     The First Amendment requires that forced disclosures of information about group membership satisfy a demanding constitutional test. ......................................... 10

II.    The subpoena's compelled disclosure of Jewish organizational information fails to satisfy the exacting scrutiny standard established by the Court. ................................. 12

      A.     The EEOC's requests for lists of Jewish faculty and staff fail because they are not narrowly tailored. ....................................................................................... 12

      B.     The significant burden and risks to Penn's Jewish faculty imposed by the EEOC's subpoena confirm the need for narrow tailoring. ................................... 16

Conclusion .......................................................................................................................... 18

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*AJP Educational Foundation v. Miyares*,
  2025 WL 2950186 (E.D. Va. Oct. 17, 2025) ........................................................................17

*Americans for Prosperity Foundation v. Bonta*,
  594 U.S. 595 (2021) .................................................................................................... *passim*

*EEOC v. Shell Oil Co.*,
  466 U.S. 54 (1984) ................................................................................................................12

*EEOC v. University of Pennsylvania*,
  850 F.2d 969 (3d Cir. 1988), *aff'd*, 493 U.S. 182 (1990) ....................................................13

*John Doe No. 1 v. Reed*,
  561 U.S. 186 (2010) ..............................................................................................................14

*NAACP v. Alabama ex rel. Patterson*,
  357 U.S. 449 (1958) .................................................................................................2, 10–11, 16

*Roberts v. U.S. Jaycees*,
  468 U.S. 609 (1984) ..............................................................................................................10

**Statutes**

42 U.S.C. § 2000e-8 .......................................................................................................14, 16

**Other Authorities**

Hannah Arendt, *Eichmann in Jerusalem: A Report on the Banality of Evil* (1963) .......................7

Corey Davis & Maggie Kent, *'Vile' Antisemitic Messages Projected on
  University of Pennsylvania Campus*, 6 ABC (Nov. 10, 2023),
  https://perma.cc/3HWF-E77L .................................................................................................9

Ken Dilanian, *Union: Hackers Have Personnel Data on Every Federal Employee*,
  Associated Press (June 11, 2015), https://perma.cc/3AX2-7ZWN ..........................................17

David DiMolfetta, *EEOC Experienced Security Incident Involving Contractor's
  'Unauthorized' Access, Email Says, Email Says*, NextGov/FCW (Jan. 8,
  2026), https://perma.cc/WZ53-YEJ5 .....................................................................................17

Camila Domonoske, *U.S. Soldier Honored Posthumously for Protecting Jewish
  POWs in 1945*, NPR (Dec. 2, 2015), https://perma.cc/WJ92-PW5M .......................................7

Dan Eggen, *There Was One President Who Tried to Manipulate BLS*, Wash. Post (Oct. 5, 2012), https://perma.cc/J4A8-UDH8 ...........................................................7

Final Report, Univ. of Penn., University Task Force on Antisemitism (May 20, 2024), https://perma.cc/2YCJ-JJMG .................................................................10

Jeffrey Goldberg, *Dear Jewish media, stop making lists of Jews!*, Jerusalem Post (May 23, 2013)...........................................................................................................5

Mark Goldfeder, *Defining Antisemitism*, 52 Seton Hall L. Rev. 119 (2021) .................5

Kyla Guilfoil, *Historic Philadelphia Synagogue Targeted by Vandals Three Times in One Day*, NBC News (Oct. 23, 2024), https://perma.cc/N443-BH69 ..................8

Tom Ignudo, *Racist, Antisemitic Graffiti Removed from Roxborough High School in Philadelphia, School District Says*, CBS News (Jan. 4, 2026), https://perma.cc/92DH-3FFA .........................................................................7

Matthew Impelli, *Hezbollah Flag at US College Protest Sparks Fury*, Newsweek (Apr. 26, 2024).......................................................................................................9

Jenny Jarvie, *"Are you a Zionist?" Checkpoints at UCLA encampment provoked fear, debate among Jews*, L.A. Times (May 9, 2024), https://perma.cc/DNA2-MUWC...............................................................................................................9

Neville Lamdan, *Village Jews in Imperial Russia's Nineteenth-Century Minsk Governorate Viewed through a Genealogical Lens*, 99 Nat'l Genealogical Soc'y Q. 133 (2011)........................................................................................5

Laura Meckler & Susan Svrluga, *Pro-Hamas Messages Intensify on College Campuses*, Wash. Post (Nov. 10, 2024).................................................................9

Hayden Mitman, *Main Line synagogue vandalized with antisemitic graffiti*, NBC 10 Philadelphia (Apr. 2, 2024), https://perma.cc/ZT2K-Q385 ..............................8

4 *Nazi Conspiracy and Aggression, in Int'l Military Trials, Nuremburg* (U.S. Gov't Printing Off. 1946) .......................................................................................6

Dion J. Pierra, *Antisemitic Vandalism Hits University of Pennsylvania as It Prepares to Host Anti-Zionist Festival*, The Algemeiner (Sep. 21, 2023), https://perma.cc/R2Q4-FLEB .........................................................................9

1 Antony Polonsky, *The Jews in Poland and Russia: 1350–1881* (Liverpool Univ. Press 2009).......................................................................................................6

Edgar Sandoval et al., *Suspect Charged in Arson at Pennsylvania Governor's Mansion*, N.Y. Times (Apr. 13, 2025), https://perma.cc/CF4B-GRBG ..................8

Demetri Sevastopulo, *China Hacked Email Systems of US Congressional Committee Staff*, Fin. Times (Jan. 7, 2026)..............................................................17

Statutum de Judeismo (temp. incert.), *reprinted in* 1 Statutes of the Realm ...................................5

Submit a Claim, *EEOC v. Trustees of Columbia University in the City of New York* https://perma.cc/CV6D-TS9Z ........................................15

Michael Tanenbaum, *Three People Charged with Ethnic Intimidation of Jewish Men Outside Northeast Philly Pool Hall*, Philly Voice (Oct. 24, 2024), https://perma.cc/LE5X-D6NH ........................................8

Nicquel Terry Ellis, *Antisemitic Incidents, Partly Fueled by Campus Protests, Reached Record-Breaking High in 2024, According to the ADL*, CNN (Apr. 22, 2025), https://perma.cc/Q92A-K5S2 ........................................8

TaRhonda Thomas, *University of Pennsylvania alerted FBI to antisemitic threats on campus, school's president says*, 6 ABC (Nov. 7, 2023), https://perma.cc/5MH8-LMES ........................................9

Otto D. Tolischus, *Nazi Property Law Arouses Legations*, N.Y. Times, Apr. 29, 1938...........................................................6

U.S. Holocaust Memorial Museum, Holocaust Encyclopedia, *German Jews' Passports Declared Invalid* (last visited Jan 14, 2026), https://perma.cc/4XA6-FK3N;..............................................6

U.S. Holocaust Memorial Museum, Holocaust Encyclopedia, *Jewish Badge: During the Nazi Era* (last visited Jan. 15, 2026), https://perma.cc/S7Z7-ZUK7.............6

U.S Holocaust Memorial Museum, Holocaust Encyclopedia, *Kristallnacht* (last visited Jan. 15, 2026), https://perma.cc/8FBV-HLXT................6

Sara Weissman, *Jewish Student Enrollment Is Down at Many Ivies*, Inside Higher Ed (May 8, 2023), https://perma.cc/RN6T-N7WX ..........................13

**STATEMENT OF INTEREST**

The Penn Faculty Alliance to Combat Antisemitism ("the Alliance") is an association whose membership consists predominantly of Jewish faculty at the University of Pennsylvania (the "University" or "Penn").  The Alliance has a distinct interest in the EEOC's subpoena seeking information about Jewish faculty, students, and other staff members at the University.   The Alliance counts as members 162 Jewish faculty, drawn from eleven of Penn's twelve schools.  The Alliance first formed (under a different name) after the October 7, 2023 terrorist attacks on Israel and ensuing acts of antisemitism on U.S. college campuses.  As Jewish employees at the University of Pennsylvania, many members of the Alliance are potential members of the victim class the EEOC is attempting to support.  But they would also be targeted by this subpoena.  Many were participants in the campus listening sessions on antisemitism and are members of Jewish campus organizations, and some were participants in the solidarity trip to Israel referenced in the EEOC's subpoena.  While the Alliance supports the EEOC's efforts to combat antisemitism at Penn, its members are gravely concerned that the scope of the EEOC subpoena, which effectively seeks full lists of Jewish individuals at Penn and their personal information, invokes the troubling historical persecution of Jews, and threatens the personal security of the Alliance's members.  If the Court enforces the subpoena in full, the Alliance expects that many of its members' identities as Jews and personal contact information will be disclosed to the EEOC, potentially harming its members and chilling Jewish associational life at Penn.

Although members of the Alliance are University employees, the Alliance is not itself formally affiliated with the University, does not speak for the University, and it is not filing this brief on behalf of the University or at its request.

## INTRODUCTION

The EEOC's subpoena effectively seeks a list of all the University of Pennsylvania's Jewish employees and their personal information.  It compels disclosure of sensitive information about the members of Jewish organizations, and in doing so, burdens Jewish association rights, unintentionally echoing troubling attempts in both distant and recent history to single out and identify Jews—a historically persecuted minority.  The Alliance appreciates the EEOC's concern regarding antisemitism on university campuses, which is a national problem worthy of attention.  The Alliance also recognizes that antisemitism in the context of employment discrimination falls within the EEOC's jurisdiction.  The Alliance does not take a position on the EEOC subpoena as a whole or the merits of the EEOC's investigation of Penn.  Rather, it objects to specific demands made in the EEOC's subpoena that imperil the security of members of the Alliance and infringe on Alliance members' First Amendment right to freedom of association.  Far from advancing the noble cause of combating antisemitism, the EEOC's efforts amount to gathering a list of Jews and further exacerbating the fear and uncertainty of Jewish faculty at Penn.  Whatever the EEOC's overall intention in conducting such an investigation, the EEOC's subpoena is an ill-designed means for addressing workplace antisemitism, particularly because the agency could accomplish its goals in ways that would better protect the university's Jewish faculty and staff, as well as their First Amendment rights.

The subpoena violates faculty members' First Amendment association rights.  The Constitution protects the freedom to associate without fear of even the risk of reprisals.  When the government demands information about group members—especially lists of members based on religion or ethnicity—those demands impinge on associational rights.  The Supreme Court has repeatedly recognized that forced disclosures of group membership and supporter lists are dangerous.  *See, e.g.*, *NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449, 462 (1958); *Americans*

2

*for Prosperity Found. v. Bonta*, 594 U.S. 595, 618 (2021). When state force extracts sensitive, personal details, those details could (and often do) become public, turning group members into targets for their enemies.

Several requests in the EEOC's subpoena fail the Supreme Court's test to protect freedom of association. Because of the risks that attend disclosure of personal details, the Constitution requires that forced disclosure of membership lists be narrowly tailored to important government interests. Accordingly, the EEOC's subpoena must be narrowly tailored to the Agency's interests in investigating workplace antisemitism and discrimination. But the subpoena's sweeping terms do not come close to that—instead, it compels production of a comprehensive list of Jews at Penn that far outstrips the investigation's needs. We know this because the EEOC has failed to take advantage of a number of alternative methods that would allow the agency to gather the information it needs for its investigation in a more effective, less invasive fashion. The EEOC's failure to pursue those less-intrusive options underscores the subpoena's constitutional infirmities. Moreover, the need for narrow tailoring is especially clear here. The risks faced by Jewish faculty are not hypothetical, and so the prospect of disclosure chills their associational activities. If ever there was a need for finely tuned methods, it is here—but the EEOC has insisted on an unnecessary, unconstitutional intrusion.

## BACKGROUND

### A.    The EEOC's subpoena demands what amounts to a list of Jews at Penn and their contact information.

The subpoena does not expressly seek to compile a list of Jews at Penn, but it might as well. It demands "a roster of organization members" for "all . . . groups" that are "related to the Jewish religion, faith, ancestry/National Origin." ECF No. 1-20 at 5 (Request 2e). The EEOC is requesting the names of all individuals who belong to Jewish organizations, regardless of whether

such individuals are employees at Penn.  *See id.*  It also requests the "phone number, email address and mailing address" of each organization's "Point of Contact."  *Id.* (Request 2d).  The subpoena further seeks "a list of employees in the Jewish Studies Program."  *Id.* (Request 3).  To the extent the subpoena seeks information about employees, it requests sensitive personal information for each employee, including "personal phone number[s], email address[es] and mailing address[es]."  *Id.* at 5–6 (Requests 2f, 3e, 4d, 6g, 7d, and 8e).

The subpoena also seeks the sensitive, personal information of Jewish faculty and staff through other proxies.  It insists on "a list of staff and faculty members who participated in" listening sessions on antisemitism, accompanied by their titles, dates of employment, and contact information, targeting events that would overwhelmingly have been attended by Jews.  *Id.* at 6 (Request 4).  And it requires the personal contact information of "all faculty and staff members who received the University of Pennsylvania Task Force on Antisemitism's online Qualtrics survey," all "staff and faculty members who were identified in" a particular social media post that accused those faculty of participating in "scholasticide" through a trip they took to Israel, and all "the individuals who reported" that social media post to the University's Division of Public Safety.  *Id.* at 6–7 (Requests 6g, 7d, and 8e).  Request 4 is likely to substantially overlap with the rosters of organization members sought in Requests 2 and 3.  And Request 5—which asks for notes from the listening sessions—might reveal the identities encompassed by Request 4.  Similarly, Requests 6g, 7d, and 8e do not directly ask for organization membership, and the pools from which they draw may be broader, but they are close proxies for Requests 2 and 3 and are likely to reveal sensitive personal information about the Jewish community.

**B.      For centuries, identifying and listing Jews has presaged antisemitic violence and discrimination.**

"There are some lists that have helped Jews in the past, including, most notably, Schindler's, but mainly Jewish list-making has been an activity of those who are hostile to Jews." Jeffrey Goldberg, *Dear Jewish media, stop making lists of Jews!*, Jerusalem Post (May 23, 2013), https://perma.cc/EN3T-G5KW.

Jews variously identify on the basis of their faith, ethnicity, cultural practices, values, upbringing, or some combination thereof. However, antisemitism "often looks at Jews as a collective." Mark Goldfeder, *Defining Antisemitism*, 52 Seton Hall L. Rev. 119, 130 (2021). To achieve their aims amid this complexity, antisemites seek to identify and reveal "who is a Jew" to advance their oppressive aims. *See id.* The Alliance does not at all suggest that the EEOC seeks the lists of Jewish members of the Penn community for antisemitic reasons. Indeed, the Alliance's members understand that the EEOC is seeking to investigate allegations of antisemitism in order to remediate university practices that contribute to it. But the dark historical legacy associated with government lists of Jews is critical context to understanding the burden the EEOC will impose on Penn's Jewish community, as well as other communities, if the agency extends this tactic to other antisemitism investigations.

That history is long and tragic. Prior to the expulsion of Jews from England, the 1275 Statutes of Jewry required that "each Jew after he shall be Seven Years old, shall wear a Badge on his outer Garment." Statutum de Judeismo (temp. incert.), *reprinted in* 1 Statutes of the Realm 221–221a. Following the Third Partition of Poland, authorities in Tsarist Russia identified and classified resident Jews in order to impose limitations on Jewish residence and property ownership, resulting in the Pale of Settlement. *See* Neville Lamdan, *Village Jews in Imperial Russia's Nineteenth-Century Minsk Governorate Viewed through a Genealogical Lens*, 99 Nat'l

Genealogical Soc'y Q. 133, 137–38 (2011).  Segregated, concentrated, and identified by official state lists, Jews of the Pale of Settlement would soon become easy targets for recurrent pogroms in which the state and its antisemitic supporters mass murdered and terrorized Jewish communities. *See, e.g.*, 1 Antony Polonsky, *The Jews in Poland and Russia: 1350–1881*, at 1–13 (Liverpool Univ. Press 2009).

During the Holocaust, the Nazis' meticulous recordkeeping and tracking of Jews enabled them to annihilate Jewish homes, businesses, and institutions en masse on a single night in 1938. *See* Otto D. Tolischus, *Nazi Property Law Arouses Legations*, N.Y. Times, Apr. 29, 1938, at 3; U.S Holocaust Memorial Museum, Holocaust Encyclopedia, *Kristallnacht* (last visited Jan. 15, 2026), https://perma.cc/8FBV-HLXT.  Armed with its lists, the Third Reich could enforce its decrees requiring Jews to carry identification cards and wear large yellow Stars of David with the word "Jew."  *See* 4 *Nazi Conspiracy and Aggression*, *in* Int'l Military Trials, Nuremberg 9 (U.S. Gov't Printing Off. 1946) (translating the First Regulation to the Reich Citizenship Law of November 14, 1935); U.S. Holocaust Memorial Museum, Holocaust Encyclopedia, *German Jews' Passports Declared Invalid* (last visited Jan 14, 2026), https://perma.cc/4XA6-FK3N; U.S. Holocaust Memorial Museum, Holocaust Encyclopedia, *Jewish Badge: During the Nazi Era* (last visited Jan. 15, 2026), https://perma.cc/S7Z7-ZUK7.

In the years that followed, such records enabled the Nazis to concentrate Jews in ghettos throughout Europe and subsequently transport Jews to death camps for mass murder.  As Hannah Arendt described in her recounting of the trial of Adolf Eichmann, the Nazi official who oversaw mass deportations of European Jews to death camps, "[i]n country after country, the Jews had to register, were forced to wear the yellow badge for easy identification, were assembled and deported, the various shipments being directed to one or another of the extermination centers in

the East, depending on their relative capacity at the moment[.]"  Hannah Arendt, *Eichmann in Jerusalem: A Report on the Banality of Evil* 114 (1963).

The Nazis also frequently demanded that others identify the Jews among them.  In January 1945, the Nazi commandant of an American POW camp demanded that Master Sergeant Roddie Edmonds, the most senior officer detained, single out all the Jewish-American POWs to come forward the next morning, presumably to face summary execution.  Camila Domonoske, *U.S. Soldier Honored Posthumously for Protecting Jewish POWs in 1945*, NPR (Dec. 2, 2015), https://perma.cc/WJ92-PW5M.  But Edmonds defied the demand and ordered all American POWs to come forward.  *Id.*  When the commandant pressed a pistol upon Edmonds' head and repeated his order, Edmonds maintained his refusal to single out the approximately 300 Jewish-American POWs and said "[w]e are all Jews."  *Id.*  The commandant relented and the Jewish-American soldiers were saved.  *Id.*

Despite the United States' valiant liberation of many Nazi death camps, antisemitism has sometimes stained our country's history as well; the U.S. government has endeavored to identify Jews with malicious intent in instances within the living memory of many Alliance members.  President Richard Nixon, for example, infuriated by poor jobs reports and consumed with the canard that a "Jewish cabal" was unfavorably manipulating economic data, notoriously ordered a tally of Jews working for the Bureau of Labor Statistics.  Dan Eggen, *There Was One President Who Tried to Manipulate BLS*, Wash. Post (Oct. 5, 2012), https://perma.cc/J4A8-UDH8.

**C.    The Jewish community continues to face all-too-real risks of violence and discrimination.**

Antisemitism remains alive today, including at universities and in Philadelphia.  Earlier this month, antisemitic graffiti appeared at a Philadelphia public school.  Tom Ignudo, *Racist, Antisemitic Graffiti Removed from Roxborough High School in Philadelphia, School District Says*,

CBS News (Jan. 4, 2026), https://perma.cc/92DH-3FFA.  In 2024, arsonists attacked a historic synagogue in Center City Philadelphia attended by members of the Penn community, Kyla Guilfoil, *Historic Philadelphia Synagogue Targeted by Vandals Three Times in One Day*, NBC News (Oct. 23, 2024), https://perma.cc/N443-BH69, and three men were charged with threatening a group of Jewish men in Philadelphia with a gun after shouting antisemitic insults, Michael Tanenbaum, *Three People Charged with Ethnic Intimidation of Jewish Men Outside Northeast Philly Pool Hall*, Philly Voice (Oct. 24, 2024), https://perma.cc/LE5X-D6NH.  In April 2024, another synagogue in the Philadelphia area, Temple Beth Hillel-Beth El, was also targeted with antisemitic vandalism when swastikas were spraypainted on signs outside the synagogue.  Hayden Mitman, *Main Line synagogue vandalized with antisemitic graffiti*, NBC 10 Philadelphia (Apr. 2, 2024), https://perma.cc/ZT2K-Q385.  A number of members of the Alliance are members of Temple Beth Hillel-Beth El and thus were exposed to this incident.  And in 2025, Pennsylvania Governor Josh Shapiro was targeted in a life-threatening antisemitic arson attack that caused significant damage to the Governor's mansion following a Passover seder with members of the Jewish community.  Edgar Sandoval et al., *Suspect Charged in Arson at Pennsylvania Governor's Mansion*, N.Y. Times (Apr. 13, 2025), https://perma.cc/CF4B-GRBG.

Those incidents are part of a disturbing trend.  In recent years, particularly since the October 7 terror attacks, Jews have become frequent targets on university campuses.  According to one tally, antisemitic incidents on campuses increased 344% between 2019 and 2024.  *See* Nicquel Terry Ellis, *Antisemitic Incidents, Partly Fueled by Campus Protests, Reached Record-Breaking High in 2024, According to the ADL*, CNN (Apr. 22, 2025), https://perma.cc/Q92A-K5S2.  At Columbia, on the anniversary of October 7, a protest featured a sign with the message "Long Live the Al-Aqsa Flood," in reference to Hamas's name for the October 7 attack, and a

protest at Princeton included a Hezbollah banner.  *See* Laura Meckler & Susan Svrluga, *Pro-Hamas Messages Intensify on College Campuses*, Wash. Post (Nov. 10, 2024), https://perma.cc/7YL7-9BGN; Matthew Impelli, *Hezbollah Flag at US College Protest Sparks Fury*, Newsweek (Apr. 26, 2024), https://perma.cc/S55M-5Y9T.  At their most extreme, these incidents have included harassment and exclusion from campus, such as occurred at UCLA, where less than two years ago, protesters at a campus encampment demanded to know "[a]re you a Zionist?" before allowing students to pass.  *See* Jenny Jarvie, *"Are you a Zionist?" Checkpoints at UCLA encampment provoked fear, debate among Jews*, L.A. Times (May 9, 2024), https://perma.cc/DNA2-MUWC.

There have been antisemitic incidents at Penn as well.  In September 2023, a swastika appeared on a university building, and a few days later an unidentified person walked into Penn Hillel and shouted "F— the Jews!"  Dion J. Pierra, *Antisemitic Vandalism Hits University of Pennsylvania as It Prepares to Host Anti-Zionist Festival*, The Algemeiner (Sep. 21, 2023), https://perma.cc/R2Q4-FLEB.  In November 2023, antisemitic messages were splashed onto campus buildings using light projectors.  Corey Davis & Maggie Kent, *'Vile' Antisemitic Messages Projected on University of Pennsylvania Campus*, 6 ABC (Nov. 10, 2023), https://perma.cc/3HWF-E77L.  The same month, threatening, antisemitic emails were sent to several university staff.  TaRhonda Thomas, *University of Pennsylvania alerted FBI to antisemitic threats on campus, school's president says*, 6 ABC (Nov. 7, 2023), https://perma.cc/5MH8-LMES.  And the Alliance has among its members faculty who, following a trip to Israel that is discussed in the EEOC's memorandum of law, were doxed on social media and accused of "scholasticide."  *See* ECF No. 1 at 15.  Individuals featured in that social media post were threatened, and personal

information about them was shared on the internet.  This incident, along with others during that same time period, created great apprehension among members of the Alliance.

The University has made progress in addressing such incidents over the course of the past two years.  It created task forces to address antisemitism and to combat hate; it created a Title VI office, namely the Office of Religious Inclusion, and tasked it with keeping careful tabs on all bias incidents on campus; and it revised the University's guidelines on open expression, putting more stringent restrictions on hate speech that could lead to the harassment of members of the University community based on religious identification or ethnicity.  *See generally* Final Report, Univ. of Penn., University Task Force on Antisemitism (May 20, 2024), https://perma.cc/2YCJ-JJMG.

## ARGUMENT

I. **The First Amendment requires that forced disclosures of information about group membership satisfy a demanding constitutional test.**

The First Amendment protects the "right to associate with others in pursuit of a wide variety of political, social, economic, educational, religious, and cultural ends."  *Roberts v. U.S. Jaycees*, 468 U.S. 609, 622 (1984).  Freedom of association "is especially important in preserving political and cultural diversity and in shielding dissident expression from suppression by the majority."  *Id.*

In order to protect individuals' freedom of association, the First Amendment limits the government's power to compel the disclosure of organizational membership.  *See Americans for Prosperity Found. v. Bonta*, 594 U.S. 595, 606–07 (2021).  This principle can be traced back to the Civil Rights era, in which the Supreme Court addressed the state of Alabama's attempts to target the NAACP.  *See NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449, 462 (1958).  The NAACP's Alabama office supported racial integration in higher education and public transportation.  *Id.* at 452.  As part of an organized campaign to run the NAACP out of the State,

the Alabama Attorney General sought the group's membership lists. *Id*. at 452–53. The Supreme Court explained that "[e]ffective advocacy of both public and private points of view, particularly controversial ones, is undeniably enhanced by group association," *id*. at 460, and it emphasized "the vital relationship between freedom to associate and *privacy in one's associations*," *id*. at 462 (emphasis added). NAACP members faced a serious reprisal risk if their affiliation with the organization became known. *See id.* At the same time, Alabama failed to identify an offsetting government interest "sufficient to justify the deterrent effect" of the disclosure of organization members. *Id*. at 463–65. Taken together, the Supreme Court concluded that Alabama's requests violated the First Amendment by infringing on the NAACP members' freedom of association.

Protection of organizational membership from state-compelled disclosure has only strengthened over time. Most recently, in *Americans for Prosperity Foundation v. Bonta*, the Supreme Court held that a California regulation requiring non-profits to disclose, among other things, a list of names and addresses of donors who have contributed over $5,000 impermissibly violated the First Amendment rights of the non-profits. 594 U.S. at 602. The Court explained that compelled disclosures require that the information sought is "narrowly tailored to the government's asserted interest." *Id.* at 608. The government asserted that the disclosures were necessary to detect charitable fraud and self-dealing. *Id.* at 612. But the Court found that the "amount and sensitivity of th[e] information harvested by the State" was a "dramatic mismatch" with the state's anti-fraud rationale, particularly in light of narrower, "alternative mechanisms" that did not chill association. *Id.* at 612–14. Even the "*risk* of a chilling effect on association is enough" to render a compelled disclosure unlawful. *Id.* at 618 (emphasis added).

As a result of these grave risks posed by seeking membership lists, the Supreme Court concluded that government requests for membership lists must meet "exacting scrutiny." *Id.* at

611.  Under this standard, a Court must ensure that there is "a substantial relation between the disclosure requirement and a sufficiently important governmental interest." *Id.* (citation omitted). Importantly, a "substantial relation is necessary but not sufficient." *Id.* at 609.  The government's required disclosure must also be "narrowly tailored to the government's asserted interest." *Id.* at 608.  This very demanding rule is necessary because, as the Court explained, "[w]hen it comes to a person's beliefs and associations, broad and sweeping state inquiries into these protected areas discourage citizens from exercising [their] rights." *Id.* at 610 (citation modified).  The EEOC subpoena's demands for identification of Jews is precisely the kind of broad and sweeping state inquiry that must be rejected under the rule defined in *Bonta*.

## II.    The subpoena's compelled disclosure of Jewish organizational information fails to satisfy the exacting scrutiny standard established by the Court.

While the EEOC has an important interest in investigating workplace antisemitism and other forms of discrimination, the EEOC's subpoena fails to heed *Bonta*'s tailoring requirement. In order to survive constitutional scrutiny, "a substantial relation to an important interest is not enough to save a disclosure regime that is insufficiently tailored." *Id.* at 609.

### A.    The EEOC's requests for lists of Jewish faculty and staff fail because they are not narrowly tailored.

To survive exacting scrutiny, the EEOC must show that its requests are narrowly tailored to its interest in investigating antisemitism and discrimination.  *See id.* at 609–10.  Instead, it has asserted broad statutory authority to seek any evidence merely "relevant" to its investigation, apparently even if such purported evidence would include names of Jewish individuals who are not even employees at Penn. *See* ECF No. 1 at 19.  The EEOC stresses that it may acquire "access to virtually any material that may cast light on the allegations against the employer." *Id.* (quoting *EEOC v. Shell Oil Co.*, 466 U.S. 54, 68–69 (1984)).  But the government must heed the Constitution's constraints.  "Even when a subpoena is authorized by statute and

12

relevant to the agency's investigative mission, 'different considerations come into play when a case . . . implicates first amendment concerns.'" *EEOC v. Univ. of Penn.*, 850 F.2d 969, 980 (3d Cir. 1988) (citation omitted), *aff'd*, 493 U.S. 182 (1990). "Protection of the constitutional liberties of the target of the subpoena calls for a more exacting scrutiny." *Id.* (citation modified). If relevance alone were sufficient for narrow tailoring, the First Amendment's promise of freedom of association would be meaningless.

Here there is a "dramatic mismatch," *Bonta*, 594 U.S. at 612, between the government's interest and the demanded disclosures. The subpoena is not narrowly tailored and seeks information wholly unnecessary for the EEOC investigation—increasing the danger faced by Jews at Penn without justification. In particular, the subpoena seeks sensitive information, including the rosters of all Jewish organizations (which necessarily would include names of Jewish individuals who are not Penn employees, including, potentially, students), and with respect to members who are also employees, home addresses, personal email addresses, and phone numbers. *See supra* Background Part A. In 2023, there were well over a thousand Jewish undergraduate students alone at the University. *See* Sara Weissman, *Jewish Student Enrollment Is Down at Many Ivies*, Inside Higher Ed (May 8, 2023), https://perma.cc/RN6T-N7WX (explaining that Jewish students "make up just roughly 16 percent of the 10,412 undergraduates at Penn"). It is not plausible that every single member of every Jewish organization on campus would have information relevant to the pending investigation.

It is particularly jarring that the subpoena seeks to identify Jewish non-employees. *See* ECF No. 1-20 at 5 (requesting "a roster of organization members," without limiting that request to employees). Congress has empowered the EEOC to seek only "evidence of any person being investigated . . . that relates to *unlawful employment practices* covered by [the Act] and is relevant

to the charge under investigation." 42 U.S.C. § 2000e-8(a) (emphasis added). That the subpoena broadly seeks the identity of anyone affiliated with Jewish campus groups, regardless of whether they are or are not employed by the University, demonstrates the subpoena's alarming breadth—and the corresponding chilling effect. Accordingly, the subpoena is poorly tailored to the government's interests in identifying witnesses for its investigation.

This gap between goals and methods is akin to the California rule rejected in *Bonta.* There, the state defended its mass disclosure rule on the ground that using narrower methods—like "a subpoena or audit letter"—would be "inefficient and ineffective compared to up-front collection." *Bonta*, 594 U.S. at 613. The EEOC has twisted the subpoena, which should be a narrow investigative tactic, into its own method of "up-front collection." Perhaps the EEOC believes there is an attractive efficiency to collecting a complete list of Jews at Penn, even if there necessarily are Jewish individuals at Penn who are not employees. But *Bonta* confirms that "cast[ing] a dragnet" like this is constitutionally dubious. *Id.* at 614. This is even more true in a situation like this one, where the EEOC is seeking membership information of a religious and ethnic group (Jewish members), which further implicates First Amendment concerns. *See John Doe No. 1 v. Reed*, 561 U.S. 186, 207 (2010) (Alito, J., concurring) (noting that forced disclosure of "demographic information," such as "race, religion, political affiliation, sexual orientation, ethnic background, and interest-group memberships" presents an especially "chilling picture of the role of government").

The dramatic mismatch between the government's goals and its chilling effect is easily cured by better-tailored alternatives that reduce the possibility of chilling association and would better effectuate the EEOC's interests. The burden lies with the government to demonstrate that they had "considered [those] alternatives" and that they are inadequate. *Bonta*, 594 U.S. at 613.

The EEOC cannot satisfy this condition.  The Alliance's members can imagine several plausible, constitutionally unobjectionable options, and are aware that the University has already offered to facilitate at least one such alternative method.  <u>First</u>, as the University has proposed, it can coordinate with the EEOC to send an email to all University faculty, staff, and students, offering opportunities to contact and speak directly with the EEOC about campus antisemitism on an opt-in basis.  This alternative would allow the EEOC to identify potential interviewees without requiring organizations to disclose sensitive membership information.  <u>Second</u>, the EEOC could reach out to the leadership of campus Jewish groups with publicly available contact information and ask whether the groups' members would be willing to engage with the EEOC.  <u>Third</u>, the EEOC might collect information through a website dedicated to the investigation.  The agency has done something like this as part of its investigation into antisemitism at another university:  After a settlement with Columbia University, the EEOC launched an online portal to allow possible claimants to identify themselves.  Submit a Claim, *EEOC v. Trustees of Columbia University in the City of New York* https://perma.cc/CV6D-TS9Z.  So, too, could the EEOC solicit information from Jewish members of the Penn community.  All these options would accomplish the EEOC's investigatory goals.  But the EEOC has either rejected or has not considered any of these options.

An opt-in would also be *more* effective in collecting the evidence the government seeks precisely because it would have less of a chilling effect on Jewish individuals on campus.  As the Alliance's members can attest, more Jewish employees would feel comfortable participating with the EEOC's investigation on a voluntary basis and without the risk of broader disclosure of all faculty, staff, and students identifying as Jewish.  The subpoena is not just overbroad but counterproductive to several of the government's own aims to protect Jewish organizational life and secure maximum participation in its investigation from potential witnesses.  Because the

subpoena is not narrowly tailored, the objectionable provisions are inconsistent with the First Amendment.

**B.    The significant burden and risks to Penn's Jewish faculty imposed by the EEOC's subpoena confirm the need for narrow tailoring.**

Narrow tailoring protects against "widespread burden[s]" on "associational rights." *Bonta*, 594 U.S. at 618.  Associational rights are particularly important to protect when the "revelation of the identity" of group members "has exposed [those] members to economic reprisal, loss of employment, threat of physical coercion, and other manifestations of public hostility." *NAACP*, 357 U.S. at 462.  Those concerns are acute here.  The information that the EEOC seeks in Requests 2d–f, 3, 4, 6g, 7d, 8e, and any personally identifying details produced in response to Request 5, *see* ECF No. 1-20 at 5–7, would impose a significant burden on Penn faculty by chilling Jewish associational life at the University.

Here, the "amount and sensitivity of th[e] information harvested," *Bonta*, 594 U.S. at 613, by the EEOC's subpoena creates *at least* a risk of chilling.  In a national environment where antisemitism has been on the rise, particularly on college campuses, "the risk of reprisals" is real, *id.* at 603, as in *NAACP* and *Bonta*.  For members of organizations related to Jewish identity at the University, including the Alliance, the simple fact that their identities may be collected and connected with membership in Jewish groups creates a pall of fear.  Moreover, the "risk of reprisals" dampens Jewish associational life and harms the "political and cultural diversity" that the First Amendment is supposed to "preserv[e]." *Id.* at 603, 606 (citation omitted).

The Alliance recognizes that any identifying information the EEOC obtains is subject to some protection from disclosure. *See* 42 U.S.C. § 2000e-8(e) (imposing limits on public release). But those protections are not ironclad—the EEOC could release the information it gathers in subsequent litigation. *See id.* (allowing for disclosure of information after "the institution of any

proceeding under [the equal employment opportunity statute] involving such information"). Regardless, assurances of confidentiality do not obviate the risk. *See Bonta*, 594 U.S. at 615–16 (rejecting the argument that a disclosure requirement's chill is limited because the information remained "confidential"). Even if the government can try to assure with utmost confidence the safe handling of the information, the forced disclosures would cause many Jewish individuals to fear targeting and reprisal.[1]    That chilling effect is heightened by the unique history of antisemitism—in which Jew-haters have specifically used lists of Jews to target Jewish individuals for oppression. And here, the subpoena's effect is to assemble a list of Jews at the University, risking exposure of their names—and, often, addresses and contact information—to bad actors. The result of compliance would be less participation in Jewish organizational life at the University, an outcome no party to this matter seeks.

Chilling effects are a reason to reject constitutionally problematic subpoenas. Associational rights concerns extend to individual subpoenas and civil investigatory demands ("CID"). For example, in *AJP Educational Foundation v. Miyares*, plaintiffs successfully obtained an order quashing a CID that sought a non-profit's donor lists for an investigation into terror funding that purportedly violated a state charitable-contribution law. *See* 2025 WL 2950186, at

---

[1] In any event, such assurances would ring hollow in light of recent data breaches, including at the EEOC. Just this month, it was publicly reported that the EEOC experienced a security breach in 2025 that "involved unauthorized access of agency data that may have exposed personally identifiable information in records submitted to the agency by the public." David DiMolfetta, *EEOC Experienced Security Incident Involving Contractor's 'Unauthorized' Access, Email Says, Email Says*, NextGov/FCW (Jan. 8, 2026), https://perma.cc/WZ53-YEJ5. Other government agencies have suffered hacks that revealed the personal information of millions. A 2015 hack of the federal Office of Personnel Management is thought to have exposed the personal information of every federal employee and federal retiree. Ken Dilanian, *Union: Hackers Have Personnel Data on Every Federal Employee*, Associated Press (June 11, 2015), https://perma.cc/3AX2-7ZWN. And in the "Salt Typhoon" hack, Chinese-government hackers accessed government technology systems, including the emails of Congressional staff. Demetri Sevastopulo, *China Hacked Email Systems of US Congressional Committee Staff*, Fin. Times (Jan. 7, 2026), https://perma.cc/82EK-64JR.

*12–15 (E.D. Va. Oct. 17, 2025) (citing *Bonta*, 594 U.S. at 612 and concluding that the government's "significant interest" in "probing an organization's connections to terrorism" could not justify its "sweeping" request for the organization's "entire donor list," given that the request "creates an unnecessary risk of chilling" (citation modified)).  Likewise here: That the EEOC's subpoena creates chilling effects on associational rights reinforces the government's obligation to use narrowly tailored methods.  Because the EEOC has not done so, and has not exhausted all available voluntary means of seeking cooperation from potential complainants and witnesses, the subpoena's objectionable provisions unlawfully infringe on First Amendment rights.

## CONCLUSION

For the foregoing reasons, the Alliance respectfully encourages the Court to deny the EEOC's Application for an Order to Show Cause with respect to the subpoena's Requests 2d–f, 3, 4, 6g, 7d, and 8e, and to personal information contained in responses to Request 5.

Dated: January 20, 2026

Respectfully submitted,

 /s/ Kevin Kelly
Kevin Kelly (PA Id. # 311876)
Robert K. Kelner (*pro hac vice* pending)
Evan D. Parness (*pro hac vice* pending)
Noam Kutler (*pro hac vice* pending)
Samuel Ackerman (*pro hac vice* pending)
Benjamin Rolsma (*pro hac vice* pending)
COVINGTON & BURLING LLP
850 Tenth Street, NW
Washington, DC 20001-4956
202-662-6000
kkelly@cov.com

*Counsel for Penn Faculty Alliance to Combat Antisemitism*

**CERTIFICATE OF SERVICE**

I certify that on January 20, 2026, I caused the foregoing document to be filed electronically through the Court's CM/ECF system, which will send a notification of the filing to all counsel of record.

Dated: January 20, 2026

*/s/ Kevin Kelly*
Kevin Kelly