UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, | ) ) ) | |
| Petitioner, | ) ) | No. 2:25-cv-06502 (GJP) |
| v. | ) ) | |
| UNIVERSITY OF PENNSYLVANIA, | ) ) | |
| Respondent. | ) | |

**[PROPOSED] BRIEF OF PUBLIC CITIZEN
AS AMICUS CURIAE SUPPORTING RESPONDENT**

**TABLE OF CONTENTS**

Table of Authorities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

Interest of Amicus Curiae . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Statement of the Case . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

# TABLE OF AUTHORITIES

Page(s)

## CASES

*Arista Records v. Doe 3*,
        604 F.3d 110 (2d Cir. 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Arkansas Times v. Waldrip*,
        37 F.4th 1386 (8th Cir. 2022) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Bates v. Little Rock*,
        361 U.S. 516 (1960) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Boy Scouts of America v. Dale*,
        530 U.S. 640 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Bursey v. United States*,
        466 F.2d 1059 (9th Cir. 1972) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Dendrite International v. Doe No. 3*,
        342 N.J. Super. 134, 775 A.2d 756 (2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Enterline v. Pocono Medical Center*,
        751 F. Supp. 2d 782 (M.D. Pa. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Healy v. James*,
        406 U.S. 169 (1972) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Hurley v. Irish-American Gay, Lesbian and Bisexual Group of Boston*,
        515 U.S. 557 (1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Hustler Magazine v. Falwell*,
        485 U.S. 46 (1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*In re DMCA § 512(h) Subpoena to Twitter*,
        608 F. Supp. 3d 868 (N.D. Cal. 2022) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Jordahl v. Brnovvich*,
        336 F. Supp. 3d 1016 (D. Ariz. 2018),
        *vacated and remanded*, 789 F. App'x 589 (9th Cir. 2020) . . . . . . . . . . . . . . . . . . . . . . 13

*Keyishian v. Board of Regents*,
        385 U.S. 589 (1967) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 11

*Koontz v. Watson,*
      283 F. Supp.3d 1007 (D. Kan. 2018) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Letter Carriers v. Austin,*
      418 U.S. 264 (1974) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 01

*Martin v. Wigley,*
      540 F. Supp. 3d 1220 (N.D. Ga. 2021) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*McCullen v. Coakley,*
      573 U.S. 464 (2014) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*McIntyre v. Ohio Elections Commission,*
      514 U.S. 334 (1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Moody v. Netchoice LLC,*
      603 U.S. 707 (2024) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*N.A.A.C.P v. Claiborne Hardware Co.,*
      458 U.S. 886 (1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 14

*N.L.R.B. v. Midland Daily News,*
      151 F.3d 472 (6th Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Organization for a Better Austin v. Keefe,*
      402 U.S. 415 (1971) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Pilchesky v. Gatelli,*
      12 A.3d 430 (Pa. Super. 2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Signature Management Team v. Doe,*
      876 F.3d 831 (6th Cir. 2017) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Snyder v. Phelps,*
      562 U.S. 443 (2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Stand With US Center for Legal Justice v. Massachusetts Institute of Technology,*
      158 F.4th 1 (1st Cir. 2025) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Sweezy v. New Hampshire,*
      354 U.S. 234 (1957) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 11

*United States v. Cuthbertson*,
  630 F.2d 139 (3d Cir. 1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*United States v. Garde*,
  673 F. Supp. 604 (D.D.C. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Watchtower Society v. Village of Stratton*,
  536 U.S. 150 (2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

## CONSTITUTION AND STATUTES

First Amendment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

Civil Rights Act of 1964
  Title VI . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
  Title VII. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

## OTHER AUTHORITIES

Bodnick, *I'm a Jewish Harvard student. A right-wing doxxing mob is attacking my peers* (Oct. 13, 2023),
  https://forward.com/opinion/564873/harvard-jewish-palestinian-doxxing/ . . . . . . . . . . . .

Concepcion, *Rep. Elise Stefanik on University of Pennsylvania president's resignation: 'One down, two to go'* (Dec. 10, 2023),
  https://www.nbcnews.com/politics/congress/rep-elise-stefanik-university-pennsylvania-presidents-resignation-one-rcna128939 . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Del Valle, *Columbia University Has a Doxing Problem* (Apr. 26, 2024),
  https://www.theverge.com/24141073/columbia-doxxing-truck-student-encampment-palestine-israel . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

Executive Order No. 14,188, *Additional Measures to Combat Anti-Semitism* (Jan 29, 2025),
  https://www.whitehouse.gov/presidential-actions/2025/01/additional-measures-to-combat-anti-semitism/ . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Flitter, *A Wall Street Law Firm Wants to Define Consequences of Israel Protests*, (July 8, 2024),
  https://www.nytimes.com/2024/07/ 08/business/sullivan-cromwell-israel-protests.html . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

Fox, *"Everyone gets to be uncomfortable": How Jewish students at Brown kept antisemitism at bay* (May 3, 2024), https://forward.com/news/ 609526/brown-university-antisemitism-protests-encampment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

Kariuki, *After a 2-week encampment, Philly police arrest 33 protesters on Penn's campus* (May 10, 2024), https://whyy.org/articles/penn-gaza-encampment-arrests-police/ . . . . . . . . . . . . . . . . 3

Oliphant, *Facebook takes down page that Justice Department says was used to harass ICE agents* (Oct, 25, 2025), https://www.reuters.com/world/us/facebook-takes-down-page-that-justice-department- says- was-used-harass-ice-agents-2025-10-14/. . . . . . . . . . . . . . . . . . . . . . . 14

Papadopoulous, *ICE agents 'doxed' on social media, wear masks after receiving death threats, director says*(June 2, 2025), https://www.boston25news.com/news/ local/ ice-agents-doxed-social-media-wear-masks-after-receiving-death-threats-director-says/ 2NIC6OZ6XRGMXDR YLWLIKJ66GU/. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

Schwartz, *University of Pennsylvania Rejects Trump's Higher Education Compact*, https://www.highereddive.com/news/penn-rejects-trumps-higher -education- compact/803078/.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Sachs, et al., *America's Censored Campuses 2025: Expanding the Web of Control* (Jan. 15, 2026), https://pen.org/report/americas-censored-campuses -25-web-of-control/ . . . . . . . . 3, 13

Silver, *How Americans view Israel and the Israel-Hamas war at the start of Trump's second term* (April 8, 2025), https://www.pewresearch.org/short-reads/2025/04/08/how-americans-view-israel-and-the-israel-hamas-war-at-the-start-of-trumps-second-term/ . . . . . . . . . . . . . . . . . . . . . 12

Speri, *Jewish organizers are increasingly confronting Trump: 'The repression is growing, but so is the resistance'*, (May 31, 2025), https://www.theguardian.com/us-news/2025/may/31/jewish-americans-antisemitism-gaza-trump. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

Stern, *I drafted the definition of antisemitism. Rightwing Jews are weaponizing it*, The Guardian (Dec. 13, 2019), https://www.theguardian.com/commentisfree/2019/dec/13/antisemitism-executive-order-trump-chilling-effect. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

Leo Terrell with Mark Levin, *How We Will Defeat Antisemitism in the USA*,
    https://www.youtube.com/watch?v= NOFIKRr2Sco (Mar. 9, 2025) . . . . . . . . . . . . . . . 2

Truth Social, https://truthsocial.com/@realDonaldTrump/posts/114104167452161158
    (Mar. 4, 2025). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

*U.S. Department of Education Letter to Harvard University* (Apr. 25, 2025),
    https://www.nytimes.com/interactive/2025/04/14/us/trump-harvard-
    demands.html . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

U.S. Department of Education, *DOJ, HHS, ED, and GSA Announce Initial Cancelation
    of Grants and Contracts  to Columbia University Worth $400 Million*
    (Mar. 7, 2025),
    https://www.ed.gov/about/news/press-release/doj-hhs-ed-and-gsa-announce-initial-
    cancelation-of-grants-and-contracts-columbia-university-worth-400-million . . . . . . . . . 2

## INTEREST OF AMICUS CURIAE

Public Citizen is a non-profit consumer advocacy organization with members in all fifty states. Since its founding in 1971, Public Citizen has encouraged public participation in civic affairs, including through public protests. For example, in 1999, it helped organize the 1999 "Battle in Seattle," a large protest at a meeting of the World Trade Organization. More recently, Public Citizen has helped organize protests at Donald Trump's private golf-club dinner with the top buyers of his $TRUMP meme coin and at auto shows to highlight some automakers' opposition to electrical vehicles, as well as the "No Kings," "Hands Off" and "ICE Out for Good" rallies in 2025 and 2026. Public Citizen has also participated as amicus curiae in numerous cases involving the First Amendment rights of citizens to participate in civic affairs and public debates.

## STATEMENT OF THE CASE

This case is one of several arising from the efforts of the Trump Administration to bring America's universities to heel for their perceived hostility to conservative viewpoints and their failure to suppress students' protests of the Israeli military attacks in Gaza beginning in October 2023, seeking an end to American military support for Israel. Here, the Equal Employment Opportunity Commission ("EEOC") seeks information about many students and employees of the University of Pennsylvania ("Penn") based on their membership in various Jewish organizations or their connections with a social media post that criticized several members of the Penn faculty for having participated in a conference in Israel during the Gaza bombing campaign. The subpoena, and the investigation from which it stems, is part of a broad campaign by the Trump Administration seeking to weaponize claims of anti-Semitism to suppress protests about Israel by arguing that universities' failure to take sufficiently punitive action against protestors has caused emotional harm to Jewish students and faculty and hence allowed anti-Semitism to flourish on campus.

Specifically, shortly after taking office, President Trump issued an executive order that required all executive agencies to submit reports identifying actions that they could take against "institutions of higher education [alleged to have committed] civil rights violations related to or arising from post October 7, 2023 campus anti-Semitism." *Additional Measures to Combat Anti-Semitism* (Jan 29, 2025), ¶ 3(a), https://www.whitehouse.gov/presidential-actions/2025/01/additional-measures-to-combat- anti-semitism/.  He also threatened a "law-and-order" response to campus protests:

> All Federal Funding will STOP for any College, School, or University that allows illegal protests. Agitators will be imprisoned/or permanently sent back to the country from which they came. American students will be permanently expelled or, depending on the crime, arrested.  NO MASKS!

Truth Social, https://truthsocial.com/@realDonaldTrump/posts/114104167452161158 (Mar. 4, 2025). Subsequently, the Administration threatened to suspend funding for universities that did not impose certain restrictions on speech on campus, including strict enforcement of rules that the Administration said were needed to protect Jewish students from anti-Semitic expression, stating, "We are going to bankrupt these universities.  We are going to take away every federal dollar.  That is why we are targeting these universities."[1]  At the same time, the Administration demanded that universities increase "viewpoint diversity" among the faculty and student body, and ensure that conservative viewpoints that the Administration favors be well represented on campus.  *E.g.*, U.S. Department of Education Letter to Harvard University (Apr. 25, 2025), available at

---

[1] U.S. Department of Education, *DOJ, HHS, ED, and GSA Announce Initial Cancelation of Grants and Contracts to Columbia University Worth $400 Million* (Mar. 7, 2025 press release), available at https://www.ed .gov/about/news/press-release/doj-hhs-ed-and-gsa-announce-initial-cancelation-of-grants-and-contracts-columbia-university-worth-400-million; Leo Terrell with Mark Levin, *How We Will Defeat Antisemitism in the USA*, available at https://www.youtube.com/watch?v= NOFIKRr2Sco (Mar. 9, 2025interview at 1:14, 2:41, 4:17; 6:35).

https://www.nytimes.com/interactive/2025/04/14/us/trump-harvard-demands.html. The Trump Administration's offensive on these issues is but the leading edge of a campaign to subject the American system of higher education to a "web of control" intended to suppress disfavored viewpoints. *See generally* Sachs, et al., *America's Censored Campuses 2025: Expanding the Web of Control* (PEN America Jan. 15, 2026) ("*Web of Control*"), available at https://pen.org/report/americas-censored-campuses-25-web-of-control/.

Penn was one of the many universities where students organized protests against Israel's Gaza campaign, including by erecting a public encampment on the campus, which police eventually cleared at Penn's behest. Kariuki, *After a 2-week encampment, Philly police arrest 33 protesters on Penn's campus* (May 10, 2024), https://whyy.org/articles/penn-gaza-encampment-arrests-police/. Penn was also one of several universities that declined to sign the "Compact with Higher Education" promulgated by the Trump Administration as a potential condition for the priority in allocation of federal grants to support research and scholarships at elite colleges and universities. Schwartz, *University of Pennsylvania Rejects Trump's Higher Education Compact*, https://www.highereddive.com/news/ penn-rejects-trumps- higher-education-compact/803078/. The proposed compact has been widely criticized for its potential to waive the traditional academic freedom of universities to protect "freedom of speech, the freedom to learn, and the freedom to engage in constructive debate and dialogue on campuses across the country." *Id.* In addition, Penn's president was one of several university leaders who were pilloried in a Congressional hearing about campus anti-Semitism, after which she resigned her position. Concepcion, *Rep. Elise Stefanik on University of Pennsylvania president's resignation: 'One down, two to go'* (Dec. 10, 2023), https://www.nbcnews.com/politics/ congress/rep-elise-stefanik-university-pennsylvania

-presidents-resignation-one-rcna128939.

In 2024, a student group calling itself "Penn Against the Occupation" posted images on social media that criticized a group of 29 Penn faculty members for traveling to Israel, meeting with the President of Israel, and showing support for an Israeli university, at the same time that Israel was bombing universities in Gaza; the post referred to the visit as showing support for "scholasticide,"



which the post defined as "the systematic destruction of Palestinian schools," and said that these faculty members "do not represent us."




In addition to a photograph of the entire Penn delegation, accompanied by a legend indicating that the group "condemn" these staff members for "supporting the ongoing scholasticide in Palestine," the post included separate images of five Penn faculty members, giving their names and positions, along with the legend "supports scholasticide."

According to petitioner, after a conversation between a Penn staff member and a student who was part of Penn Against the Occupation, that group's post was taken down. Attachment R to the Complaint, page 4, DN 1-21. However, the post remains publicly available on a different Instagram account, at https://www.instagram.com/p/C3x5el0pa5r/?img_index=1. Penn later "deregistered" the student organization that was responsible for the posting on the ground that student groups are not permitted to remain entirely anonymous. Attachment R, page 4.

On March 5, 2025, the EEOC announced that it would be partnering with other Trump Administration agencies in furthering Trump's Executive Orders directed at the campus protests against Israeli attacks in Gaza. Adegbile Declaration, Exh. 3, DN 21-4. The Chair of EEOC then instituted a charge alleging that Penn was subjecting Jewish members of its staff, including faculty and other employees as well as students employed by the university, to a "hostile work environment" based on their Jewish "national origin, religion and/or race" in violation of Title VII. *Id.* Exh. 1, DN 21-2. In conjunction with its investigation of that charge, the EEOC issued the administrative subpoena whose enforcement is at issue in this proceeding. *Id.* Exh. 8, DN 21-9.

The first six sections of the subpoena sought information about the members of various Jewish campus organizations, and about some "listening sessions" and an online survey that Penn conducted as part of its task force on anti-Semitism. *Id.* ¶¶ 1-6. The final three paragraphs in the subpoena sought information about the social media post set forth on pages 4-5 above. *Id.* ¶¶ 7-9.

-5-

This amicus brief addresses the three last paragraphs of the subpoena, which seek identifying information about the faculty criticized in the post, identifying information about anybody who reported the post to the University, and "the complete investigation for the 'Penn Students Against the Occupation' investigative report."  Penn provided several hundred pages of documents in response to the subpoena, Adegbile Declaration ¶ 21, DN 21-1, withholding only identifying information about students and faculty who declined to give permission for release of their personal information to the Government.   Penn Opposition Brief page 1, DN 20.

As explained below, the social media post is protected political speech and government action to investigate the report, suppress the report, and/or impose sanctions for Penn's failure to suppress the report or punish its authors, and the use of government power to compel identification of anonymous speakers to pursue that investigation, are barred by the First Amendment.

## ARGUMENT

A.  The Government's basis for seeking information about the social media post and about the student organization that posted it necessarily rests on the contention that Penn can be punished for its failure to suppress online speech by its students about professors' travel to Israel, and that this objective justifies an investigation into the identities of the student speakers, of the witnesses whom Penn interviewed about the report, and of the faculty who objected to the post, none of whom have consented to Penn's disclosure of their identifying information to the Government.  That contention run directly into three separate lines of well-settled First Amendment precedent, each of which is sufficient to warrant denial of the subpoena.

First, the First Amendment protects academic freedom, including the freedom to articulate views at odds with opinions favored by government officials.   In cases going back decades, the

Supreme Court has upheld the right to espouse unpopular views under the rubric of academic freedom, recognizing the right as fundamental to a democratic society.  As the Court explained, "[t]o impose any straitjacket upon the intellectual leaders in our colleges and universities would imperil the future of our Nation. . . . Teachers and student must always remain free to inquire, to study and to evaluate, to gain new maturuity and understanding."   *Sweezy v. New Hampshire*, 354 U.S. 234, 250 (1957); *see also Keyishian v. Board of Regents*, 385 U.S. 589 (1967).  The Supreme Court extended the protective mantle of academic freedom to student protestors in *Healy v. James*, 406 U.S. 169 (1972), stating, "The college classroom **with its surrounding environs** is peculiarly 'the marketplace of ideas,' and we break no constitutional ground in reaffirming this Nation's dedication to safeguarding academic freedom." *Id.* at 180-181 (emphasis added).  Thus, the First Amendment's protection for academic freedom limits the use of government authority to suppress the "ability to participate in the give and take of campus debate . . . by denial of access to the customary media for communicating with the administration, faculty members and other students." *Id.* at 181-182.

Second, in a series of cases, including *Watchtower Society v. Village of Stratton,*  536 U.S. 150 (2002),  *McIntyre v. Ohio Elections Commission*, 514 U.S. 334 (1995), and *Bates v. Little Rock,* 361 U.S. 516 (1960), the Supreme Court has struck down government requirements that speakers identify themselves when they engage in political and other protected speech.  These cases recognized that the right to remain anonymous is an important aspect of the freedom of speech protected by the First Amendment.  *McIntyre,* 514 U.S. at 342.  Pursuant to that First Amendment right to speak anonymously, both state and federal courts have held that even a private party seeking to use judicial process to identify anonymous speakers for the purpose of seeking relief based on their speech must make a legal and factual showing of a potentially valid claim before piercing the

anonymity of the speakers. *E.g. Signature Mgt. Team v. Doe*, 876 F.3d 831, 838 (6th Cir. 2017); *Arista Records v. Doe 3*, 604 F.3d 110, 119 (2d Cir. 2010); *In re DMCA § 512(h) Subpoena to Twitter*, 608 F. Supp. 3d 868, 876-877 (N.D. Cal. 2022); *Pilchesky v. Gatelli*, 12 A.3d 430 (Pa. Super. 2011)*; Dendrite International v. Doe No. 3*, 342 N.J. Super. 134, 775 A.2d 756 (2001). *See also United States v. Cuthbertson*, 630 F.2d 139, 146 (3d Cir. 1980) (recognizing a common law privilege, founded in the First Amendment, not to reveal confidential sources absent a showing of necessity); *Enterline v. Pocono Med. Ctr.*, 751 F. Supp. 2d 782, 787-788 (M.D. Pa. 2008) (applying a similar test to bar enforcement of subpoena to newspaper to identify author of an anonymous comment on its website). Such First Amendment strictures similarly apply when a government agency invokes its power to investigate whether a federal statute has been violated. *N.L.R.B. v. Midland Daily News*, 151 F.3d 472 (6th Cir. 1998); *Bursey v. United States*, 466 F.2d 1059 (9th Cir. 1972); *United States v. Garde*, 673 F. Supp. 604 (D.D.C. 1987).

Third, the First Amendment limits the use of government authority to restrict the ability of private parties to decide what speech by third parties will or will not be made from their facilities. Thus, in *Hurley v. Irish-American Gay, Lesbian and Bisexual Group of Boston*, 515 U.S. 557 (1995)*,* the Court held that the holders of a government parade permit could exclude expressions of gay identity from their parade, notwithstanding state anti-discrimination laws. And in *Boy Scouts of America v. Dale*, 530 U.S. 640 (2000), the Court upheld the right of a private organization to exclude gay scoutmasters whose expression was at odds with the stances that the organization wanted to be communicated to its youthful charges. More recently, in *Moody v. Netchoice LLC*, 603 U.S. 707 (2024), the Supreme Court applied the lessons of *Hurley* in holding that the First Amendment constrains efforts by two state governments to regulate the process by which social media platforms

engage in content moderation, deciding which speech may or may not be delivered on their platforms, and deciding what consequences should be imposed on speakers whose content is determined, either before or after the fact, to run afoul of the rules applied by the platforms' owner.

Here, the only basis for compelling identification of Penn's students and employees in connection with the social media post is the possibility that Penn could be found liable under the civil rights laws for failing to suppress that post—a statement consisting of purely political speech. The First Amendment, however, bars that theory of liability. The principles set forth in the foregoing lines of cases confirm that the First Amendment protects the right of a private university to decide whether to allow student protests, to decide whether to allow students to conceal their identities when engaged in student protest, to determine in what university facilities student protest may be delivered, and to assess what consequences should be visited on protestors who contravene the university's rules and directives.

**B.** Because the First Amendment protects a private university's decisions about the regulation of student speech, only a compelling government purpose would authorize the federal government to penalize a university by imposing remedial consequences based on the school's choices about how to treat student protestors, and to compel the identification of anonymous speakers for the purpose of pursuing such a claim. The EEOC's purported concerns about the impact of the protests on Jewish faculty and other employees fall well short of the required showing, for several reasons.

To start, although some portion of Penn's Jewish employees and faculty may be upset with the protests, the hurt feelings of those who witness speech do not justify the Administration's insistence on suppression of that expression. Doctors and other personnel who work in the facilities

of abortion clinics (and the women who come to use their services) must live with the emotional impact of the First Amendment protections for the anti-abortion protestors who parade on public streets nearby. *See McCullen v. Coakley*, 573 U.S. 464 (2014). Gold Star mothers must accept the emotional impact of the First Amendment's protection for a religious sect that tout homophobic slogans while parading near their children's funerals. *See Snyder v. Phelps,* 562 U.S. 443 (2011). Realtors working in certain neighborhoods must accept the dissemination of leaflets and mounting of picket lines that accuse them of blockbusting. *See Organization for a Better Austin v. Keefe*, 402 U.S. 415 (1971). And workers who cross picket lines must be willing to bear the emotional impact of being called "scabs" in a union newsletter. *See Letter Carriers v. Austin,* 418 U.S. 264 (1974). Indeed, the Supreme Court has held that emotional distress suffered by the target of a satirical magazine does not form a basis for suing over that speech, unless the speech is otherwise actionable (such as for libel). *See Hustler Magazine v. Falwell*, 485 U.S. 46 (1988).

So, too, that some Jewish members of Penn's staff may be offended when students denounce the state of Israel or express support for Palestinians is not a proper basis for a governmental actor to demand that a university bar such speech or bar such speakers from making social media postings. Indeed, the university campus is frequently the place where students and faculty who may have been raised in a relatively cloistered environment, where they were primarily exposed to the opinions of the like-minded, and of others who were ethnically or religiously similar to themselves, are exposed to the opinions of those who were raised in different environments. When students choose to attend, and faculty choose to provide instruction at, a heterogenous university that attracts attendees from very different backgrounds and with very different opinions—universities that feature the "viewpoint diversity" that the Trump Administration purports to want—they may encounter opinions that make

-10-

them deeply uncomfortable.

Learning to live with those differences is part of the maturation process descried in *Sweezy*, 354 U.S. at 250, and sophisticated university leaders employ a range of techniques, free from government compulsion, to help students learn to appreciate each others' differences, and to phrase their criticisms in ways that promote mutual respect and enable students to co-exist in the educational environment.  *See Keyishian*, 385 U.S. at 603.   Considering the important role that universities play on helping students broaden their perspectives, employees who come to work at private universities must similarly expect to be confronted with political speech that makes them deeply uncomfortable.

The EEOC's purported theory for pursuing its investigation—that political speech by students is creating a hostile work environment for Penn's faculty, and that Penn can therefore be held liable for having failed to prevent or punish such speech—is dubious on its face.  To be sure, as a private university, Penn would be entitled to decide that certain speech will not be tolerated on its campus or in online media that are accessible to its staff; it could decide that law enforcement or online censors should be called into action as soon as a student speaks at a time, in a place or in a manner that contravenes university rules.  But the constraints that the First Amendment's requirement of strict scrutiny imposes on government action bars the United States  from insisting that Penn do so.  Similarly, although  Penn is entitled to decide not to accord recognition to student groups that remain anonymous, as Penn apparently does, the federal government is not entitled to pierce the anonymity of student speakers absent evidence that they have committed a wrong forbidden by federal law.

Moreover, courts have emphatically rejected efforts to deploy claims of anti-Semitism as a

basis for suppressing speech critical of Israel and critical of Americans who support Israel.  Most recently, the United States Court of Appeals for the First Circuit rejected a suit contending that protests against Israel and expressed opposition to Zionism can be proscribed under Title VI consistent with the First Amendment.   The court explained, "Plaintiffs are entitled to their own interpretive lens equating anti-Zionism (as they define it) and antisemitism.  But it is another matter altogether to insist that others must be bound by plaintiffs' view."  *Stand With US Center for Legal Justice v. Massachusetts Institute of Technology*, 158 F.4th 1, 6 (1st Cir. 2025).  It reiterated that the "[a] law punishing private citizens for expressing political opinions disfavored by Congress would be subject to 'the most exacting' First Amendment scrutiny," *id.* at 13, and applied that standard in deciding whether civil rights claims based on disfavored could withstand First Amendment scrutiny.  *Id.* at 14-19.

As the First Circuit explained, there are broad differences within the American community, and indeed among Jewish Americans, about Israel's actions in Gaza, and government bodies cannot seize on claims of national origin discrimination or religious discrimination to suppress one side of this debate.  *Id.* at 17 (rejecting plaintiffs' reliance on a determination by the U.S. Department of State that defined anti-Semitism to include denunciations of Israel).[2]   Given these differences of opinion within the broader community, PEN America is surely correct in arguing, in its recent report on Trump Administration attacks on academic freedom, that although some federal civil rights

---

[2] *See* discussion of Jewish opinions in Speri, *Jewish organizers are increasingly confronting Trump: 'The repression is growing, but so is the resistance',* (May 31, 2025), https://www.theguardian.com/ us-news/2025/may/31/jewish-americans-antisemitism-gaza-trump; Fox, *'Everyone gets to be uncomfortable': How Jewish students at Brown kept antisemitism at bay* (May 3, 2024), https://forward.com/news/ 609526/brown-university-antisemitism-protests-encampment; Silver, *How Americans view Israel and the Israel-Hamas war at the start of Trump's second term* (April 8, 2025), available at https://www.pewresearch.org/short-reads/2025/04/08/how-americans-view-israel-and-the-israel-hamas-war-at-the-start-of-trumps-second-term/.

enforcers have adopted the definition of anti-Semitism adopted by the International Holocaust Remembrance Alliance (IHRA), which treats criticism of Israel and Zionism as examples of anti-Semitism, that approach risks the very sort of censorship that the First Circuit rejected. *Web of Control*, *supra* at 23-24.[3]

Similarly, several courts have held, following the Supreme Court decision in *N.A.A.C.P v. Claiborne Hardware Co.*, 458 U.S. 886 (1982), that state laws forbidding expressions of collective support for boycotting, divesting and sanctioning Israel violate the First Amendment. *Martin v. Wigley*, 540 F. Supp. 3d 1220 (N.D. Ga. 2021); *Jordahl v. Brnovvich*, 336 F. Supp.3d 1016 (D. Ariz. 2018), *vacated and remanded*, 789 F. App'x 589 (9th Cir. 2020); *Koontz v. Watson*, 283 F. Supp.3d 1007 (D. Kan. 2018).[4]

C.  Moreover, the speakers who issued the anonymous social media posting have every reason to fear the real-world consequences of being identified.  Some opponents of the anti-Israel protests have been doxing protestors leading to "relentless online harassment," Del Valle, *Columbia University Has a Doxing Problem* (Apr. 26, 2024), available at https://www.theverge.com/ 24141073/columbia-doxxing-truck-student-encampment-palestine-israel, or demanding explanations from protestors who have applied for jobs.  Flitter, *A Wall Street Law Firm Wants to Define Consequences of Israel Protests*, (July 8, 2024), available at https://www.nytimes.com/2024/07/ 08/business/sullivan-cromwell-israel-protests.html.

---

[3] PEN America's report notes that the lead drafter of the IHRA definition has withdrawn his support because the definition has been so often invoked as a basis of censorship. *Id.* 24, citing Stern, *I drafted the definition of antisemitism. Rightwing Jews are weaponizing it*, The Guardian (Dec. 13, 2019), available at https://www.theguardian.com/commentisfree/2019/dec/13/antisemitism -executive-order-trump -chilling-effect.

[4] Courts have divided, however, on the issue of whether a state can demand that a business waive any right to participate in an economic boycott as a condition of doing business with state agencies. *Compare* the above cases with *Arkansas Times v. Waldrip*, 37 F.4th 1386 (8th Cir. 2022).

Some of the Administration's own law enforcement officials have worn masks based on similar concerns. Papadopoulous, *ICE agents 'doxed' on social media, wear masks after receiving death threats, director says* (June 2, 2025), available at https://www.boston25news.com/news/local/ice-agents-doxed-social-media-wear-masks-after-receiving-death-threats-director-says/2NIC6OZ6XRGMXDR YLWLIKJ66GU/. Indeed, the Department of Justice has been pressuring social media platforms to shut down pages that doxx agents of Immigration and Customs Enforcement, contending that disclosure of their identities subjects them to retaliation, Oliphant, *Facebook takes down page that Justice Department says was used to harass ICE agents* (Oct, 25, 2025), https://www.reuters.com/world/us/facebook-takes-down-page-that-justice-department-says-was-used-harass-ice-agents-2025-10-14/.

To the extent that some protestors may have made unprotected statements, a different question would be presented. But First Amendment does not permit a government body to impose collective responsibility on a group engaged in protected protesting for the possibly abusive speech or conduct of others who share the same views, at least in the absence of a showing of ratification by those in charge. *NAACP v. Claiborne Hardware Co.,* 458 U.S. 886 (1982). A private university such as Penn might well take a different approach to the handing of protests if the participants misbehave, but the government cannot insist on identifying authors of protected pseech on that ground.

## CONCLUSION

For these reasons, as well as other reasons offered by respondents and by the intervenors in support of respondents, the Court should deny enforcement of the EEOC's subpoena and dismiss the order to show cause.

-14-

Respectfully submitted,

  /s/ Jim Davy
Jim Davy
  All Rise Trial & Appellate
  1602 Frankford Ave
  Box 15216
  Philadelphia, Pennsylvania 19125
  (215) 792-3579
  jimdavy@allriselaw.org

**of counsel:**

    /s/ Paul Alan Levy
Paul Alan Levy
  Public Citizen Litigation Group
  1600 20th Street, NW
  Washington, D.C. 20009
  (202) 588-7725
  plevy@citizen.org

                                         Attorneys for Public Citizen

January 21, 2026

-1-