**THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION,

Petitioner,

v.

THE TRUSTEES OF THE UNIVERSITY OF PENNSYLVANIA,

Respondent.

Civil Action No. 2:25-CV-06502-GJP

**PETITIONER EQUAL EMPLOYMENT OPPORTUNITY COMMISSION'S REPLY TO INTERVENORS' OPPOSITION TO THE APPLICATION FOR AN ORDER TO SHOW CAUSE**

CATHERINE L. ESCHBACH
Acting General Counsel

CHRISTOPHER LAGE
Deputy General Counsel

DEBRA M. LAWRENCE
Regional Attorney

EQUAL EMPLOYMENT
OPPORTUNITY COMMISSION
Philadelphia District Office
31 Hopkins Pl., Suite 1432
Baltimore, MD 21201
410 801-6691
Debra.lawrence@eeoc.gov

## Argument

1. Intervenors Fail To Address The Limited Nature Of This Subpoena Enforcement Action.

This action concerns a routine EEOC request for victim and witness contact information and internal complaints about an employer under investigation for fostering a hostile work environment. Intervenors' Opposition To The Application for An Order to Show Cause ("Brief") profoundly sidesteps this essential context by stringing together cases that articulate general constitutional principles. None concern a civil rights investigation, as here, in which Congressionally conferred investigatory powers under section 710 of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e-9, authorize the subpoena in question. In addition to race and national origin, Title VII specifically empowers EEOC to investigate claims of religious discrimination, which necessarily means that EEOC would gather information about employees' religious affiliations in the course of investigations on that statutory basis. Moreover, while asserting inapplicable constitutional concerns, Intervenors fail to acknowledge *University of Pennsylvania v. EEOC*, 493 U.S. 182 (1990), an EEOC subpoena enforcement case against this very employer that provides a clear roadmap for enforcing EEOC's current subpoena.

As the Supreme Court held in *University of Pennsylvania*, "Title VII gives the Commission broad power to seek access to all evidence that may be relevant to the charge under investigation." *Id.* at 192 (internal quotation marks omitted). In response to assertions of the need for privacy and confidentiality, the Court considered those arguments and Congress's adoption of criminal penalties for disclosure of information learned during an EEOC investigation, stating that "Congress apparently considered the issue of confidentiality, and it provided a modicum of protection." Thus, the Supreme Court rejected Penn's exhortation "to strike the balance differently from the one Congress adopted." *Id.* In view of many of the same arguments that the

Intervenors and Penn make here today, the Court's rejection is clear: "unless specifically provided otherwise in the statute, EEOC may obtain 'relevant' evidence. Congress has made the choice." *Id.* at 194. Nor did adherence to the "relevance" standard give rise to a First Amendment issue where Penn asserted turning over the tenure materials would have a "chilling effect" on academic freedom. *Id.* at 196-97. In this matter, as in *University of Pennsylvania*, there is no direct infringement on religious exercise, speech, or academic freedom. Here too Intervenors (and Penn) make attenuated arguments about speculative harms—claiming that disclosing information to EEOC that must be kept confidential by statute results in fears of "doxxing," "harassment," and "threats," (Br. at 4), and would instead lead to government retaliation against them by the very agency charged with rooting out workplace discrimination, Br. 4-7. These types of concerns do not infringe the First Amendment without a need to even consider whether there is an overriding, compelling government interest in subpoena enforcement. 493 U.S. at 201-02. *University of Pennsylvania* alone should close the door on Intervenors' arguments against subpoena enforcement.

Contrary to Intervenor's claim that EEOC's routine request for information likely to lead to victims of and witnesses to the alleged hostile work environment amounts to a "disturbing and unconstitutional demand," (Br. at 1), this manner of evidence collection is not novel and remains essential to EEOC's work: *See, e.g., McLane Co., Inc. v. EEOC,* 581 U.S. 72 (2017); *EEOC v. UPS, Inc.*, 587 F.3d 136 (2d Cir. 2009). That the information is safeguarded by statute imposing criminal penalties against disclosure (42 U.S.C. §2000e-8(e)) addresses Intervenors' privacy concerns and renders much of their caselaw inapposite as it pertains to compelled public disclosure. "Safeguards against disclosure of private material have been held to be adequate

when there exists a statutory penalty for unauthorized disclosures…" *Fraternal Order of Police, Lodge No. 5 v. City of Philadelphia*, 812 F.2d 105, 118 (3d Cir. 1987).

Moreover, Intervenors fail to acknowledge that this subpoena enforcement proceeding, like all others, is summary in nature, and mandates enforcement upon a showing that the charge is proper, the information requested is relevant to the charge, the subpoena is not too indefinite, and is not issued for an illegitimate purpose or unduly burdensome. *See McLane Co., Inc. v. EEOC,* 581 U.S. at 76-77. Their conclusory argument that the Commissioner's charge, alleging a hostile work environment, is invalid as lacking an alleged unlawful employment practice, misunderstands that "a hostile work environment" is itself an unlawful employment practice comprising unequal "terms and conditions of employment" prohibited by Section 703(a) of Title VII, 42 U.S.C. § 2000e-2(a)(1). *See Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 117 (2002) ("A hostile work environment claim is composed of a series of separate acts that collectively constitute one 'unlawful employment practice.' 42 U.S.C. § 2000e–5(e)(1)").

Unable to override the established standard for subpoena enforcement, Intervenors instead argue that, as applied to identifying Jewish victims and witnesses, the subpoena is unconstitutional. But in essence, Intervenors ask EEOC to enforce its anti-discrimination laws differently for Jewish employees and second guess EEOC's judgment as to the most effective investigative steps, which could create First Amendment and Equal Protection problems. *See, e.g., Larson v. Valente,* 456 U.S. 228, 246 (1982) ("[the] fullest realization of true religious liberty requires that government . . . effect no favoritism among sects . . . and that it work deterrence of no religious belief") (quoting *School Dist.of Abington Tp. Pa. v. Schempp,* 374 U.S. 203, 305 (1963)); *Rogers v. United States,* 696 F. Supp. 2d 472, 498-99 (W.D. Pa. 2010). In short, the solution that Intervenors are asking the Court to adopt, wherein EEOC must adopt special

restrictions in enforcing Title VII with respect to a particular protected class, is itself constitutionally suspect.

2. Intervenors' Suggestion That EEOC's Investigation Is "Punitive" Lacks Merit.

EEOC declines to engage with Intervenors' political rhetoric characterizing the administration's efforts to combat antisemitism as punitive. EEOC seeks identifying information to ensure nondiscrimination rights are upheld and not to imperil any individual. Their reliance on case law critical of the administration's efforts to identify antisemitic actors during college protests (e.g., *American Ass'n of Univ. Professors v. Rubio,* 802 F. Supp.3d 120 (D. Mass. 2025)) is hardly akin to EEOC's efforts to identify employees exposed to "swastikas and hateful graffiti," ECF 1-10, "hateful antisemitic messages projected on buildings," and "disturbing emails threatening violence to individuals purely based on their Jewish and other identities." ECF 1-14. Nor are the cases addressing the withholding of funding from academic institutions for failing to combat antisemitism on campus (*President and Fellows of Harvard College v. United States Dep't of Health and Human Services*, 798 F. Supp.3d 77 (D. Mass. 2025); *American Ass'n of Univ. Professors v. Trump,* Case No. 25-cv-07864-RFL, 2025 WL 3187762 (N.D. Cal. Nov. 14, 2025)),[1] applicable to EEOC's investigation of whether or to what extent Penn has fostered a hostile work environment against Jewish employees. Intervenors repeatedly ignore that this is not a merits proceeding. Rather, it is simply the mechanism for obtaining information to determine if the charge has merit. "[I]f the victim does not subjectively perceive the environment to be abusive, the conduct has not actually altered the conditions of the victim's employment, and there is no Title VII violation." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21

[1] EEOC does not suggest these cases were correctly decided, but in all circumstances they are clearly off point here.

(1993). And if the charge has merit, withholding of funding is not a remedy available under Title VII. *See* 42 U.S.C.§2000e-5(g) and 42 U.S.C. §1981a.

3. Compelled Disclosure of Contact Information Does Not Implicate Associational Rights.

Associational rights are not absolute, as recognized in cases relied upon by Intervenors – *Roberts v. United States Jaycees*, 468 U.S. 609 (1984) (enforcing a state's anti-discrimination statute may infringe associational rights where the impact on the group's expressive association is not substantial); and *Buckley v. Valeo,* 424 U.S. 1 (1976) (disclosure requirements for campaign finance contributors survive First Amendment scrutiny because the governmental interest in transparency and electoral integrity outweighs the burden on associational rights). Any associational burdens here are far less than those in *Roberts*, as EEOC is not seeking to compel any organization to admit members, or those in *Buckley*, created by compelled public disclosure of political donors, as EEOC must keep the information confidential. Especially so where EEOC is amenable to obtaining contact information of potential victims and witnesses without Penn providing any reference to organizational affiliations, Intervenors' claim that their members' associational rights are so burdened as to create a constitutional issue falls short. And even if they were so implicated, EEOC's law enforcement mandate to eradicate workplace discrimination—specifically including religious discrimination—would provide the compelling justification for the disclosure.

The case law offered by Intervenors to claim associational protections is distinguishable from this action. As explained in EEOC's prior briefing, (ECF 36 at 6-8), *Americans for Prosperity Found. v. Bonta,* 594 U.S. 595 (2021) and *NAACP v. Alabama ex rel. Patterson,* 357 U.S. 449 (1958), are highly distinguishable because EEOC, pursuant to its law enforcement function, seeks information for the limited purpose of investigating a possible hostile work

environment, not to probe, penalize, or chill religious or associational activity. In further contrast, EEOC is also required to keep the information confidential. For these same reasons, *Bates v. City of Little Rock,* 361 U.S. 516 (1960), where the Court rejected the compulsory disclosure and public disclosure of the NAACP membership lists as lacking any relation to the government's imposition of occupational license taxes, is likewise off-point. The First Amendment equities in those cases do not extend to EEOC's tailored collection of information sought through a subpoena issued pursuant to a valid charge investigation, which EEOC must keep confidential under threat of criminal penalty.

Instead of recognizing that contact information of potential victims and witnesses disclosed to a law enforcement agency governed by statutory confidentiality protections does not violate associational rights, Intervenors pepper their brief with case law migrating into issues far afield from what needs to be decided here: *NAACP v. Claiborne Hardware Co*., 458 U.S. 886 (1982) (affirming right to boycott); *Talley v. California*, 362 U.S. 60 (1960) (affirming right to distribute anonymous leaflets promoting boycott); *McIntyre v. Ohio Elections Com'n*, 514 U.S. 334 (1995) (affirming right to distribute anonymous leaflets opposing tax levy); *Buckley v. Am. Constitutional Law Found., Inc.,* 525 U.S. 182 (1999) (affirming right of circulators of petitions to remain anonymous). But Intervenors fail to offer any case law addressing an agency's attempt, not to monitor or punish individuals for their associations, but to identify violations of and, where warranted, remedy employees' statutory rights under Title VII.

Were exacting scrutiny to apply, as argued by Intervenors, claims of First Amendment protections do not automatically invalidate a lawfully issued government subpoena where EEOC can clearly demonstrate a compelling interest in enforcement. "Although the speech and associational protections afforded by the First Amendment have been invoked in defense of an

administrative subpoena, the presence of First Amendment issues alone is not enough to thwart its enforcement." *See United States v. Inst. for College Access & Success,* 27 F. Supp.3d 106, n.8 (D.D.C. 2014) (citing *Federal Election Comm'n. v. Machinists Non–Partisan Political League,* 655 F.2d 380, 389–90 (D.C. Cir. 1981)). Here, of course, the compelling interest is a law enforcement agency's statutory mandate to remedy employment discrimination. Requiring an employer to produce contact information for potential witnesses and victims of discrimination is, at most, a de minimis burden on their rights—constitutional, privacy, or otherwise—and even assuming there is any burden that does not override EEOC's compelling interest in carrying out its enforcement mandate. If Penn's employees believe they were unharmed by the conduct being investigated, they can say so. But nowhere in Title VII and its subpoena authority is there any provision that restricts EEOC from obtaining potential victims' or witnesses' personal contact information and reaching out to them only with their consent.

4. <u>Providing the Subpoenaed Information to EEOC Does Not Violate Intervenors' Constitutional or Statutory Rights.</u>

Along with the contact information of victims and witnesses, employees' complaints of a hostile work environment at Penn, whether shared at listening sessions or in any other context, are critical to this investigation. *See Faragher v. City of Boca Raton*, 524 U.S. 775 (1998); *Burlington Indus. v. Ellerth*, 524 U.S. 742 (1998). Intervenors cannot shield these complaints and investigatory materials from disclosure merely by characterizing them as "political and religious speech in public discourse" (Br. at 13). Nor do Intervenors' cases protecting religious and political speech from government regulation (Br. at 13-15) bear any meaningful connection to the relevant inquiry of whether such complaints or other internal investigation materials must be disclosed to EEOC. Intervenors offer no basis for concluding that employee complaints reporting

behavior potentially unlawful under Title VII should not be disclosed to the agency charged with enforcing this statute.

Intervenors fare no better arguing that disclosure to EEOC of personal contact information of employees in the Jewish Studies program would interfere with academic freedom. Their identities and work contact information already are public on Penn's website, and Intervenors have not shown any real or imminent threat to privacy, safety, academic, or associational freedoms. *See University of Pennsylvania*, 493 U.S. at 201-02. EEOC needs information beyond what is publicly available so as not to use Penn, the employer under investigation, as the intermediary between EEOC and the potential victims and witnesses. Nor is it seeking to use Penn's communication platforms to contact these individuals for obvious reasons: EEOC's reluctance to interfere with potential victims' and witnesses' work obligations; Penn's access to and ability to monitor communications occurring over its platforms; and the threat of retaliation against these employees were Penn privy to these communications. Indeed, retaliation claims are the most frequently filed charges with EEOC.[2]

EEOC's investigation here does not violate the Free Exercise Clause. Nor does it violate RFRA.[3] Contrary to Intervenors' assertion, EEOC is not "targeting" Jews. Rather, it is investigating a charge alleging a possible hostile work environment targeting Penn's Jewish employees. Unlike Intervenors' cited authority – *Mack v. Warden Loretto FCI*, 839 F.3d 286 (3d Cir. 2016) (prison guards' anti-Muslim harassment and hostility towards inmate caused him to

---

[2] *See* Table_E1a._Charge_Receipts_by_Basis_or_Statute_(All_Statutes)_FY_1997_-_FY_2024.xlsx (last accessed 2/11/2026).

[3] The Religious Freedom Restoration Act of 1993 (RFRA) prohibits the "Government [from] substantially burden[ing] a person's exercise of religion even if the burden results from a rule of general applicability" unless the Government "demonstrates that application of the burden to the person—(1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. §§ 2000bb–1(a), (b).

refrain from praying at work, stating a claim under RFRA); *Kennedy v. Bremerton Sch. Dist.,* 597 U.S. 507 (2022) (school district violated Free Exercise Clause by terminating football coach after he knelt to offer a quiet personal prayer); *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 582 U.S. 449 (2017) (state policy of denying church an otherwise available public benefit on account of its religious status violated its rights of under the Free Exercise Clause); *Church of Lukumi Babalu Aye, Inc. v. City of Hialeah***.** 508 U.S. 520 (1993) (city ordinance prohibiting religious killings of animals by Santeria church members but excluding almost all other animal killings violated Free Exercise Clause)) – there is no nexus between EEOC's administrative subpoena (seeking information to investigate, among other bases, potential religious discrimination) and a direct burden on or regulation of any religious practice. EEOC has not prohibited any religious practice or sought membership information for purposes of eliminating Jewish affiliated groups—it instead seeks to enforce antidiscrimination laws to ensure Jewish employees are not being subjected to an unlawful hostile work environment. And in all circumstances, a Title VII investigation is a compelling interest.

Nor can the Equal Protection Clause support Intervenors' argument against enforcement of the subpoena. If the EEOC's request for contact information for likely Jewish employees or other employees most likely to have witnessed potential antisemitic acts violates the Equal Protection Clause, this would also be the case for other potential victims of discrimination of all races and religions, and other bases statutorily protected.[4] Intervenors' position, if accepted by the Court, would impair EEOC's statutory mandate by constraining its ability to investigate discrimination on the basis of religion, race, national origin, and other protected categories, and to identify and obtain relief for victims. The constitutional equities argued by Intervenors are not

[4] *See supra* at 1 and ECF 28 at 1, citing similar information requests involving other categories of protected bases.

so burdened here as to override EEOC's compelling interest in conducting an investigation of alleged discrimination pursuant to Congressionally conferred authority under Title VII.

Intervenors spend much time voicing concerns about a government list that will harm potential victims and witnesses. These arguments, again, fail due to Title VII's strict confidentiality provisions. Claiming confidentiality or First Amendment protections as a basis for withholding information would allow any employer to shield the records of any internal, confidential HR investigation from any subsequent EEOC investigation on the grounds of promised confidentiality. That is not and cannot be the law, for it would deprive EEOC of what is likely the *most* relevant information in any hostile work environment investigation. Further, Intervenor's position remains at odds with *University of Pennsylvania v. EEOC*, which firmly established that a university does not occupy special status to shield relevant information from EEOC investigations, notwithstanding its claims of privacy, confidentiality, and constitutional protections – many of the same arguments that the same employer advances here. Accordingly, Penn's assurances of confidentiality to employees who participated in listening sessions, as a matter of law, cannot undermine EEOC's law enforcement functions.

## Conclusion

What remains a very routine subpoena enforcement action should not be decided based on which party is most vocal. Enforcement of the subpoena must protect all employees from a hostile work environment, including the silent and fearful ones. Civil rights laws function only when EEOC can hear from everyone. While denial of enforcement would shield employees, it also would shield unlawful misconduct. EEOC requests enforcement of its subpoena.

Respectfully submitted,

U.S. EQUAL EMPLOYMENT
OPPORTUNITY COMMISSION

/s/______________________________
DEBRA M. LAWRENCE
Regional Attorney
Philadelphia District Office
31 Hopkins Pl., Suite 1432
Baltimore, MD 21201
410 801-6691
Debra.lawrence@eeoc.gov

CERTIFICATE OF SERVICE

I hereby certify that the above-referenced document was served this 11th day of February, 2026 via ECF to all counsel of record.

/s/______________________________
Debra M. Lawrence