**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION,<br><br>　　　　　*Petitioner,*<br><br>　　v.<br><br>THE TRUSTEES OF THE UNIVERSITY OF PENNSYLVANIA, et al.,<br><br>　　　　　*Respondents.* | CIVIL ACTION<br>NO. 25-6502 |

**Pappert, J.**                                                              **March 31, 2026**

### MEMORANDUM

Based on public statements by the University of Pennsylvania's president and others affiliated with the school that individuals had been subject to antisemitism on Penn's campus, United States Equal Employment Opportunity Commissioner Andrea K. Lucas issued in December of 2023 a charge that Penn engaged in a pattern or practice of harassment of Jewish employees in violation of Title VII of the Civil Rights Act of 1964.  In July of 2025, the EEOC issued an administrative subpoena to gather evidence relevant to that charge.  The EEOC viewed this as a "garden variety" use of one of its common investigative methods, where it seeks contact information for possible victims of the employer's alleged misconduct or witnesses thereto.  But unlike investigations into, for example, sexual harassment or racial discrimination, the subpoena sought information pertaining to people's faith, making its requests more intrusive and calling for greater sensitivity, something the EEOC now acknowledges.

One of those requests in particular sought, among other things, lists of school groups and organizations "related to the Jewish religion," including personal contact

1

information for Penn employees in those groups.  Though ineptly worded, the request had an understandable purpose—to obtain in a narrowly tailored way, as opposed to seeking information on all university employees, information on individuals in Penn's Jewish community who could have experienced or witnessed antisemitism in the workplace.  Penn resisted the subpoena on various grounds and when the parties could not resolve their differences, the EEOC filed this subpoena enforcement action.

Penn and other groups and associations the Court permitted to intervene significantly raised the dispute's temperature by impliedly and even expressly comparing the EEOC's efforts *to protect Jewish employees from antisemitism* to the Holocaust and the Nazis' compilation of "lists of Jews."  Such allegations are unfortunate and inappropriate.  They also obfuscate the Court's limited role and the discrete legal issues before it.  And the EEOC no longer seeks any employee's specific affiliation with a particular Jewish-related organization on campus.

For their legal arguments, respondents contend the charge of discrimination is invalid and the subpoena violates the United States Constitution in various ways.  But the charge is valid and the constitutional claims are easily dispensed with.  The Court grants accordingly the EEOC's application for enforcement and orders Penn to respond to the subpoena, though without revealing any employee's affiliation with a specific organization.

I

A

Title VII of the Civil Rights Act of 1964 makes it unlawful for an employer "to discriminate against any individual with respect to his" "terms" or "conditions" "of

employment, because of such individual's . . . religion." 42 U.S.C. § 2000e–2(a)(1). This language prohibits an employer from maintaining a hostile work environment on the basis of religion. *Vance v. Ball State Univ.*, 570 U.S. 421, 427 (2013). To secure the "effective enforcement of private rights" under Title VII, *Gen. Tel. Co. of Nw., Inc. v. EEOC*, 446 U.S. 318, 326 (1980), Congress created the EEOC, a five-member, bipartisan commission whose mission is to investigate and eliminate unlawful employment discrimination, 42 U.S.C. § 2000e–4(a). The EEOC's investigatory powers are "broad." *Gen. Tel. Co.*, 446 U.S. at 333.

A "charge of discrimination," a written document alleging an employer has engaged in unlawful discrimination, triggers the EEOC's enforcement responsibilities. *University of Pa. v. EEOC*, 493 U.S. 182, 190 (1990); 42 U.S.C. § 2000e–5(b). Either an aggrieved employee or, relevant here, an EEOC commissioner may file a charge. 42 U.S.C. § 2000e–5(b). A commissioner may do so if she has reason to think an employer has engaged in a pattern or practice of discrimination. *EEOC v. Shell Oil Co.*, 466 U.S. 54, 62 (1984). (An employer engages in a pattern or practice of discrimination if discrimination was its "standard operating procedure." *Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 336 (1977).) It is "fairly common" for a commissioner to file a pattern-or-practice charge based on publicly available information so employees do not have to "com[e] forward [on their own] and accus[e] their employer" of wrongdoing. (Tr. of Oral Arg. at 10:12–16, EEOC.) After a commissioner files a charge, the EEOC must notify the employer within ten days. 42 U.S.C. § 2000e–5(b).

The EEOC then investigates the charge to determine whether there is reasonable cause to believe it is true. *Id.* If no reasonable cause exists, the EEOC must

3

dismiss the charge, but if reasonable cause exists, the EEOC attempts to eliminate the unlawful employment practice through informal means, such as persuasion. *Id.* If informal means fail, the EEOC may bring an enforcement action against the employer in federal court. *Id.* § 2000e–5(f)(1).

To enable the EEOC to make its reasonable-cause determination, Title VII "confers a broad right of access." *University of Pa.*, 493 U.S. at 191. In connection with its investigation, the EEOC may issue administrative subpoenas to obtain evidence "relevant to the charge." 42 U.S.C. § 2000e–8(a); *see id.* § 2000e–9; 29 U.S.C. § 161(1). After the EEOC issues a subpoena, an employer may petition the EEOC to revoke or modify it. 29 U.S.C. § 161(1). If the EEOC denies the petition, and the employer still refuses to obey the subpoena, the EEOC may apply to a federal court for enforcement. *Id.* § 161(2).

B

In the wake of Hamas's October 2023 terrorist attack on Israel, Penn students and employees experienced "pernicious acts of antisemitism" on Penn's campus. (Then-University President Elizabeth Magill, Nov. 1, 2023 at 1, Dkt. No. 1-9.) Among other things, they were subject to hateful antisemitic messages, including swastikas, on academic buildings. (Magill, Nov. 3, 2023 at 1, Dkt. No. 1-11); (Magill, Nov. 9, 2023 at 1, Dkt. No. 1-13); (Magill, Nov. 10, 2023 at 1, Dkt. No. 1-14.) They endured "hateful rhetoric" and public chants that "glorif[ied] the terrorist atrocities of Hamas" and "celebrate[d] and praise[d] the slaughter and kidnapping of innocent" Jewish people. (Magill, Nov. 10, 2023 at 1); (Magill, Nov. 3, 2023 at 1.) And certain Penn employees received disturbing emails threatening violence because of their Jewish faith. (Magill,

4

Nov. 6, 2023 at 1, Dkt. No. 1-12.)  All of this "brought tremendous pain to Jewish students, faculty, and staff."  (Magill, Nov. 10, 2023 at 1.)

On December 8, 2023, EEOC Commissioner Andrea Lucas issued a sworn charge of discrimination, alleging Penn "engaged in a pattern or practice of harassment based on national origin, religion, and/or race against Jewish employees, in violation of Title VII."  (Comm'r's Charge, Dkt. No. 1-4.)  Specifically, Commissioner Lucas alleged Penn, since November of 2022, failed to provide Jewish faculty, staff and other employees a work environment free from religious harassment.  (*Id.*)  She premised her charge on "publicly available information"—including, among other sources, a federal lawsuit against Penn and President Magill's statements.  *See* (*id.*).

On July 23, 2025, the EEOC issued an administrative subpoena to obtain from Penn contact information of potential employee victims or witnesses of antisemitic harassment.  (Subpoena No. Pa. 25-07, Dkt. No. 1-20); (Tr. of Oral Arg. at 158:5–6, EEOC.)  While the EEOC initially considered subpoenaing all Penn employees' contact information, it decided not to do so, assuming Penn would object on grounds of relevance.  (Tr. of Oral Arg. at 15:13–19, EEOC.)  The EEOC also believed it could not effectively investigate Commissioner Lucas's charge by calling 20,000 individuals, (*id.* at 15:21, EEOC), as it is "short-staffed" and has "tremendous inventory," (*id.* at 20:8–9, EEOC.)

Accordingly, the EEOC sought to identify primarily employees "aligned with the Penn Jewish community."  (*Id.* at 15:24–25, EEOC.)  Such employees, the EEOC believed, would be reasonably likely to have information relevant to Commissioner Lucas's charge.  (*Id.*)  The EEOC could not demand from Penn all employees' contact

information and their religious affiliation. (*Id.* at 15:1–12, EEOC.) While federal law requires employers to maintain data on, among other things, employees' race and sex, the same is not true of religion. (*Id.*) And so, while the EEOC can subpoena employers for employees' contact information and race and sex in racial and sexual harassment cases, *see, e.g.*, *In re AAM Holding Corp.*, 153 F.4th 252, 262 (2d Cir. 2025), it cannot issue similar subpoenas in religious harassment cases.

The EEOC's subpoena therefore seeks, among other things, (1) the names of employees who reported antisemitic harassment to Penn; (2) the Jewish-related organizations on campus and the private contact information (personal phone number, email address and mailing address) of the employee members in each organization; (3) the private contact information of employees in Penn's Jewish Studies Program; (4) the private contact information of employees who participated in Penn's March 2024 listening sessions on antisemitism; and (5) the private contact information of employees who received a Penn survey on antisemitism. (Subpoena No. PA 25-07 at 5–7.)

Penn petitioned the EEOC to revoke or modify the subpoena, and later, the EEOC largely denied the petition. (EEOC Appl. for an Enforcement Order at 16–17, Dkt. No. 1) Penn still refused to obey the subpoena, and the EEOC moved for enforcement. (*Id.*) The Court permitted the American Academy of Jewish Research, Penn's Jewish Law Students Association, the American Association of University Professors, Penn's chapter of the American Association of University Professors and the Penn Association of Senior and Emeritus Faculty to intervene as respondents. *EEOC v. Trs. of Univ. of Pa.*, No. 25-6502, 2026 WL 281132, at *1–4 (E.D. Pa. Feb. 3, 2026).

6

Each intervenor has members who are Penn employees in Jewish-related organizations on campus or the Jewish Studies Program. *Id.* at *1.

Penn and the intervenors oppose the subpoena on various grounds, primarily that it requires Penn to disclose the affected employees' affiliation with specific Jewish-related organizations on campus. (Penn's Answer at 22, Dkt. No. 20); (Intervenors' Answer at 28–29, Dkt. No. 21.) That, they argue, will reveal sensitive information, such as whether an employee is a Zionist or an anti-Zionist, or whether he supports or opposes Israel. (Penn's Answer at 22); (Intervenors Answer at 28–29.) Appreciating this concern, the EEOC now seeks to obtain the contact information of employees in Jewish-related organizations "without reference to any[] [employee's] particular organizational affiliation." (EEOC's Reply to Penn's Answer at 6, Dkt. No. 36); (EEOC's Reply to Intervenors' Answer at 6, Dkt. No. 43.) The EEOC, in other words, "doesn't care who belongs to what association." (Tr. of Oral Arg. at 33:1–2, EEOC.)

## II

The Court's role in this administrative subpoena enforcement action is "sharply limited." *EEOC v. City of Norfolk Police Dep't*, 45 F.3d 80, 82 (4th Cir. 1995) (citation omitted). It must determine if the charge of discrimination is valid, whether the subpoena seeks information relevant to the charge and whether the subpoena unduly burdens Penn. *McLane Co. v. EEOC*, 581 U.S. 72, 76–77 (2017); *see also* (Penn's Answer at 14–19).

## A

To be valid, a charge of discrimination "should" contain, among other things, a "clear and concise statement of the facts, including pertinent dates, constituting the

alleged unlawful employment practice[].” 29 C.F.R. § 1601.12(a)(3); 42 U.S.C. § 2000e–5(b); *Shell Oil Co.*, 466 U.S. at 68–82. The Supreme Court has long given this regulation a “sensible” interpretation in the context of a commissioner’s pattern-or-practice charge. *Shell Oil Co.*, 466 U.S. at 73. “Insofar as he is able, the Commissioner should identify the groups of persons that he has to reason to believe have been discriminated against, the categories of employment positions from which they have been excluded, the methods by which the discrimination may have been effected, and the periods of time in which he suspects the discrimination to have been practiced.” *Id.* at 73. This four-part test is “minimal,” *EEOC v. Bellemar Parts Indus., Inc.*, 865 F.2d 780, 781 (6th Cir. 1989), or “fairly lenient,” *EEOC v. Bashas’, Inc.*, No. 09-0209, 2009 WL 3241763, at \*15 (D. Ariz. Sep. 30, 2009), and “must be applied pragmatically,” *EEOC v. Quad/Graphics, Inc.*, 63 F.3d 642, 647 (7th Cir. 1995).

Penn does not dispute that the charge satisfies three components of *Shell Oil*’s test. (Penn’s Answer at 14–16.) It alleges Penn has discriminated against Jewish individuals. (Comm’r’s Charge.) It specifies the affected employment positions: faculty, including tenured, non-tenured and adjunct professors, staff and other employees. (*Id.*) And it contends the discrimination has allegedly occurred since November of 2022. (*Id.*)

Penn challenges the charge on the grounds that it fails to allege a method of discrimination, arguing it has “no idea what [the charge] is about.” (Tr. of Oral Arg. at 43:2–3, Penn.) That is not so. The charge fairly alleges Penn failed to provide Jewish faculty, staff and other employees a work environment free from religious harassment in the form of antisemitic slurs, messages and threats of violence. That is sufficient to state a method of discrimination under *Shell Oil*.

8

To begin, the charge identifies the "type of discrimination" Penn allegedly committed. *Quad/Graphics, Inc.*, 63 F.3d at 648. Title VII makes it illegal for employers "to discriminate against any individual with respect to his" "terms" or "conditions" "of employment, because of such individual's . . . religion." 42 U.S.C. § 2000e–2(a)(1). This language prohibits the maintenance of a hostile work environment based on religious harassment. *Vance*, 570 U.S. at 427; *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 64–65 (1986); *Abramson v. William Paterson Coll. of N.J.*, 260 F.3d 265, 276–77 (3d Cir. 2001). A hostile work environment on the basis of religion has five elements: (1) an employee was subjected to harassment because of his religion; (2) the harassment was severe or pervasive; (3) the harassment detrimentally affected the employee; (4) the harassment would detrimentally affect a reasonable person; and (5) there is a basis for employer liability. *Abramson*, 260 F.3d at 276–77. The facts necessary to hold an employer liable for harassment depend on the status of the harasser. *Vance*, 570 U.S. at 427–28. If the harasser is a supervisor, the employer is automatically liable unless it can prove an affirmative defense: that it exercised reasonable care to deter the abuse and that the employee did not take advantage of the corrective opportunities provided. *Id.* at 428–30. If, instead, the harasser is a coworker or a nonemployee, the employer is liable if it acted negligently in failing to prevent the abuse. *Id.* at 424; *Lockard v. Pizza Hut, Inc.*, 162 F.3d 1062, 1074 (10th Cir. 1998) ("[T]he same standard of liability applies to both co-worker and [nonemployee] harassment."). A hostile work environment (especially in a pattern-or-practice case) is therefore "composed of a series of separate acts" of harassment. *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 117 (2002). Commissioner Lucas alleged Penn

9

maintained a hostile work environment based on religious harassment against Jewish faculty, staff and other employees.  (Comm'r's Charge.)  The charge identifies a form of discrimination under Title VII.  *Vance*, 570 U.S. at 427; *see also id.* at 452 (Ginsburg, J., dissenting) (stating the "creation of a hostile work environment . . . is a form of proscribed discrimination").

The charge also incorporates by reference specific factual allegations that informed Penn of the acts of harassment employees may have experienced on campus. (Tr. of Oral Arg. at 99:12–18, EEOC.)  Commissioner Lucas identified the "publicly available information" that prompted the charge including, among other things, a federal-court complaint against Penn and the public statements by Magill and others connected to the school.  (Comm'r's Charge.)

The federal-court complaint refers to the case of *Yakoby v. Trustees of University of Pennsylvania*, No. 23-4789, 2025 WL 1558522 (E.D. Pa. June 2, 2025).  *See* (Penn's Answer at 14–15).  There, three Jewish students sued Penn before Commissioner Lucas issued the charge, alleging Penn tolerated a hostile educational environment.  (Compl. ¶¶ 2–3, Dkt. No. 1-2, Dec. 5, 2023, Case No. 23-4789.)  Specifically, the plaintiffs alleged that in recent years Jewish individuals on Penn's campus have been subject to "vile and threatening antisemitic slurs and chants" and messages on academic buildings.  (*Id.* ¶ 2.)  They accused Penn of, among other things, hiring "antisemitic professors who call for anti-Jewish violence."  (*Id.* ¶ 1.)  And they alleged Penn failed to appropriately respond to all this harassment.  (*Id.*)

In addition, one month before the charge's issuance, Magill made several announcements, one of which described "vile, disturbing antisemitic emails that

threatened violence" against certain Penn employees.  (Magill, Nov. 6, 2023 at 1.)  The emails contained "hateful language," targeting the employees because of their Jewish faith.  (*Id.*); *see* (Letter from WilmerHale to Louis Marino at 6, Dkt. No. 20-3).  Magill stated that Penn responded to this incident by sweeping certain areas on campus to prevent violence.  (Magill, Nov. 6, 2023 at 1.)

These factual references—all of which Penn acknowledges—bolster Commissioner Lucas's charge that Penn failed to provide Jewish faculty, staff and other employees a work environment free from harassment in the form of hateful and vile antisemitic slurs, messages and threats of violence.

The charge therefore ensures Penn has "some idea of [its] nature."  *Shell Oil Co.*, 466 U.S. at 75.  First, it gives Penn "fair notice" of the allegations.  *Id.* at 79.  Second, the charge "would enable [Penn] . . . to undertake its own inquiry into its employment practices and to comply voluntarily with the substantive provisions of Title VII."  *Id.*  Indeed, Penn cites many things it has done to "combat antisemitism" since the charge's issuance.  (Letter from WilmerHale to Jamie Storey at 4, Dkt. No. 20-13.)  As one example, in December of 2024, Penn created the Office of Religious and Ethnic Interests to "investigat[e] and attempt[] to resolve reports alleging discrimination or harassment based on a person's actual or perceived religion."  (*Id.*)  Finally, the charge alerts Penn to the sort of employment records that might be relevant to the EEOC's investigation—for example, records of employees who have made allegations of antisemitic harassment.  *Shell Oil Co.*, 466 U.S. at 79.

Penn responds the charge fails to reference "employee complaint[s]," "allegation[s] made by or concerning employees" or any "specific workplace incident."

(Penn's Answer at 14.)  But this argument conflicts with the "sensible" interpretation the Supreme Court has given the statement-of-facts requirement.  *Shell Oil Co.*, 466 U.S. at 73.  Because a commissioner can "rarely . . . identify any single instance of discrimination until the Commission has gained access to the employer's personnel records," she has no obligation to describe "the persons injured, when and how" in the charge.  *Id.*  And in any event, by incorporating the factual allegations described above in her charge, Commissioner Lucas put Penn on notice of the acts of harassment employees may have experienced in the workplace.

Penn also contends the charge fails to state a claim under Federal Rule of Civil Procedure 12(b)(6).  If the EEOC filed a complaint in federal court using the charge's language, Penn argues, a judge "would dismiss the complaint from the outset."  (Tr. of Oral Arg. at 66:11–16, Penn.)  Therefore, Penn concludes, "[t]here's no way [Commissioner Lucas's charge] constitutes a [valid] charge."  (*Id.* at 66:17–18, Penn.)  But a "charge of employment discrimination is not the equivalent of a complaint initiating a lawsuit."  *Shell Oil Co.*, 466 U.S. at 68.

Penn next claims the information referenced in the charge fails to demonstrate a hostile work environment.  It argues the District Court in *Yakoby* dismissed the plaintiffs' complaint, noting "Penn has responded to the antisemitic incidents . . . on its campus and has made efforts to redress these problems."  *Yakoby*, 2025 WL 1558522, at *7.  It points out it responded to the threatening emails Jewish employees received. (Letter from WilmerHale to Louis Marino at 6.)  And it says that "protests" and "expressions" on "matters of public concern" on its campus "do not equate to . . . harassment."  (Penn's Answer at 15.)  But the Court may not use a subpoena

enforcement action "as an opportunity to test the strength of the underlying [charge]." *McLane Co.*, 581 U.S. at 76.

Finally, Penn relies on two federal-court opinions which hurt, not help, its position. In the first, an EEOC commissioner charged that an employment agency (1) classified or referred applicants for jobs in a way that deprived or tended to deprive them of opportunities because of sex and (2) failed or refused to refer for employment individuals because of sex. *EEOC v. Superior Temp. Servs., Inc.*, 56 F.3d 441, 443 (2d Cir. 1995). Applying *Shell Oil*, the Second Circuit Court of Appeals held this charge "plainly" alleged two methods of discrimination, noting Title VII makes it unlawful for employers to "classify . . . applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities . . . because of such individual's . . . sex" and "to fail or refuse to refer for employment . . . any individual on the basis of his . . . sex." 42 U.S.C. § 2000e–2(a)(2), (b); *Superior Temp. Servs., Inc.*, 56 F.3d at 445–46. If a commissioner can state valid methods of discrimination by broadly alleging an employer classified employees in a way that deprived them of opportunities because of sex and failed to refer for employment individuals on the basis of sex, Commissioner Lucas's charge is valid. It described the type of discrimination (hostile work environment) and referenced specific instances of harassment on Penn's campus that employees may have experienced (antisemitic slurs, messages and threats of violence).

In the second case, two women filed charges against their former employer alleging hostile work environment. *EEOC v. Grinnell Fire Prot. Sys. Co.*, 764 F. Supp. 623, 624 (D. Kan. 1991). Applying *Shell Oil*, the District Court held the charges were

valid because they alleged "sexual harassment" that "took the form of foul and sexually vulgar language, and physical contact of a sexual nature." *Id.* at 626.  Here, the charge alleges hostile work environment based on religious harassment in the form of derogatory language, messages and threats of violence.

B

The EEOC may obtain evidence "relevant to the charge under investigation."  42 U.S.C. § 2000e–8(a).  The relevance standard is not "particularly onerous."  *EEOC v. Kronos Inc.*, 620 F.3d 287, 296 (3d Cir. 2010).  It permits the EEOC to seek "virtually any material that might cast light on the allegations against the employer."  *Shell Oil Co.*, 466 U.S. at 68–69.

The EEOC's subpoena easily clears this low bar.  Commissioner Lucas alleges Penn subjected Jewish employees to a hostile work environment based on religion.  The EEOC now seeks, relevant here, the contact information of employees in (1) Jewish-related organizations on campus (absent identification of any employee's affiliation with a specific organization) and (2) the Jewish Studies Program.  (Subpoena No. Pa. 25-07 at 5–7); (Penn's Answer at 17–18.)  Such employees are reasonably likely to have information relevant to whether Penn subjected Jewish employees to religious discrimination.  *See In re AAM Holding Corp.*, 153 F.4th at 262.

Penn offers little in response.  It argues Jewish-related organizations on campus are "connected to the educational environment at Penn, not the workplace."  (Penn's Answer at 17.)  And it contends the charge did not state that Penn maintained a hostile work environment within the Jewish Studies Program in particular.  (*Id.* at 18.)  But again, employees in Jewish-related organizations and academic programs are

14

reasonably likely to have information relevant to whether Penn maintained a hostile work environment on the basis of antisemitic harassment.  *See In re AAM Holding Corp.*, 153 F.4th at 262.

Penn also contends the EEOC's request for information is underinclusive.  It asserts employees unconnected to Jewish-related organizations or the Jewish Studies Program may also have information relevant to Commissioner Lucas's charge.  But Penn cites no authority for the proposition that Title VII's relevance requirement imposes an underinclusiveness limitation.  And had the EEOC cast a wider net, as it initially contemplated, Penn would argue that the subpoena is overly broad and burdensome.  The subpoena seeks contact information for employees most likely to have information relevant to the charge.  That suffices for relevancy.

Penn finally argues the EEOC may not use its "investigatory powers to find evidence" to "justify[]" a commissioner's charge.  (Penn's Answer at 18.)  But Congress gave the EEOC broad investigatory powers—including subpoena power—so it could obtain evidence relevant to a charge.  And the EEOC does not use its subpoena power to hunt for facts to "justify" a charge.  The EEOC is a "neutral fact finder," "not an advocate for the charging party."  EEOC Compliance Manual § 602.3 (1988).  Its sole job at this stage is to determine if "there is reasonable cause to believe that the charge is true."  42 U.S.C. § 2000e–5(b).

C

Whether a "subpoena is overly burdensome turns on the nature of the materials sought and the difficulty the employer will face in producing them."  *McLane Co.*, 581

15

U.S. at 81.  The overly burdensome limitation is "difficult" to prove.  *EEOC v. United Air Lines, Inc.*, 287 F.3d 643, 653 (7th Cir. 2002) (citation omitted).

Penn offers no "metric" for the Court to assess whether the subpoena imposes an undue burden.  *EEOC v. Ferrellgas, L.P.*, 97 F.4th 338, 350 (6th Cir. 2024).  It estimates neither the number of documents the subpoena will require it to produce, nor the cost to produce those documents or the hours of work compliance demands.  *Walsh v. Alight Sols. LLC*, 44 F.4th 716, 726–27 (7th Cir. 2022).  And it makes no argument the subpoena threatens its normal business operations.  *EEOC v. Citicorp Diners Club, Inc.*, 985 F.2d 1036, 1040 (10th Cir. 1993); *EEOC v. Md. Cup Corp.*, 785 F.2d 471, 479 (4th Cir. 1986).

Penn primarily responds that the EEOC may conduct its investigation in another way.  Penn offers to inform its employees of the EEOC's investigation so they may contact the EEOC directly if they wish to do so.  (Penn's Answer at 18–19.)  But this has nothing to do with whether the subpoena imposes a difficult burden.  *McLane Co.*, 581 U.S. at 81.  And Title VII entrusts the EEOC, not an employer, to "make an investigation" of a charge, 42 U.S.C. § 2000e–5(b), giving the EEOC broad "discretion in deciding how to investigate," *EEOC v. Randstad*, 685 F.3d 433, 451 (4th Cir. 2012). Nothing in Title VII permits an employer to dictate how the EEOC investigates a charge.  42 U.S.C. § 2000e–5(b).

Penn also argues the subpoena "would markedly degrade [its] ability to . . . access private confidential information from its employees."  (Tr. of Oral Arg. at 77:5–8, Penn.)  Specifically, it claims enforcement of the subpoena would harm its ability to provide "avenues for . . . employees . . . to come forward [with] information about bad

16

things that have happened to them." (*Id.* at 77:14–16, Penn.) Penn seems to focus here on the subpoena's request for the names of employees who reported antisemitic harassment to Penn. It apparently believes enforcement of the subpoena would deter employees from reporting harassment in the future. But this argument also has nothing to do with whether the subpoena imposes an undue burden on Penn. *McLane Co.*, 581 U.S. at 81. And permitting Penn to shield the names of employees who reported harassment would give it a "potent weapon" to interfere with the EEOC's investigation. *University of Pa.*, 493 U.S. at 194 (citation omitted).

## III

Penn, along with the intervenors, also contend the subpoena violates the United States Constitution in various ways. It does not.

## A

They argue first the subpoena offends the affected employees' substantive due process right to informational privacy. A two-part test governs this claim. The Court must first determine whether the information at issue falls "within the ambit of materials entitled to privacy protection." *United States v. Westinghouse Elec. Corp.*, 638 F.2d 570, 577 (3d Cir. 1980). Only "highly personal" non-public facts that involve "the most intimate aspects of human affairs" suffice. *Nunez v. Pachman*, 578 F.3d 228, 232 (3d Cir. 2009) (citation omitted). If the Constitution protects the information, the Court must balance the Government's interest in collecting it against the employees' interest in keeping it private. *Westinghouse Elec. Corp.*, 638 F.2d at 578–80.

Penn argues the affected employees have a privacy interest in (1) their mailing addresses and personal phone numbers and (2) the fact that they participated in Penn's

17

listening sessions on antisemitism and received a Penn survey on antisemitism. (Penn's Answer at 20–21.)  But this information is unlike a person's medical records, *Westinghouse Elec. Corp.*, 638 F.2d at 577, prescription medications, *Doe v. Se. Pa. Transp. Auth.*, 72 F.3d 1133, 1138 (3d Cir. 1995), HIV diagnosis, *Doe v. Delie*, 257 F.3d 309, 316 (3d Cir. 2001), sexual identity, *Sterling v. Borough of Minersville*, 232 F.3d 190, 196 (3d Cir. 2000), or debts and salary, *Fraternal Ord. of Police, Lodge No. 5 v. City of Philadelphia*, 812 F.2d 105, 115 (3d Cir. 1987).  While such materials may reveal "intimate facts of a personal nature," mailing addresses, phone numbers, participation in a campus event and receipt of a school survey do not.  *Westinghouse Elec. Corp.*, 638 F.2d at 577.

Penn relies principally on two cases.  In the first, the United States Supreme Court held federal agencies could not disclose the home addresses of civil service employees to collective-bargaining representatives consistent with a provision of the Freedom of Information Act, which protects against clearly unwarranted invasions of personal privacy.  *U.S. Dep't of Def. v. FLRA*, 510 U.S. 487, 494–95 (1994).  In the second, the Pennsylvania Supreme Court remarked in passing that the Commonwealth's Constitution provides some measure of privacy protection for home addresses and phone numbers.  *Allegheny Reprod. Health Ctr. v. Pa. Dep't of Hum. Servs.*, 309 A.3d 808, 902 (Pa. 2024).  But a federal statute and a state constitution do not dictate the scope of the right to informational privacy under the United States Constitution.  *E.B. v. Verniero*, 119 F.3d 1077, 1103 n.23 (3d Cir. 1997).

Penn also argues its employees have a privacy interest in the fact that they have affiliations with Jewish-related organizations on campus and the Jewish Studies

18

Program.  (Penn's Answer at 20.)  But Penn does not show that this information is even private.  Information is private if it is "general[ly] unavailab[le]" and a person "treat[s]" it as "confidential."  *Fraternal Ord. of Police, Lodge No. 5*, 812 F.2d at 116.  Penn offers no argument as to whether its employees' mere affiliation with Jewish-related organizations and the Jewish Studies Program is generally unavailable, or whether the employees treat this information as confidential.  And as the EEOC points out, the Jewish Studies Program lists its faculty and staff members' names and pictures on its public-facing website.[1]  *People*, *Penn Arts & Sciences: Jewish Studies Program*, https://jwst.sas.upenn.edu/people (last visited March 30, 2026).  Penn doesn't respond to this.

Finally, respondents argue the affected employees have a privacy interest in both their private contact information and the fact that they are in some Jewish-related organization on campus because disclosure will create a "serious safety risk." (Intervenors' Answer at 29); *see also* (Penn's Answer at 21).  Information may be protected if disclosure threatens "personal security."  *Paul P. v. Verniero*, 170 F.3d 396, 402 (3d Cir. 1999).  In *Kallstrom v. City of Columbus*, 136 F.3d 1055 (6th Cir. 1998), for example, three undercover officers testified against gang members in a criminal case. *Id.* at 1059.  During trial, the City of Columbus disclosed the officers' names and addresses along with the names and addresses of the officers' relatives.  *Id.*  Because the gang had a "propensity for violence" and would "likely . . . seek revenge," the Sixth

---

[1]    The EEOC cannot rely on the work contact information of employees listed on the Jewish Studies Program's website.  It seeks the employees' personal information because it wishes to contact them without Penn monitoring any communications.

19

Circuit held substantive due process protected the officers' personal information.  *Id.* at 1063–65.

Respondents offer no evidence to show enforcement of the subpoena would create a "substantial risk of serious bodily harm."  *Id.* at 1064.  They refer first to Nazi Germany.  Penn, for example, argues "allowing regimes to collect lists of Jewish people has not boded well for their safety."  (Statement of Penn's Am. Assoc. of Univ. of Professors at 2, Dkt. No. 20-14.)  And the intervenors assert the EEOC seeks to "establish a central registry of the University's Jews" which may result in "frightening implications" based on "historical echoes."  (Intervenors' Answer at 28.)  But comparing the EEOC's investigation into antisemitism at Penn with Nazi Germany is counterproductive, as counsel acknowledged by attempting to backtrack from such analogies.  (Tr. of Oral Arg. at 89:2–5, Penn.)

Respondents next believe the EEOC may publicly disclose the affected employees' information which may lead to acts of private violence.  (Penn's Answer at 22); (Intervenors' Answer at 29.)  But as the Court explains below, respondents offer no evidence to show a reasonable probability the affected employees' information will become public.  And they offer no evidence to show that, if their information did become public, the affected employees would face a credible risk of harm.  They state the Nation's "political environment" is "saturated with unvarnished hate, including antisemitism."  (Intervenors' Answer at 29); (Penn's Answer at 21–22.)  But this "generalized" statement "fall[s] well short of the [requisite] substantial, direct, and individualized risk of bodily harm."  *Gore v. Lee*, 107 F.4th 548, 564 (6th Cir. 2024).

Even if the subpoena seeks protected information, the EEOC is "justified" in accessing it based on a "balancing of [the] competing interests." *Westinghouse Elec. Corp.*, 638 F.2d at 580. To begin, the EEOC has a "substantial" interest in investigating the charge of discrimination. *Id.* at 579. Title VII is "central to the federal policy of prohibiting wrongful discrimination in the Nation's workplaces." *University of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 342 (2013). Commissioner Lucas issued a valid charge of discrimination, alleging Penn engaged in systemic discrimination against Jewish employees. And in issuing a subpoena pursuant to that charge, the EEOC seeks to vindicate the "public interest" in investigating charges of workplace discrimination. *Gen. Tel. Co.*, 446 U.S. at 326.

Next, the EEOC has a "reasonable need" for the information. *Westinghouse Elec. Corp.*, 638 F.2d at 579. The EEOC seeks to contact (1) employees who reported harassment to Penn, (2) employees in Jewish-related organizations and the Jewish Studies Program and (3) employees who participated in Penn's listening sessions and received Penn's antisemitism survey because they are reasonably likely to have information relevant to whether Penn maintained for Jewish employees a hostile work environment on the basis of religion. Neither Penn nor the intervenors, moreover, have shown the affected employees are "likely to suffer any adverse effects from [the] disclosure to [EEOC] personnel." *Id.* The EEOC routinely uses employees' contact information during investigations to "protect[]" their rights under Title VII. *Id.*

Finally, Title VII protects against "unauthorized disclosure" of the information. *Id.* A "statutory penalty for unauthorized disclosures" is sufficient to safeguard employee information submitted to the Government. *Fraternal Ord. of Police, Lodge*

21

*No. 5*, 812 F.2d at 118.  Under Title VII, it is "unlawful for any officer or employee of the Commission to make public in any manner whatever any information obtained by the Commission pursuant to its authority . . . prior to the institution of any proceeding . . . involving such information."  42 U.S.C. § 2000e–8(e).  Any employee who violates this prohibition "shall be guilty of a misdemeanor and upon conviction . . . shall be fined not more than $1,000, or imprisoned not more than one year."  *Id.*

Penn and the intervenors take no comfort in the confidentiality mandate and reach for arguments to discredit it.  Penn argues the EEOC is "not immune to data breaches."  (Penn's Answer at 24.)  But "data breaches are a possibility any time the Government stores information."  *NASA v. Nelson*, 562 U.S. 134, 158 (2011).  The "mere possibility that security measures will fail provides no proper ground for a broad-based attack on government information-collection practices."  *Id.* (citation omitted).

Respondents also argue the Department of Government Efficiency coerced the Social Security Administration to share private information with it in violation of federal law.  (Tr. of Oral Arg. at 85:19–25, 86:1–4, Penn); (Intervenors' Answer at 14.)  Given this, they suggest DOGE may coerce the EEOC to share the affected employees' information.  (Tr. of Oral Arg. at 86:1–4, Penn.)  There is no evidence to support this argument.  Nothing in the record shows how DOGE coerced the Social Security Administration to share information, what information the Social Security Administration shared or what federal law the Social Security Administration violated.  The Court has no grounds upon which to conclude respondents have a reasonable justification for its purported fears.

The intervenors also argue the current presidential administration has "made an unprecedented push to share data across the federal government," and in support, cite a March 2025 executive order. (Intervenors' Answer at 14.) The order directs agency heads to, consistent with law, ensure that federal officials designated by the President or agency heads shall have access to, among other things, unclassified agency records and data. *See* Stopping Waste, Fraud, and Abuse by Eliminating Information Silos, 90 Fed. Reg. 13681 (2025). Nothing indicates the EEOC is required to share information it gathers during an investigation with other federal agencies.

Finally, the intervenors argue the affected employees' information may "fall into the wrong hands" within the Government because two online articles reported that current administration officials have ties to antisemites. (Intervenors' Answer at 14.) National Public Radio, for example, reported that a White House official worked on Andrew Tate's legal team and attended a Nick Fuentes rally. Tom Dreisbach, *Multiple Trump White House Officials Have Ties to Antisemitic Extremists*, NPR (May 14, 2025), https://www.npr.org/2025/05/14/nx-s1-5387299/trump-white-house-antisemitism. And the New York Times reported this same official said in a text message that he had a "Nazi streak." Katie Rogers, *In Trump's Washington, Hate is Not a Deal Breaker*, NEW YORK TIMES (Oct. 21, 2025), https://www.nytimes.com/2025/10/21/us/politics/trump-ingrassia-republicans.html. These are unserious political arguments, not serious legal ones which, as counsel admitted, undercut her position. (Tr. of Oral Arg. at 146:6–25, 148:1–9, Intervenors.)

B

Penn and the intervenors argue next the subpoena infringes the affected employees' right to associate with Jewish-related organizations on campus.  The First Amendment protects the "freedom of speech."  U.S. Const. amend. I.  The Supreme Court has long read the First Amendment to impliedly protect a right to associate with others to exercise the freedom of speech the Amendment expressly protects.  *Roberts v. U.S. Jaycees*, 468 U.S. 609, 622 (1984).  A three-step test governs respondents' free-association claim.  *Pi Lambda Phi Fraternity, Inc. v. University of Pittsburgh*, 229 F.3d 435, 442 (3d Cir. 2000).  Respondents must first show the affected employees engage in expressive association.  *Id.*  They must next demonstrate the subpoena significantly affects their ability to associate.  *Id.*  If they can make it past these first two steps, the EEOC must satisfy exacting scrutiny.  *Id.*

Respondents believe enforcement of the subpoena would make the affected employees less likely to participate in the Jewish-related organizations on Penn's campus to which they belong.  The parties initially dispute the second free-association element: whether the subpoena significantly affects the employees' right to associate. The EEOC suggests it does not because no evidence shows a "reasonable probability" enforcement of the subpoena would "subject [the affected employees] to threats, harassment, or reprisals [or other consequences] from either Government officials or private parties."  *Buckley v. Valeo*, 424 U.S. 1, 74 (1976) (per curiam).  The intervenors respond that they need not make this showing under *Americans for Prosperity Foundation v. Bonta*, 141 S. Ct. 2373 (2021).  *Bonta*, they assert, stands for the proposition that all compelled disclosure requirements implicating associational rights

24

automatically trigger exacting scrutiny.  (Tr. of Oral Arg. at 143:16–25, Intervenors.)

Like the parties, judges have taken different views on how to read *Bonta*.  *See, e.g.*,

*Ward v. Thompson*, No. 22-16473, 2022 WL 14955000, at \*1 (9th Cir. Oct. 22, 2022)

(order) (stating in a subpoena enforcement action that a party must initially show the

subpoena's enforcement would result in harassment or other objective consequences

that would deter association); *id.* at \*3 (Ikuta, J., dissenting) (arguing that under *Bonta*

any compelled disclosure requirements implicating associational rights automatically

trigger exacting scrutiny).  The Court need not decide who is correct because, assuming

exacting scrutiny applies, the EEOC satisfies it.

Under exacting scrutiny, there must be a substantial relation between the

subpoena and an important governmental interest, and the governmental interest must

"reflect the seriousness of the actual burden" imposed on the affected employees.  *Ams.*

*for Prosperity Found.*, 141 S. Ct. at 2383, 2385 (citation omitted).  The subpoena must

also be narrowly tailored to the interest it promotes.  *Id.* at 2384.

The EEOC has an important interest in investigating the charge of

discrimination.  *Id.* at 2386.  When the EEOC issues a subpoena pursuant to a valid

pattern-or-practice charge, it acts in the public interest to investigate allegations of

systemic discrimination in the workplace.  *Supra* Part III.A.

There is a substantial relation between the EEOC's interest and its subpoena.

*Ams. for Prosperity Found.*, 141 S. Ct. at 2385.  Commissioner Lucas alleges Penn

subjected Jewish faculty, staff and other employees to a hostile work environment

based on religion.  The subpoena seeks contact information for employees in Jewish-

25

related organizations because they are reasonably likely to have information relevant to the charge.

The EEOC's interest reflects the actual burden imposed on the affected employees' ability to associate with Jewish-related organizations on campus. *Id.* at 2387. The EEOC is no longer asking Penn to disclose any affected employee's membership in a particular organization. (EEOC's Reply to Penn's Answer at 6); (Tr. of Oral Arg. at 33:1–2, EEOC.) In compelled-disclosure cases, the Government usually compels organizations to reveal information about their members or supporters. *Ams. for Prosperity Found.*, 141 S. Ct. at 2384; *NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449, 461–63 (1958). Or the Government might compel an individual to disclose the particular organizations to which he belongs or supports. *Shelton v. Tucker*, 364 U.S. 479, 481 (1960). That is no longer the case here. Thus, while respondents assert that disclosing an employee's membership in a specific Jewish-related organization may reveal whether he or she is a Zionist or an anti-Zionist, or whether he or she supports or opposes specific political positions, *see* (Penn's Answer at 22); (Intervenors' Answer at 28), these burdens are misplaced. Because information provided in response to the subpoena will not reveal any employee's affiliation with a specific organization, it does not impose a burden akin to the one imposed in the typical compelled-disclosure scenario. *See, e.g.*, *Ams. for Prosperity Found.*, 141 S. Ct. at 2384; *NAACP*, 357 U.S. at 461–63.

Next, the subpoena does not require Penn to publicly disclose the affected employees' information, which "reduce[s] the burden" imposed. *Ams. for Prosperity Found.*, 141 S. Ct. at 2388. And as explained, respondents fail to show a reasonable

26

probability the EEOC will disclose the information to the public. *Id.* at 2388 n.*. Disclosure requirements can admittedly chill association even if there is no disclosure to the general public. *Id.* at 2388. In *Shelton*, for example, the Supreme Court addressed a 1958 Arkansas statute that compelled all public school teachers, as a condition of employment, to submit annually an affidavit of every organization to which they belonged or regularly contributed. *Shelton*, 364 U.S. at 480. In explaining why this statute imposed a burden on the teachers' right to associate, the Supreme Court noted that "the pressure upon a teacher to avoid any ties which might displease those who control his professional destiny would be constant and heavy." *Id.* at 486. Nothing suggests the EEOC would impose a "constant and heavy" pressure on the affected employees to deter them from associating with Jewish-related organizations on Penn's campus.

There is also little evidence to show that enforcement of the subpoena would objectively chill the affected employees' ability to associate. Only two of the intervenors submitted declarations regarding the effect the subpoena would have on their members' ability to associate with Jewish-related organizations. The president of the American Academy of Jewish Research is "concerned" that if the Court enforces the subpoena "students and scholars may be discouraged and intimidated from . . . participating in Jewish-identified academic, cultural, and religious organizations." (Teter Decl. at 3, Dkt. No. 40-1.) And the co-president of Penn's Jewish Law Students Association "fear[s]" that "people" may be "less likely to participate in the Jewish community on campus" if the subpoena were enforced. (Naimark Decl. at 4, Dkt. No. 14-4.) But these

27

"clearly articulated fears" of "harm generally alleged" do not suffice to outweigh the EEOC's interest in enforcing the subpoena.  *Buckley*, 424 U.S. at 71 (citation omitted).

Finally, the subpoena, particularly as modified by the EEOC, is narrowly tailored.  Narrow tailoring requires the EEOC to demonstrate its need for the information in light of less intrusive alternatives.  *Ams. for Prosperity Found.*, 141 S. Ct. at 2386.  But an alternative must be "[]adequate."  *Id.* at 2385.  And an alternative may be inadequate if it is ineffective.  *Id.* at 2386.

The intervenors propose two alternatives that they assert would address, in equal measure, the EEOC's interest in investigating Commissioner Lucas's charge. They contend Penn could tell its employees of the EEOC's investigation and provide them with contact information for the EEOC.  (Intervenors' Answer at 18–19.)  Or, they argue, the EEOC could invite Penn employees to contact it through a hotline.  (*Id.* at 19.)

These alternatives are "inadequate."  *Ams. for Prosperity Found.*, 141 S. Ct. at 2385.  The first forces the EEOC to speak through Penn.  "Messages from [the] EEOC to employees filtered through an employer always risk creating confusion, fear, and mistrust among recipients."  (EEOC's Reply to Penn's Answer at 3.)  And the EEOC makes a valid point when it says the proposal is "unlikely to yield" any reports of harassment because there is a significant risk employees will be less likely to approach the EEOC if they are told to do so by their employer.  (*Id.*)  Both proposals, moreover, prohibit the EEOC from contacting potential victims or witnesses of harassment directly.  Putting the burden on employees to come forward on their own defeats the point of a commissioner's charge of discrimination.  Commissioner Lucas issued the

28

charge based on publicly available information, so employees did not have to come

forward and accuse Penn of wrongdoing.  The EEOC seeks to investigate the charge by

contacting potential victims or witnesses of harassment and informing them of their

rights.  Employees may refuse to participate in the investigation, but the EEOC needs

the opportunity to talk to them directly to learn if they have evidence of discrimination.

In sum, the EEOC has an important interest in investigating the charge of

discrimination and the subpoena is substantially related to that interest.  The EEOC's

interest reflects the actual burden imposed on the affected employees, and the

subpoena is narrowly tailored.  *Ams. for Prosperity Found.*, 141 S. Ct. at 2388.[2]

C

The intervenors next contend the subpoena infringes upon their members' right

to academic freedom.  But their "claim does not fit neatly within any right of academic

freedom" that exists.  *University of Pa.*, 493 U.S. at 199.

Academic freedom is a "special concern of the First Amendment."  *Keyishian v.*

*Bd. of Regents of Univ. of State of N.Y.*, 385 U.S. 589, 603 (1967).  But this right

"inheres in [a] [u]niversity" and embodies the "right of self-governance in academic

affairs."  *Urofsky v. Gilmore*, 216 F.3d 401, 410 (4th Cir. 2000) (en banc).  It is the

"educational institution that has a right to academic freedom, not the individual

---

[2]    The intervenors also argue the subpoena chills political speech because it would force Penn
to identify employees who participated in Penn's listening sessions on antisemitism.  They assert, if
"participation in such [sessions] threatens to draw unwanted attention from the government,
employees' right to assemble and express their views free from the prospect of public exposure,
government surveillance, or retaliation are compromised." (Intervenors' Answer at 21.)  The briefing
on this claim is inadequate and the Court is unsure how to analyze it.  Assuming the claim fits the
compelled-disclosure mold, the Court rejects it for the reasons described above.  The EEOC has a
substantial interest in investigating the charge, and there is no dramatic mismatch between that
interest and the subpoena.  Employees who participated in the listening sessions are likely to have
information relevant to the charge.  The EEOC's interest reflects the actual burden imposed on the
affected employees and the intervenors' proposed alternatives are inadequate.

teacher." *Borden v. Sch. Dist. of Twp. of E. Brunswick*, 523 F.3d 153, 172 n.14 (3d Cir. 2008).  In other words, academic freedom implicates the right of a university to make its own judgments as to education. *Regents of Univ. of Cal. v. Bakke*, 438 U.S. 265, 312 (1978) (Powell, J.); *see also Sweezy v. New Hampshire*, 354 U.S. 234, 263 (1957) (Frankfurter, J., concurring).  The right to academic freedom permits a university "to choose who may teach, what may be taught, how it shall be taught, and who may be admitted to study." *Edwards v. Cal. Univ. of Pa.*, 156 F.3d 488, 492 (3d Cir. 1998) (citation omitted).

The EEOC's subpoena "effects no . . . usurpation" on Penn's ability to choose who may teach, what may be taught, how it shall be taught or who may be admitted to study. *University of Pa.*, 493 U.S. at 198.

D

The intervenors argue next the subpoena violates the Religious Freedom Restoration Act and the Free Exercise Clause of the First Amendment.  Here, the intervenors must initially show the subpoena substantially burdens their members' religious exercise.  42 U.S.C. § 2000bb–1(a); *Anspach ex rel. Anspach v. City of Phila., Dep't of Pub. Health*, 503 F.3d 256, 272 (3d Cir. 2007).

They argue enforcement of the subpoena would make it less likely for their members to engage in religious exercise.  (Intervenors' Answer at 23.)  At oral argument, they said members in the Jewish Law Students Association engage in religious exercise by, among other things, praying, studying the Torah and reading the Bible.  (Tr. of Oral Arg. at 123:3–12, Intervenors.)  Thus, the question is whether the

30

subpoena imposes a substantial burden on the Jewish Law Students Association's members' ability to collectively engage in religious exercise.

To show a substantial burden, the intervenors must demonstrate the subpoena puts "substantial pressure" on the members to "substantially modify" their religious exercise. *Mack v. Warden Loretto FCI*, 839 F.3d 286, 304 (3d Cir. 2016) (citation omitted). The intervenors do not cite, let alone apply, this standard. They broadly assert the subpoena violates RFRA and the Free Exercise Clause because it requires Penn to disclose that employees in the Jewish Law Students Association belong to some Jewish-related organization on campus. That, they argue without any record support, "risks" deterring individuals in the Jewish Law Students Association from "worshiping with" the group. (Intervenors' Answer at 24.) The Court assumes the intervenors here are relying on the declaration by the co-president of Penn's Jewish Law Students Association, which states he has a "fear" that "people" may be "less likely to participate in the Jewish community on campus" if the subpoena were enforced. (Naimark Decl. at 4.) But mere "subjective chilling effects" do not suffice under either RFRA or the Free Exercise Clause. *Vernon v. City of Los Angeles*, 27 F.3d 1385, 1395 (9th Cir. 1994). And the intervenors do not cite any case which would permit the Court to conclude otherwise.

E

Finally, the intervenors contend the subpoena violates the equal-protection guarantee the Supreme Court has read into the Fifth Amendment's Due Process Clause. Equal protection provides heightened scrutiny for federal laws premised on protected classifications, such as race, sex and religion. *United States v. Skrmetti*, 145

31

S. Ct. 1816, 1828 (2025); *Hassan v. City of New York*, 804 F.3d 277, 300 (3d Cir. 2015). A law classifies on the basis of a protected characteristic when it "grant[s] or den[ies] benefits" based on that characteristic. *Sessions v. Morales-Santana*, 582 U.S. 47, 58 (2017). In other words, when it "prescrib[es] one rule" for a particular group and "another [rule]" for another group. *Id.*

The intervenors argue the subpoena classifies based on religion because it refers to religion. But a subpoena's mere reference to religion does not mean it classifies based on religion. *See Skrmetti*, 145 S. Ct. at 1829.

An appropriate Order follows.

BY THE COURT:

*/s/ Gerald J. Pappert*

Gerald J. Pappert, J.